1  Alan Alexander Beck, SBN 276646
   Attorney at Law
2  4780 Governor Drive
   San Diego, CA 92122
3  Telephone: (619) 971-0414
   Email: ngord2000@yahoo.com
4
   Scott A. McMillan, SBN 212506
5  Michelle D. Volk, SBN 217151
   Sean E. Smith, SBN 288973
6  **The McMillan Law Firm, APC**
   4670 Nebo Dr., Suite 200
7  La Mesa, CA 91941-5230
   Tel. 619-464-1500 x 14
8  Fax. 206-600-5095

9  Attorneys for Plaintiff,
   Lycurgan, Inc.
10
                **UNITED STATES DISTRICT COURT**
11
               **SOUTHERN DISTRICT OF CALIFORNIA**
12

13  LYCURGAN, INC., a California         Case No.:14-cv-00548-JLS-BGS
    corporation, d/b/a Ares Armor,
14
             Plaintiff,                  **FIRST AMENDED COMPLAINT
15                                       FOR DAMAGES; DEPRIVATION OF
             vs.                         CIVIL RIGHTS (BIVENS ACTION);
16                                       INJUNCTIVE AND DECLARATORY
    B. TODD JONES, as Director of        RELIEF; JURY TRIAL DEMAND.**
17  the Bureau of Alcohol, Tobacco,
    Firearms, and Explosives, EARL       **(1) First Amendment
18  GRIFFITH, an individual,             (2) Second Amendment
    UNKNOWN NAMED                        (3) Fourth Amendment
19  TECHNOLOGIST, an individual,         (4) Fifth Amendment**
    UNKNOWN NAMED AGENTs I-
20  VII, individuals, and DOES I-XI, in  DEMAND FOR JURY TRIAL
    their individual capacities.
21
             Defendants.
22

23
         Plaintiff  LYCURGAN, INC., a California corporation, d/b/a Ares Armor
24
    alleges:
25
    / / /
26
    / / /
27
    / / /
28

**JURISDICTION**

1. This is a civil action for damages, equitable, and declaratory relief, brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

**VENUE**

2. Venue is proper in the Southern District of California pursuant to Title 28, United States Code, Section 1391(e)(1)(B), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

**PARTIES**

3. At all times relevant to this Complaint, Plaintiff LYCURGAN, INC. (hereinafter referred to as "Plaintiff" or "Lycurgan"), a California corporation, is a corporation which does business in San Diego County, California under the fictitious business name of "Ares Armor."  Plaintiff is a manufacturer and distributor of "sporting goods" merchandise, and "tactical" equipment used by law enforcement and military.  The subject merchandise which was the ostensible subject of the raid of March 15, 2014, is known in the sporting goods market as AR-15 variant "unfinished lower receiver." Unfinished lower receivers are marketed to be finished by hobbyists consumers as a component of a semiautomatic, magazine fed, sport-utility rifle of the style commonly referred to as an "AR-15."

4. During the subject raid on Lycurgan's premises, Defendants obtained possession of Lycurgan's customer list.   That "customer list" is "property" of Lycurgan and protected as an asset under California law according to California Civil Code section 3426.1, subd. (d).

5. Plaintiff Lycurgan's customers include:

    a.     Individuals who lawfully purchased such unfinished lower receivers prior to the BUREAU OF ALCOHOL, TOBACCO, FIREARMS,

First Amended Complaint

AND EXPLOSIVES deeming some unfinished lower receivers to be firearms. As a result of the incipient interpretation, and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES use of such interpretation to subsequently implement regulatory and criminal investigations against Plaintiff and its customers, those individual customers cannot sell or transfer such unfinished lower receivers in their possession, and to do so without declaratory relief by this Court would subject those customers to administrative or criminal sanction;

b.   Individual and business entity customers who are not federal firearm licensees and who have or sold the unfinished lower receivers  now deemed by the BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES to be a firearm. As a result of the new interpretation, these customers can no longer manufacture or sell unfinished lower receivers with characteristics defendants herein have now deemed to subject such products to regulation as a firearm. The new interpretation is inconsistent with law, regulation, and the prior interpretations and opinions of the BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, and these resulting inconsistencies render the affected customers unable to understand or comply with the law; and

c.   Individual and business entity customers who are not federal firearm licensees and who have sought to distribute a product similar to the subject  product now deemed by the BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES to be a firearm. These customers desire to distribute or resell their unfinished lower receivers with characteristics defendants herein have now deemed to subject such products to regulation as a firearm. Customers rely upon

fair and objective application of the laws and regulations regarding firearm purchases, modifications, manufacture, and sales in order to comply with the law in engaging in such activities with firearms or the constituent parts that may become firearms. In the absence of fair, consistent, and objective application of such laws and regulations, the resulting inconsistencies render affected customers unable to understand or comply with the law.

6.   Plaintiff Lycurgan and its customers have a reasonable expectation of privacy in their transactions of unfinished lower receivers and other non-regulated parts.  Further, the BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES and other Federal Government agencies are specifically prohibited from directly linking non-National Firearms Act firearms to their owners, as set forth in 18 USC § 926:

> "No such rule or regulation prescribed [by the Attorney General] after the date of the enactment of the Firearms Owners Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or disposition be established. Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation."

7.   Plaintiff has lost customers as a result of the customers' fear of the BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES and its agents and the unjustified and unlawful conduct described herein.

8.   Plaintiff Lycurgan brings the following claims set forth in First Claim for Relief, the Fourth Claim for Relief, the Eighth Claim for Relief, and the Ninth Claim for Relief, *infra*, on its own behalf as well as on behalf of its customers, and the remainder on its own behalf.

9.   Defendant B. TODD JONES, is the current Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE"), a subdivision of the

Department of Justice, and this suit is brought against him in his official capacity. Defendant B. TODD JONES is in charge of the federal agency, whose duties include regulating and enforcing the laws relating to the manufacture, sale, and distribution of "firearms."

10.   Defendant Earl Griffith is the Chief of the Firearms Technology Branch of the BATFE.   Defendant Griffith is sued in his individual capacity.

a.   Defendant Griffith falsely suggested that persons in the same class as Plaintiff, i.e., those in possession of the EP Arms unfinished lower receivers, were in possession of un-serialized firearms, or otherwise receivers or frames, a suggestion which he knew or reasonably should have expected would result in the deception of a judicial officer resulting in the issuance of search warrants, the execution of those warrants and such injury and upset resulting therefrom, and possible unjust criminal prosecution against the Plaintiff or those similarly situated as Plaintiff.

b.   Defendant Griffith intended to suppress the communication of information contained on the EP Arms unfinished lower receiver published through the "indexing" and use of different colored materials.

11.   Defendant Unknown Named Technologist  is sued in his or her individual capacity.

a.   Defendant Unknown Named Technologist is identified by the reference to him or her as "FTB Enforcement Officer {redaction}" at paragraph 19 of the Affidavit that deceptively formed the basis for the issuance of the Search Warrants executed against Plaintiff herein. [Exhibit E, p. 8, ¶ 19.]  Defendant Unknown Named Technologist falsely suggested that persons in the same class as Plaintiff were in possession of un-serialized firearms, or otherwise receivers or frames,

First Amended Complaint

a suggestion which he or she knew or reasonably should have expected would result in the deception of a judicial officer resulting in the issuance of search warrants, the execution of those warrants and such injury and upset resulting therefrom, and possible unjust criminal prosecution against the Plaintiff or those similarly situated as Plaintiff. In truth, those not "engaged in the business" of manufacturing firearms, i.e., such as Plaintiff's customers that are hobbyist-consumers completing unfinished lower receivers for their own personal use or education, rather than "as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured" need not affix a serial number to either their unfinished lower receiver, or a completed functional lower receiver.

b.  Plaintiff is informed and believes that Defendant Unknown Named Technologist falsely stated that he or she had "and determined that the material that comprises the main body of the variant lower receiver is formed at a different time in the manufacturing process than that which comprises the plug. As a result of the two plastics being poured at two different times, the receiver and plug being are formed in such a way that they are not adhered to each other. As such, the plug can be removed and the firearm can readily be placed into a firing condition." [Exhibit E, p. 8, ¶ 19.]

c.  Defendant Unknown Named Technologist intended to suppress the communication of information contained on the EP Arms unfinished lower receiver published through the "indexing" and use of different colored materials.

12.  Defendant Unknown Named Agent I is the affiant on that Affidavit signed in support of the Search Warrant executed on March 14, 2014. Despite an

First Amended Complaint

effort to determine the name of said Defendant, Plaintiff remains ignorant of the true name of Unknown Named Agent I and thus refers to such defendant accordingly.  A redacted copy of such warrant attested to by this defendant is attached hereto as Exhibit 'A'.

      a.    Defendant Unknown Named Agent I falsely attested that Plaintiff was in possession of un-serialized firearms, or otherwise receivers or frames, a suggestion which he or she knew or reasonably should have expected would result in the deception of a judicial officer resulting in the issuance of search warrants, the execution of those warrants and such injury and upset resulting therefrom, and possible unjust criminal prosecution against the Plaintiff or those similarly situated as Plaintiff.  In truth, those not "engaged in the business" of manufacturing firearms, i.e., such as Plaintiff's customers that are hobbyist-consumers completing unfinished lower receivers for their own personal use or education, rather than "as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured" need not affix a serial number to either their unfinished lower receiver, or a completed functional lower receiver.

      b.    Defendant Unknown Named Technologist intended to suppress the communication of information contained on the EP Arms unfinished lower receiver published through the "indexing" and use of different colored materials.

    13.  Defendants Unknown Named Agents II through VII, are those agents that participated in the search of the Ares Armor location in National City on March 15, 2014, who engaged in the vandalism of those premises, the asportation of the goods that were not listed on the inventory list, misused the comfort facilities, and damaged the furniture and fixtures therein.  Despite an effort to

determine the name of said Defendants, Plaintiff remains ignorant of the true name of Unknown Named Agents II through VII and thus refers to such defendants accordingly.

14.  Plaintiff is informed and believes, and based thereon, alleges that each of the Defendants designated as DOES 1 through 10 are intentionally or negligently responsible, in some manner, for the events and happenings described herein.  The true names and capacities of the various DOES are not known to Plaintiff.  Plaintiff is informed and believes that DOES 1 through 10 are special agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter referred to as "BATFE") who unlawfully obtained and executed a search warrant at the four San Diego County business locations of Plaintiff.  The BATFE has refused to disclose the names of its participating agents, including the affiant who applied for the search warrant.  Plaintiff will amend this Complaint to reflect the true names and identifies of the aforementioned parties at such time as they become known.

15.  At all times relevant to this Complaint, each Defendant DOE was an individual residing, on information and belief, in San Diego County, California, and an officer, agent, and employee of the BATFE.

16.  Plaintiff is informed and believes and on such basis alleges that at all relevant times, that the defendants including the Defendants DOES I-X (hereinafter referred to as "Defendants"), and each of them, were the knowing agents of one another, and that Defendants directed, ratified, and/or approved the conduct of each of the other Defendants, and each of their agents or employees, and are therefore vicariously liable for the acts and omissions of their co-defendants, their agents and employees, as more fully alleged herein.  Moreover, all of the Defendants, and each of them, agreed upon, approved, ratified, and/or conspired to commit all of the acts and/or omissions alleged in this Complaint.

## FACTUAL ALLEGATIONS

17.  Plaintiff Lycurgan brings this action against those Defendants sued in their individual capacities, to recover among other things: lost profits, impaired earning capacity, personal property damages, real property damages, remedies for violations of its Civil Rights, attorney's fees, costs of suit and expenses, compensatory, punitive and exemplary damages, and equitable relief, including restitution and injunctive relief.

## BACKGROUND

18.    Plaintiff was founded by former Marine Sergeant Dimitri Karras following his Honorable Discharge after eight years of service in foreign lands in defense of the United States.  Sgt. Karras had served in the Marines as infantryman, completing separate deployments in Theaters of Operation Iraq and then Afghanistan.   After eight years of service to this country, Mr. Karras was inspired to pursue the American Dream by starting a business which would provide manufacturing jobs utilizing skilled labor in San Diego County, California. Sgt. Karras is the Chief Executive Officer of Lycurgan, Inc., a California corporation d/b/a Ares Armor ("Lycurgan").

19.  Plaintiff Lycurgan began operations in Oceanside, California in 2010. Plaintiff began as a manufacturing business, designing and manufacturing backpacks, slings, cumberbunds and other textile based equipment for use by Marines and Soldiers.  With a phalanx of sewing machine operators, Plaintiff still manufactures that textile based equipment at its Industry Street, Oceanside location. Now, Plaintiff also manufactures polymer holsters.

20.  Although lacking formal training in business, Dimitri Karras had been trained in leadership and organization skills by the Marine Corps.  Although infantryman skills found little purpose in business, the values and traits instilled by the Marine Corps such as  courage, resourcefulness, flexibility and the ability

First Amended Complaint

1  to inspire proved applicable in building a company.[1]  Mr. Karras applied Marine

2  Corps principles such as "lead by example" and "make sound and timely

3  decisions" in the infant company.[2]  As a result, Lycurgan burgeoned.

4      21.  The principal business of manufacturing textile based tactical

5  equipment diverged into another line after Mr. Karras and other employees of

6  Plaintiff began making their own custom firearms.  Presently, Plaintiff Lycurgan

7  is a retailer of sporting goods and tactical equipment including clothing, firearm

8  components, and firearms related accessories.  Since 2011, through the present,

9  Plaintiff has provided milled or cast aluminum metal to its customers for those

10  customers to fabricate and assemble their own sport-utility firearms. Plaintiff

11  operates a small retail store in City of Oceanside, and one in National City.

12  Plaintiff also operates a sewing factory in Oceanside, sewing and assembling the

13  tactical gear.  Plaintiff maintains a fourth location for mail order fulfillment. In

14  addition, it operates a Website (www.aresarmor.com) through which it sells

15  sporting goods and tactical equipment, including "80%" AR-15 unfinished lower

16  receivers.

17      22.  From its modest beginnings in 2010 from Sgt. Karras's selling his

18  couch to finance Ares Armor, Plaintiff grew from a one person small business to

19  employ about 40 people at the time of the raid.  Plaintiff's operations grew from

20  no revenue, to a multi-million dollar operation employing for the most part, former

21  Marines or spouses of Marines.  In a time when manufactured goods are imported

22  into the United States, Plaintiff provided training to otherwise unskilled workers

23  and employment to skilled workers in manufacturing, and provided a starting point

24  for others in the retail distribution trade.

25      23.  In late 2013, Plaintiff began purchasing unfinished lower receivers from

---

[1] http://www.marines.com/being-a-marine/leadership

[2] http://www.marines.com/history-heritage/principles-values?nav=lp1

1  EP Arms, LLC ("EP Arms").  Said unfinished lower receivers are manufactured

2  using polymer material, rather than cast or forged metal.

3      24.  On or about July 20, 2013, Attorney Jason Davis ("Davis") whilst

4  acting on behalf of EP Arms, sent by FedEx a letter to Defendant Earl Griffith, in

5  his capacity as the Chief of the Firearms Technology Branch, Bureau of Alcohol.

6  Tobacco, Firearms, and Explosives, seeking clarification as to whether the

7  unfinished lower receiver manufactured by EP Arms was a "firearm" under the

8  ATF's interpretation of 18 U.S.C. § 921(a)(3) .  A copy of that letter is attached as

9  **Exhibit 'A'**.

10      25.  On or about February 7, 2014, Defendant Earl Griffith provided a

11  response to Davis's letter.  A copy of that letter is attached hereto as **Exhibit 'B.'**

12  Within that letter, Defendant Griffith articulated his misapprehension that the EP

13  Arms had manufactured a lower receiver with a empty fire-control cavity, and then

14  backfilled that cavity with a different colored polymer material: "We further note

15  that the fire-control cavity has been formed and then, at a later time, filled in with

16  plastic material. [Exhibit B, page 2.]   In truth and in fact: the fire-control cavity

17  *had not been* formed and then, at a later time, filled in with plastic material.

18      26.  On March 4, 2014, Davis responded by mailing a letter by FedEx to

19  Defendant Griffith, explaining that the "biscuit" of the EP Arms unfinished lower

20  receiver which Mr. Griffith had believed to be the filling, was actually

21  manufactured first, and then the remaining material had been formed surrounding

22  that biscuit.  A copy of that letter is attached hereto as **Exhibit 'C.'**

23      27.  The ATF responded to Davis's letter set forth at Exhibit 'C', in that

24  letter attached as **Exhibit 'D.'** That undated letter was written sometime after

25  March 4, 2014, and subject to further investigation and discovery to determine that

26  date: Defendant Griffith acknowledged his misapprehension of the manufacturing

27  process of the EP Arms unfinished lower receiver.  But, then Mr. Griffith provided

28  the additional reason, among others, that the biscuit differentiated the fire-control

1  area from the rest of the receiver and thus facilitated the process of making the

2  receiver into a functional firearm. [Exhibit D, page 6.] And, that the "fire control

3  area is created during the manufacturing process through the use of the biscuit."

4  [Id.]   Further, for the first time, Defendant Griffith claimed that the excess

5  material extending past the exterior walls of the casting, indicating the

6  approximate locations of the holes to be drilled for the selector, hammer, and

7  trigger pins comprised location "indexing" marks sufficient to classify the

8  unfinished lower receiver as a firearm.   [Exhibit D, pages 5-6.]

9     28.  Plaintiff is informed and believes, and based thereon alleges, that

10  Defendants EARL GRIFFITH, UNKNOWN NAMED TECHNOLOGIST, and

11  DOES XI-XIV, intentionally failed to affix a date to the Exhibit D.  The omission

12  was intentionally made in order to conceal the timing of the decision making

13  preceding and thereby provide "plausible deniability" of sinister intentions

14  preceding or contemporaneous with the threatening behavior by the ATF

15  beginning on or about March 9, 2014 towards Plaintiff herein.

16     29.  Plaintiff is informed and believes, and based thereon alleges, that the

17  rationale expressed by Defendants EARL GRIFFITH, UNKNOWN NAMED

18  TECHNOLOGIST, and DOES XI-XIV within Exhibit D was pretextual, and

19  merely intended to provide a basis to leverage a bargain with Plaintiff herein to

20  satisfy Defendant B. Todd Jones and the individually named defendants' covetous

21  urge to obtain Plaintiff's customer list.  Specifically, Plaintiff could either hand

22  over the customer list and its valuable supply of EP Arms unfinished lower

23  receiver, or face the ostensible threat of a raid, seizure, and a criminal prosecution

24  contrived from the reasoning set forth in the undated letter set forth in Exhibit D.

25            **The Subject Unfinished Lower Receivers Are Not Regulated**

26     30.  A "firearm" is defined pursuant to 18 U.S.C. § 921(a)(3) as:

27  (A) any weapon (including a starter gun) which will or is designed to

28     or may readily be converted to expel a projectile by the action of an

explosive; (B) the frame or receiver of any such weapon;

(C) any firearm muffler or firearm silencer; or

(D) any destructive device.

31.  A "firearm frame or receiver" is defined as:

"[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

32.  A firearm is *not* an unfinished receiver under 18 U.S.C. § 921(a)(3). See, *United States v. McMurty*, 24 Fed. Appx. 594 (7th Cir. 2001).  The *McMurty* Court, by a panel that included the Hon. Richard A. Posner, Circuit Judge, upheld a jury instruction that defined a firearm as:

"any weapon which will expel a projectile by the action of an explosive; or any weapon which is designed to expel a projectile by the action of an explosive; or any weapon which may be readily converted to expel a projectile by the action of an explosive; *or* the frame or receiver of such weapon."

[*United States v. McMurty*, 24 Fed. Appx. 594 (7th Cir. 2001)(*Emphasis added*).]

33.  Thereby, the law was well-established on March 14, 2014 that whether an unfinished receiver was "readily convertible" into a finished receiver was of no moment:  an unfinished receiver that is readily convertible into a finished receiver is still *not* a firearm.

34.  An unfinished lower receiver is akin to an incomplete engine block that requires additional cutting, sanding, and shaping before it will function and can be installed into an engine bay as part of a complete automobile.

35.  As sold to Plaintiff's customers, unfinished lower receivers cannot function as "receivers" in a "firearm" without undergoing significant machining work. Before an unfinished lower receiver can actually function as a receiver, the purchaser must perform additional machining and drilling using machining tools such as a drill press:

    a.     Machining out the Fire-Control Cavity

b.    Machining out the Trigger slot

c.    Drilling out the Pin and Safety Selector Holes.

36.   Only after this additional machining by the individual purchaser is performed is an unfinished lower receiver actually able to function as a "receiver" and thereby accept the attachment of other constituent firearm parts to become a part of a functional – and thereby legally regulated – "firearm."

37.   With the exception of the EP Arms unfinished lower receiver which the ATF has now deemed to constitute a "firearm," per federal law and regulation, unfinished lower receivers are not deemed to be firearms and are not subject to regulation by a state or federal agency.

38.   EP Arms manufactured an unfinished lower receiver that the ATF deemed through a letter which lacked a date, based on the characteristics described below, to constitute a "firearm" subject to regulation. (Exhibit D).

39.   While all unfinished lower receivers require extensive machining before they are considered firearms under federal law and regulation, with respect to the EP Arms unfinished lower receiver, the ATF claims two distinct characteristics and the manufacturing process of the precursor as transmuting an otherwise unregulated unfinished lower receiver into a firearm subject to regulation. The two apparently material characteristics are a contrast-color core piece (sometimes referred to as a "biscuit") and pre-cast indices to guide where an individual purchaser who machines a firearm receiver from the unfinished lower receiver should drill certain holes required to build a functioning firearm receiver. This latter feature, along with the colored biscuit, are collectively referred to by the ATF as "indexing." An unfinished lower receiver with these two additional characteristics will be hereinafter referred to as an "EP Arms unfinished lower receiver."  But for these two additional "indexing" features on an unfinished lower receiver, the ATF would not deem such an unfinished lower receiver to be a "firearm" subject to regulation. As set forth below, the ATF's use of these two

First Amended Complaint

1   characteristics to differentiate between an otherwise unfinished lower receiver and

2   a challenged unfinished lower receiver is a distinction without logical or legal

3   support, and the implementation of the policy by defendants regulating such

4   unfinished lower receiver is a violation of federal law and the First Amendment to

5   the United States Constitution.

6       40.   The ATF also alleged that a "fire-control cavity" was created during the

7   process of manufacturing the EP Arms unfinished lower receiver. It is ATF's long-

8   standing position that the creation of a "fire-control cavity" causes a precursor to

9   meet the definition of a "firearm."  ATF claims the process to make an EP Arms

10  unfinished lower receiver, requiring the creation of the biscuit first and the rest of

11  the precursor is formed around the biscuit, creates a "cavity" and consequently a

12  "firearm." (Exhibit D).

13      41.   **Distinction No. 1: The Biscuit**

14      a.    Unlike other unfinished lower receivers, there is a "reference" point

15            for where the fire-control cavity in the center of the precursor can be

16            machined out. The polymer material constituting the central area in

17            the EP Arms unfinished lower receiver where the "fire-control cavity"

18            will eventually be hollowed out is a different color from the other

19            surrounding portions of the precursor. Because of this, in the

20            extensive process of machining and transforming a precursor into a

21            functional "receiver," the EP Arms unfinished lower receiver

22            effectively has a color-coded "guide" indicating some of the

23            dimensions that need to be machined or drilled out of the unfinished

24            lower receiver by the person machining it into a firearm receiver.

25      b.    The creation of the EP Arms unfinished lower receiver is a two-part

26            process. First (Exhibit D, depicted on pg. 4), the lighter colored center

27            portion of the precursor is formed by using a liquid form of the

28            polymer material. This center material is identical to the material used

1    to make the full precursor, except for its color. This center portion is

2    referred to as the core-piece, or "biscuit."

3    c.    After the biscuit is cured for two days, it is then suspended in the

4    center of a mold. The biscuit has holes through it. When the

5    additional material is poured into the mold, it flows into and through

6    the biscuit's holes, forming interlocking "bars" that are permanent in

7    nature.

8    42. **Distinction No. 2: Positive Indexing**

9    a.    In the ATF's reasoning, further differentiating other unfinished lower

10    receivers from the EP Arms lower receivers of three cylindrical

11    projections on each side (six in total) extending beyond the surface of

12    the precursor indicating where the holes for the hammer and trigger

13    pins, and the safety selector hole, should be drilled. An individual

14    who purchases the EP Arms unfinished lower receiver must still drill

15    the holes on his or her own. The holes must be drilled with skill to

16    ensure that the holes are the correct diameters for the pins or safety

17    selector. This means using a drill press or other reliable method for

18    ensuring proper completion.

19    b.    Last, with the EP Arms unfinished lower receiver, as with every

20    unfinished lower receiver, the trigger slot has to be drilled out to

21    accommodate the trigger. Nothing in the EP Arms unfinished lower

22    receiver is different from any other precursor in this regard. The only

23    differentiation made by ATF is the presence of the colored biscuit and

24    indexing. As addressed below, these two distinctions are minor, non-

25    functional, and informational only and do not lawfully bring

26    otherwise unregulated unfinished lower receivers into the ambit of the

27    ATF's regulation as firearm receivers.

28    c.    Such positive indexing and color coding is for informational purposes

only, and is subject to protection as such under the First Amendment to the United States Constitution.  Obtaining a warrant on the account of providing material that bears indexing marks comprises a prior restraint on otherwise lawful speech and subjects the ATF's reliance on positive indexing to strict scrutiny.

d.    The EP Arms unfinished receivers, with the two indexing features incomplete, still require significant additional drilling and machining work to be performed by a purchaser in order to make them a functioning receiver.

43.   **Distinction No. 3: Alleged Creation of the "Fire-Control Cavity"**

a.    The "fire-control cavity" for complete receivers houses the parts making up the trigger group of the firearm, i.e. the moving parts that allow the firearm to discharge.   With respect to the EP Arms unfinished receiver, the ATF stated that during its manufacture the "fire-control cavity" was created.  But, as explained above, the creation of the precursor is a two-part process where the biscuit is created first and the rest of the precursor is formed around the biscuit. An actual "cavity" never exists during the creation of the EP Arms unfinished lower receiver. Nevertheless, ATF's knowing of its falsity, took the position that the biscuit was non-existent and therefore the EP Arms unfinished lower receiver was a therefore a "firearm." (Exhibit D).

44.   **Transforming the Unfinished Lower Receiver into a Functional "Receiver": Machining out the Fire-Control Cavity**

a.    Only by the extensive and time-consuming act of physically removing the biscuit and "bars" in their entirety using machinery can a fire-control cavity be created. The colored biscuit provides visual guidance of where a person must further machine the EP Arms

unfinished lower receiver in order to create a "fire-control cavity." Using great skill, an individual who purchases an EP Arms unfinished lower receiver must not only remove the biscuit during process of machining and drilling the EP Arms unfinished lower receiver into a functional firearm receiver, but that person must also machine away the 1/16 of an inch of polymer material surrounding the core. This 1/16 of an inch of material is the same color as the rest of the EP Arms unfinished lower receiver. Without removing the biscuit and the surrounding, undifferentiated material by precise machining, an individual cannot create a fire-control cavity large enough to accept the necessary trigger/hammer mechanism to create a functioning receiver.

b. Only after such painstaking machinations is a fire-control cavity sufficiently created for the finished product to eventually be deemed under federal law and regulations to be a "receiver" and thus a "firearm" that is regulated. Thus, even the presence of a different colored core does not obviate the need for additional significant and precise machining and drilling to be performed on the EP Arms unfinished lower receiver to make it a receiver under federal law and regulation.

45. **Drilling out the Pin and Safety Selector Holes**

a. To be clear, painstakingly machining out the fire control cavity in the manner described above is not sufficient by itself to create a functioning receiver because additional work is needed to make the Regulated Precursor able to accept a trigger/hammer mechanism.

b. In addition to drilling out the biscuit, holes for the hammer and trigger pins, and for the safety selector, must also be drilled into the sides of the EP Arms unfinished lower receiver before it can actually

function as a receiver for a firearm. These holes hold the pins that keep the hammer and trigger in place in the fire-control cavity. One of the holes needed to be drilled is the hole for placement of the firearm's safety switch selector.

46.  **The ATF's Historical positions on Unfinished Lower Receivers are inconsistent with the incipient position taken with the EP Arms unfinished lower receiver.**

a.  The ATF has repeatedly issued agency opinion letters finding that precursors do not qualify as a "frame" or "receiver" under federal law or regulations because precursors do not and cannot provide a housing for firing mechanisms, and because precursors require additional work in order to be put into a condition where they could accept firing mechanisms or have other firearm parts attached to make a functional firearm.

b.  Over the years, the ATF issued written opinions about unfinished lower receivers to at least four manufacturers confirming that such unfinished lower receivers lacking certain machining operations performed on them are not "firearms." See, e.g., ATF letter to Bradley Reece [attached as **Exhibit I**] ("an AR-10 type receiver blank which has no machining of any kind performed in the area of the trigger/hammer (fire-control) recess might not be classified as a firearm. [and] The sample is completely solid and un-machined in the fire-control recess area and, accordingly, is not a 'firearm' as defined in the GCA.") (emphasis in original); ATF letter to Quentin Laser, LLC [attached as **Exhibit F**] ("an AR-15 type receiver which has no machining of any kind performed in the area of the trigger/hammer recess might not be classified as a firearm.") (emphasis in original); and see also ATF letter to Kenney Enterprises, Inc. and ATF letter to

First Amended Complaint

80 Percent Arms , attached as **Exhibits G and H**.

c.    The ATF's prior opinions and rulings confirm that products which require (1) milling out the fire-control cavity, (2) drilling of the selector-level hole, (3) cutting the trigger slot, (4) drilling the trigger pin hole, and (5) drilling the hammer pin hole are not "firearms." The Unfinished Lower Receivers require all of these actions, and so cannot be considered "firearms" under law.

d.    In reliance on federal law and regulations, and on the ATF's prior opinions, interpretations and letter rulings regarding what constitutes a "firearm" "frame" or "receiver," Plaintiff and hundreds of other Americans have established businesses selling unfinished lower receivers.  Thousands of Americans have established businesses selling firearm accessories, and an estimated tens of thousands of Americans have purchased and currently possess unfinished lower receivers so they can make their own firearm.

e.    According to federal law and regulations, and the ATF's prior consistent opinions on this issue, only when a fire-control cavity is created is there an actual "frame" or "receiver" of a firearm that is properly subject to regulation.

f.    Notwithstanding the additional work required to turn an unfinished lower receiver into a functioning receiver, ATF now contends that the EP Arms unfinished lower receiver is a "firearm" under federal law. It so contends for two reasons:

i.    First, ATF claims that the process of making the EP Arms unfinished lower receiver created a "cavity."

ii.    Second, ATF claims the design of the core and the projections (respectively) constitute "indexing."

First Amended Complaint

47.  As it is sold, the EP Arms unfinished lower receiver must, in fact, be machined in ways that ATF has historically consistently approved, and does not require additional machining in the fire-control area. The excess material provides information to identify to the homebuilder, or hobbyist, and show that person finishing the unfinished lower receiver where to drill or machine.  Such information is protected by the First Amendment to the United States Constitution.

48.    ATF's recent, contrived and pretextual position regarding the EP Arms unfinished lower receiver  is arbitrary, and not based upon any of its prior opinions, rulings, or reasonings. Unfinished lower receivers and jigs have been on the market with ATF's explicit blessing for years.  Unlicensed manufacturers create and sell jigs to show the purchaser of unfinished lower receivers where to drill; the ATF has determined that these jigs, which perform the exact same function as the EP Arms unfinished lower receiver cylindrical and color indexing, to be permissible and not subject to regulation as consistent with historical application. Over the years, some of these jigs have evolved, and in some cases, have become integral to the unfinished lower receiver itself. These evolved jigs attach to the unfinished lower receiver allowing the consumer to complete the receiver more easily. (See **Exhibit J** included pictures of unfinished lower receivers and jigs.) Still, the ATF –  rightly and consistent with historical application -- has declared these integrated jigs do not somehow turn a nonfirearm into a regulated receiver. These unfinished lower receivers are no different from the EP Arms unfinished lower receiver in any legally-significant sense. They all require the fire-control cavity to be created by the purchaser and holes for the trigger, hammer, and selector to be drilled or machined by the purchaser.

49.  On information and belief, the ATF's decision to deem the EP Arms unfinished lower receiver to be receivers and thus regulate them as firearms was a decision made pursuant to an official or unofficial policy or practice of the ATF, and such decision and regulation was ratified by Defendant and Jones in his

1   official capacity as the head of the ATF, a subdivision of the federal Department

2   of Justice.  As head of the ATF, Jones is a policymaker for the ATF, against whom

3   injunctive relief issued by this court would be effective to modify or enjoin

4   unlawful activity by the ATF.

5       50.  As a result of the ATF arbitrarily, and in violation of federal law and

6   regulation, deeming the EP Arms unfinished lower receiver to be "receivers"

7   subject to regulation as "firearms," Plaintiff's customers have had their EP Arms

8   unfinished lower receiver they previously purchased rendered untransferable.

9       51.  By the ATF's incipient, arbitrary, and historically inconsistent

10   designation of the EP Arms unfinished lower receiver as a firearm, Plaintiff's

11   customers have also been unable to manufacture, transfer, or sell EP Arms

12   unfinished lower receiver, and have had prior sales or transfers of EP Arms

13   unfinished lower receiver brought within the ambit of a criminal act, potentially

14   making such customers unknowing criminals where they had no intent or notice

15   that sale or transfer of such a precursor required compliance with federal and state

16   laws regarding the transfer or sale of firearms.

17       52.  By the ATF's incipient, arbitrary, and historically inconsistent

18   designation of the EP Arms unfinished lower receiver as a firearm, all such

19   affected customers who engaged in the above activity who are federal firearms

20   licensees are subject to potential regulatory penalty, including revocation of their

21   FFL by defendants, and subject to potential criminal penalty. Such customers

22   potentially acquired, held, and disposed of EP Arms unfinished lower receiver

23   without recording such transactions as required under state and federal law for

24   firearm acquisitions and dispositions. Such customers are effectively in a state of

25   criminal and regulatory "limbo," subject to criminal prosecution until the statute of

26   limitations on such a "crime" runs, and in fear of losing their Federal Firearms

27   Dealer's License ("FFL") for an interminable period of time.

28       53.  As a further result of the ATF arbitrarily, and in violation of federal law

1   and regulation, deeming the EP Arms unfinished lower receiver to be a "receiver,"

2   Plaintiff's customers who wish to manufacture their own firearm, have been

3   denied the ability to purchase the EP Arms unfinished lower receiver for such

4   activity. Further, such customers are unaware whether products similar to the EP

5   Arms unfinished lower receiver now or in the future would be considered firearms

6   by defendants, and would require such licensees to acquire, dispose of, and record

7   such receivers they stock as firearms. In the event such licensees were obligated to

8   treat such unfinished lower receivers as firearms, or, alternatively, chose to treat

9   such objects as firearms due to the ATF's arbitrary and inconsistent rules and

10  regulations on the issue, such licensees would be subject to a hardship, insomuch

11  as treating such unfinished lower receivers as firearms would necessitate

12  serializing and recording each and every such precursor bought or sold by such

13  licensees, at significant cost for each such precursor acquired or disposed of.

14       54.  Plaintiff contends that the EP Arms unfinished lower receiver is not a

15  firearm within the meaning of 18 U.S.C. § 921(a)(3) and that the EP Arms

16  unfinished lower receiver is not a frame or receiver of a firearm within the

17  meaning of 27 C.F.R. § 478.11.

18                    **LYCURGAN d/b/a Ares Armor is a lawful business**

19       55.  The Gun Control Act of 1968 was enacted to reduce crime, not place an

20  undue burden on legal firearms owners from legal possession and use of firearms.

21  See GCA68, 90-618 sec. 101. The Gun Control Act of 1968 ("the Act") provisions

22  contained in Title 18, Chapter 44, provide by exclusion under the definitions of

23  prohibited conduct, that an otherwise not prohibited person may make a firearm as

24  described in section 18 USC 921(a)(3):

25       Section 922(a)(1)(A) of the Gun Control Act of 1968 (act)

26       provides that it is unlawful for any person except a licensed importer,

27       licensed manufacturer, or licensed dealer, to engage in the business of

28       importing, manufacturing, or dealing in firearms, or in the course of

1    such business to ship, transport, or receive any firearm in interstate or

2    foreign commerce. 18 U.S.C.S. § 922(a)(1)(A).

3         The Act defines a manufacturer as any person engaged in the

4    business of manufacturing firearms or ammunition for purposes of

5    sale or distribution; and the term "licensed manufacturer" means any

6    such person licensed under the provisions of this chapter. 18 U.S.C.S.

7    § 921(a)(10).

8         "Engaged in the business" as applied to a manufacturer of

9    firearms is defined as a person who devotes time, attention, and labor

10    to manufacturing firearms as a regular course of trade or business

11    with the principal objective of livelihood and profit through the sale

12    or distribution of the firearms manufactured. 18 U.S.C.S. §

13    921(a)(21)(C).

14         "With the principal objective of livelihood and profit" means

15    that the intent underlying the sale or disposition of firearms is

16    predominantly one of obtaining livelihood and pecuniary gain, as

17    opposed to other intents, such as improving or liquidating a personal

18    firearms collection: Provided, that proof of profit shall not be required

19    as to a person who engages in the regular and repetitive purchase and

20    disposition of firearms for criminal purposes or terrorism. For

21    purposes of this paragraph, the term "terrorism" means activity,

22    directed against United States persons, which—

23         (A) is committed by an individual who is not a national

24         or permanent resident alien of the United States;

25         (B) involves violent acts or acts dangerous to human life

26         which would be a criminal violation if committed within

27         the jurisdiction of the United States; and

28         (C) is intended—

1           (i) to intimidate or coerce a civilian population;

2           (ii) to influence the policy of a government by

3           intimidation or coercion; or

4           (iii) to affect the conduct of a government by

5         assassination or kidnapping.

6    18 U.S.C.S. § 921(a)(22)(C).

7    56.  Plaintiff Lycurgan does not sell firearms as defined under 18 USC

8 921(a)(3).   Plaintiff Lycurgan does not sell receivers or frames as defined under

9 18 USC § 921(a)(3)(B).

10    57.  Plaintiff Lycurgan does not hold a license issued by the ATF, nor is

11 Plaintiff required to be licensed by the ATF.

12          **ATF targets Lycurgan for Investigation**

13    58.   On or about December 2012, Special Agent Gordon Geerdes,

14 employed by the ATF, requested that Dimitri Karras provide the ATF Plaintiff

15 Lycurgan's customer list.  Karras refused to provide its customer list.

16    59.  On or about March 10, 2014, agents from the ATF communicated to

17 Plaintiff that the ATF was in the process of obtaining a warrant against Plaintiff

18 based upon the ATF's incorrect determination that the subject unfinished lower

19 receivers were firearms.   The ATF also communicated to Plaintiff Lycurgan that

20 so long as Karras relinquished both: all of the subject unfinished lower receivers,

21 and Plaintiff's customer list  to the ATF, then ATF would not obtain a warrant.

22    60.  Said ATF agents communicated words to the effect that "[in] exchange

23 for turning over our customer's private information the BATFE, the agents stated

24 that they would not " raid'" Plaintiff's facilities and would not pursue "criminal

25 charges."

26    61.  Said threats by the ATF agents were extortionate.  Said threats were

27 unlawful.

28    62.  Karras agreed to the ATF agents' terms in order to delay an impending

1   and unjust raid against Plaintiff long enough to obtain legal protection under the

2   law from this court.

3        63.   Plaintiff is informed and believes, and based thereon alleges, that the

4   promise to not pursue "criminal charges," i.e., a promise of immunity, was made

5   without basis, was false, and entirely unauthorized.   Plaintiff is further informed

6   and believes that the ATF agents were unable to promise or agree to any

7   immunity from prosecution or other consideration by a Federal Prosecutor's Office

8   or a Court in exchange for the demanded cooperation since the decision to confer

9   any such benefit lies within the exclusive discretion of the Federal Prosecutor's

10  Office and the Court.   Plaintiff is informed and believes, and based thereon

11  alleges, that said ATF agents had not consulted with any United States Attorney's

12  office prior to making such an offer of immunity.

13       64.   Plaintiff Lycurgan has an existing property interest in its reputation as a

14  law abiding business.

15       65.   Plaintiff Lycurgan has an existing property interest in its customer list,

16  and that such list has not been made available to the public.

17  / / /

18  / / /

19  / / /

20

21

22

23

24

25

26

27

28

**Plaintiff Lycurgan seeks relief in this Court**

66.  On March 11, 2014, Plaintiff filed the initial complaint herein in this case for deprivation of Civil Rights against the BATFE, styled as *Lycurgan, Inc. v. B. Todd Jones*.  Plaintiff then sought declaratory judgment that the EP Armory 80% lower receiver (Lycurgan's primary retail product) is not a firearm.  Plaintiff also sought a temporary restraining order and injunctive relief forbidding the BATFE and/or its officers, agents, servants, and employees from seizing Lycurgan's EP Armory inventory and customer list.  Lycurgan filed the complaint in response to the aforementioned demands from the BATFE to turn over Lycurgan's unfinished lower receiver parts and confidential customer list.

67.  On March 11, 2014, Judge Sammartino, District Judge for the District Court for the Southern District of California, granted Lycurgan's request for a temporary restraining order ruling:

"        Presently before the Court is Plaintiff Lycurgan Inc. DBA Ares Armor's ("Ares Armor") Motion for Temporary Restraining Order ("TRO"). (Mot. for TRO, ECF No. 2.) Ares Armor seeks to restrain Defendants B. Todd Jones—Head of the San Diego Field Office of the Bureau of Alcohol, Tobacco, Firearms and Explosives—and Does 1 through 10 (collectively, "ATF") from seizing the Ares Armor customer list and approximately $300,000 in inventory ("the Property") at 11 a.m. on Wednesday, March 12, 2014. (Id. at 1–2.)
        Having reviewed the materials submitted, the Court HEREBY ORDERS that any steps to deprive Ares Armor of the Property SHALL NOT be executed until after the Court holds a hearing as to whether a preliminary injunction should issue. ATF SHALL FILE an opposition to Ares Armor's Motion for TRO on or before Friday, March 14, 2014. Ares Armor MAY FILE a reply, if any, at or before 9 a.m. on Monday, March 17, 2014. The parties are HEREBY ORDERED to appear for a preliminary injunction hearing on Thursday, March 20, 2014, at 1:30 p.m. in Courtroom 4A.
        IT IS SO ORDERED."
[ECF No. 4.]

68.  On March 12, 2014, an ATF agent appeared at Plaintiff's office with the stated purpose of taking possession of Plaintiff's unfinished lower receivers and the customer list for those customers that had purchased the EP Arms unfinished lower receivers.  At that time, Plaintiff caused the ATF to be served with a copy of the Court's order issued on March 11, 2014 [ECF No. 4.].  Said

1   ATF agents left empty-handed.

2       69. On March 14, 2014, the United States Attorney's Office filed an ex

3   parte application challenging the temporary restraining order.  Paul J. Ware, the

4   Division Counsel for the Los Angeles Field Division, Bureau of Alcohol,

5   Tobacco, Firearms and Explosives (ATF) supported the ex-parte application with

6   his unverified statement referring to the EP Arms unfinished receivers as both

7   "receivers" and "firearms."  [ECF No. 5-1.]

8       70. On the same day, Judge Sammartino ruled on the United States's ex

9   parte application, stating:

> "      Presently before the Court is Defendants' Ex Parte Application
> for Order: (1) Extending Injunction to Prevent Divestment of Subject
> Matter of Temporary Restraining Order; and (2) Clarifying that
> Temporary Restraining Order Does NotRestrain Lawful Criminal
> Proceedings. (ECF No. 5.)
>       Having reviewed Defendants' Ex Parte Application, the Court
> finds Defendants' requested relief to be reasonable and equitable.
> Accordingly, the Court HEREBY ORDERS that: (1) Plaintiff
> Lycurgan Inc. DBA Ares Armor ("Plaintiff") and its owners, officers,
> managers, employees, and agents ARE HEREBY PROHIBITED from
> taking any steps to destroy, transfer, sell, or otherwise divest
> themselves of the items that are the subject matter of the Court's
> March 11, 2014 Temporary Restraining Order ("TRO") (see ECF No.
> 4);
> (2) the Court's March 11, 2014 TRO DOES NOT ENJOIN lawful
> criminal proceedings, including the application for or lawfully
> executed seizure of evidence and contraband pursuant to a search
> warrant issued by a sworn United States Magistrate Judge pursuant to
> Federal Rule of Criminal Procedure 41; and (3) the hearing on
> Plaintiff's motion for TRO SHALL REMAIN SCHEDULED for 1:30
> p.m. on Thursday, March 20, 2014. However, so that the parties may
> fully address all of the facts and circumstances as alleged by one
> another, the Court now orders that Defendants SHALL FILE a
> response to Plaintiff's motion at or before 9 a.m. on Monday, March
> 17, 2014. Plaintiff SHALL FILE a reply at or before 12 p.m. on
> Tuesday, March 18, 2014.
> IT IS SO ORDERED."

[ECF No. 6.]

       71. Plaintiff is informed and believes, and on that basis alleges, that all

Defendants were aware of the Court's partial modification of its prior restraining

order to allow "lawful criminal proceedings" as opposed to pretextual, baseless,

retaliatory, contrived, and otherwise unlawful criminal proceedings.

**Unknown Named Agent 1 makes false Affidavit before Magistrate**

72.  In the evening of March 14, 2014, Defendant Unknown Named Agent 1 appeared before Magistrate Judge Skomol, made application for search warrants for premises occupied by Plaintiff based on the facts set forth in the subject Affidavit.  A copy of the Affidavit, as redacted is, attached hereto as **Exhibit 'E.'**

73.  On or about March 14, 2014, Defendant Unknown Named Agent 1, with full knowledge of the Court's order limiting the proceedings to only those "lawful criminal proceedings," submitted a materially false affidavit to the Honorable Bernard G. Skomal of this Court for the purpose of applying for a search warrant (hereinafter referred to as "Warrant") authorizing the search of Lycurgan's four business facilities, all located in San Diego County, California.

74.  Magistrate Skomol relied upon the statements of Unknown Named Agent 1 within the Affidavit in making his decision to issue the search warrant.

75.  Based on the prevarications, dissembling, wilful non-disclosures and intentionally misleading statements contained therein, Magistrate Judge Skomol issued warrants for the search of four separate premises.

76.  Plaintiff is informed and believes that the BATFE's efforts to obtain the Warrant were undertaken to punish Plaintiff for refusing to turn over the customer list when it was demanded and then filing the lawsuit styled as *Lycurgan, Inc. v. B. Todd Jones*, 14CV0548.  Plaintiff is informed and believes that the BATFE conducted its ensuing raid on March 15, 2014 in order to moot the lawsuit of *Lycurgan, Inc. v. B. Todd Jones*, rather than as a sincere "crime control" effort.

77.  Plaintiff is informed and believes, and alleges herein and in greater detail below, that Defendants knowingly and intentionally provided the magistrate with false statements, misrepresentations and/or omissions to obtain the Warrant. Plaintiff is informed and believes that the affidavit (hereinafter referred to as "Affidavit") used to secure the Warrant misrepresented the manufacturing process of Lycurgan's 80% unfinished polymer receivers, which Defendants inaccurately

1   contended transformed the innocuous parts into "firearms."  Also, the Affidavit

2   omitted the fact that the BATFE previously determined that a virtually identical

3   unfinished lower receiver as that at issue in the Affidavit did not constitute a

4   "firearm" within the meaning of the Gun Control Act of 1968.  Plaintiff is

5   informed and believes that the magistrate who issued the Warrant was misled by

6   the information contained in the Affidavit; and, that Defendants knew the

7   information was false or would have known was false except for their reckless

8   disregard for the truth.  Plaintiff is informed and believes that, if these false

9   statements are excised and removed from the submitted Affidavit and the

10  wrongfully omitted information was included, the remaining contents of the

11  Affidavit are insufficient to support the issuance of the Warrant.

12       78.  In the morning of March 15, 2014, with the unlawfully and deceptively

13  obtained Warrant in hand – heavily armed personnel, draped in body armor, some

14  toting fully automatic weapons, all with pistols strapped to their thighs in urban-

15  assault/tactical configuration, conducted a simultaneous raid of Plaintiff's four

16  locations.  Agents of the BATFE entered the premises of Plaintiff Lycurgan's four

17  separate facilities, located at: (1) 206/208 N. Freeman Street, Oceanside, (2) 416

18  National City Blvd., National City, California, (3) 180 Roymar Street, Oceanside,

19  California, and (4) 2420 Industry, Oceanside, CA.  The raid was executed pursuant

20  to the Warrant, as redacted at Exhibit 'E.'

21                              **National City Raid**

22       79.  During the course of the search at 416 National City Blvd., National

23  City, California, the Defendants Unknown Named Agents II through VII

24  unnecessarily caused property damage and disarray.  Defendants Unknown Named

25  Agents II through VII damaged the door frames of the glass doors in order to enter

26  the building.  In order to gain entry rather than simply break the glass, which could

27  be inexpensively replaced, the Unknown Named Agents II through VII  caused

28  substantial destruction to the metal door frames through the use of a battering ram

1   against the aluminum.

2   80.  As an outward manifestation of the animus, one, or possibly more, of

3   Defendants Unknown Named Agents II through VII, used the restroom facilities at

4   the National City store in a manner intended to vex, shock, disgust and annoy

5   Plaintiff's principals and employees.

6   81.  Defendants Unknown Named Agents II through VII took valuable

7   Rudius unfinished pistol frames from the National City store.  Said items had an

8   aggregate value in excess of $950.  The items were owned by Plaintiff.  Plaintiff

9   did not consent to the Unknown Named Agents II through VII taking such items.

10  Defendants Unknown Named Agents II through VII intended to permanently

11  deprive Plaintiff of its property.

12  82.  Plaintiff is informed and believes, and based thereon alleges that the

13  Defendants Unknown Named Agents II through VII failed to provide a list of the

14  items taken in order prevent Plaintiff from recovering through legal process such

15  property as such items did not appear on the inventory of seized items for that

16  store.   Indeed, Plaintiff is informed and believes, based on the circumstances of

17  the raid, the level of vandalism, the gratuitous "tossing" of the premises, and the

18  circumstances preceding the raid, that Defendants Unknown Named Agents II

19  through VII intended to steal the Rudius unfinished pistol frames, and possibly

20  other items from Plaintiff.  Such acts comprise a violation of California Penal

21  Code section 487, e.g., "Grand Theft."

22  83.  Because Defendants Unknown Named Agents II through VII also

23  removed the computers with the-then existing inventory of the store within its

24  accounting system, through Defendants' conduct Plaintiff is impaired in

25  determining all that which had been pilfered by Defendants Unknown Named

26  Agents II through VII.

27  84.  Defendants Unknown Named Agents II through VII were observed

28  using the store's property to pack up the documents they seized.  Specifically,

1   defendants dumped the contents of Lycurgan's storage bins on the floor, and then

2   used the emptied bins to pack up the documents that they seized.  Papers were

3   strewn all about the store.

4       85.  Defendants Unknown Named Agents II through VII used a sledge

5   hammer that was at the National City store which had been used to do remodeling

6   to beat open a safe.  Members of the public watched through the window as the

7   National City store raid took place.  One of those members of the public recorded

8   a video of the agents beating the safe open.  That video has now been published on

9   Youtube.[3]  The safe is destroyed, and the sledge hammer itself is damaged.

10                              **Oceanside Raids**

11      86.  During the course of the search at 180 Roymar Street, Oceanside,

12  California, the BATFE agents took approximately 5,804 unfinished polymer parts

13  otherwise known as "unfinished polymer lower receivers."

14      87.  Plaintiff is the owner of the 5,804 unfinished polymer parts.

15      88.  Such 5,804 unfinished polymer parts are not "contraband" or "other

16  property that the person from whom the property was seized may not legally

17  possess" as such terms are used within the meaning of 18 U.S.C. § 983(a)(1)(F).

18  Nor are such 5,804 unfinished polymer parts "contraband" or "other property that

19  is illegal to possess" as such terms are used within the meaning of 18 U.S.C. §

20  983(d).

21      89.  The search and seizure of Lycurgan, and its pending criminal

22  investigation, has gained substantial public news coverage and attention.

23  Consequently, there is a cloud over Lycurgan, and customers are reluctant to

24  continue engaging in business with Lycurgan.  Before the search and seizure,

25  Lycurgan was a highly profitable small business.  Since the day of the search and

26  seizure, Lycurgan has been and continues to struggle simply to stay open.

27

28

[3] https://www.youtube.com/watch?v=6KFjjLXDZ4E

90.  On March 27, 2014, the BATFE purported to give notice of seizure and administrative forfeiture proceedings of 5,804 unfinished polymer parts otherwise known as "unfinished polymer lower receivers." ("Notice")   The BATFE referred to the proceeding as ATF Case Number:  784090-13-0011-01, Asset ID: 14-ATF-009592.

91. On April 5, 2014, Plaintiff submitted a Verified Claim for the seized property to the ATF's forfeiture division.

92.  On June 11, 2014, Lycurgan filed a motion to unseal the Affidavit in the case styled as *In the Matter of the Search of: Ares Armor, 206/208 N Freeman St, Oceanside; Ares Armor, 416 National City Blvd; Ares Armor Warehouse, 180 Roymar St, Suite  D; and 2420 Industry, Oceanside, CA*, Case No. 14CV1424 DMS JLB, United States District Court, Southern District of California.  On July 10, 2014, the Government opposed the motion.  On July 17, 2014, Lycurgan filed a response to the Government's opposition.  The matter was scheduled to be heard before Judge Sammartino on July 31, 2014.

93.  On July 3, 2014, the BATFE executed a written statement that it would not be instituting Civil Forfeiture Proceedings against the 5,804 EP Arms unfinished lower receivers seized from Plaintiff.

94.  On July 9, 2014, Plaintiff through its attorney of record made written request for the release of the subject unfinished polymer parts to Assistant United States Attorney assigned to a related action currently pending in this court entitled *Lycurgan, Inc., d/b/a Ares Armor, Petitioner v. Bureau of Alcohol, Tobacco, Firearms and Explosives, Respondent (In the Matter of the Search of: Ares Armor, 206/208 N Freeman St, Oceanside; Ares Armor, 416 National City Blvd; Ares Armor Warehouse, 180 Roymar St D; and 2420 Industry, Oceanside, CA)*, So. Dist. Cal. Case No. 14-cv-1424-JLS.   As of the filing of this First Amended Complaint, the Government has refused to return the 5,804 EP Arms unfinished lower receivers.

95. On July 10, 2014, the United States Attorney's office stated in an opposition filed within that related action opposing the disclosure of the affidavit which accompanied the request for the search warrant issued to effect the March 15, 2014 raid on Plaintiff's facilities, e.g., *Lycurgan, Inc., d/b/a Ares Armor, Petitioner v. Bureau of Alcohol, Tobacco, Firearms and Explosives, Respondent (In the Matter of the Search of: Ares Armor, 206/208 N Freeman St, Oceanside; Ares Armor, 416 National City Blvd; Ares Armor Warehouse, 180 Roymar St D; and 2420 Industry, Oceanside, CA)*, So. Dist. Cal. Case No. 14-cv-1424-JLS, that:

> "[i]n this case, there is an ongoing criminal investigation that is still in the early stage of its proceedings. Gov. Exh. 4.  To date, ***an indictment has not been sought or obtained*** . . ."

[Case 14-cv-1424-JLS; Docket 8, page 9 (***emphasis added***.)]

96. On July 16, 2014, Plaintiff initiated in the United States District Court for the Southern District of California an "anti-Forfeiture" action to recover its 5,804 EP Arms unfinished lower receivers styled *Lycurgan, Inc. v. Todd Jones*, *in his official official capacity as Director of the Bureau of Alcohol, Tobacco, and Firearms Enforcement*, case no. 3:14-cv-01679-JLS-BGS.   As of the date of the filing of this amended complaint, that case remains pending.

97. At the July 31, 2014 hearing in case 14-cv-1424-JLS, Judge Sammartino ordered the Government to file a supplemental brief to substantiate the continued sealing of the Affidavit.

98. On August 14, 2014, the Government, rather than substantiating the continued sealing of the affidavit through the requested supplemental briefing, filed and disclosed a redacted version of the Affidavit attached as Exhibit E. [Case 14-cv-1424-JLS; Docket 14-1.]

/ / /

/ / /

/ / /

# I.

## FIRST CLAIM FOR VIOLATION OF FIRST AMENDMENT
## (PRIOR RESTRAINT OF SPEECH - against B. TODD JONES)
### [Declaratory Relief, Injunctive Relief, Attorneys Fees]

99.   Plaintiff re-alleges, and incorporates herein as if set forth in full, paragraphs 1 through 98 above.

100.   Plaintiff, and its customers described above, have a right to engage in speech as protected by the First Amendment to the United States Constitution, which provides:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

101.   Plaintiff has an implied right to sue derived from the First Amendment to the United States Constitution, as first set out in *Bivens*, and as recently assumed in *Wood v. Moss*, 134 S. Ct. 2056, 2066 (U.S. 2014).

102.   Defendant B. Todd Jones as Director of the BATFE supervises a noncriminal process which provides letter determinations as to whether a submitted item is considered a "firearm" or a "receiver" by that agency.

103.   The technical specifications of AR-15 variant lower receivers are in the public domain.

104.   Defendant B. Todd Jones placed restrictions on items that contain indexing marks, including those unfinished lower receivers seized from Plaintiff. Indexing marks are non-functional and informational.   Indexing marks are "speech", which is protected by the First Amendment.  Defendant B. Todd Jones and his subordinates were aware of the legal authority set forth in *United States v. Prince*, 2009 U.S. Dist. LEXIS 54116 (D. Kan. June 26, 2009), holding that indexing marks on an otherwise unfinished lower receiver do not change the unfinished nature of such receiver.

105.   Defendant B. Todd Jones placed restrictions on items that contain

different color material, including those unfinished lower receivers seized from Plaintiff.  Different colored material is non-functional and informational.  Providing information or instruction through the use of different colors in the material is "speech", which is protected by the First Amendment.

106.  Defendant B. Todd Jones has issued determination letters finding that unfinished lower receivers are "firearms" or "receivers" merely due to the presence of indexing marks.  The indexing marks are "content" of the manufacturer's speech.

107.  Defendant B. Todd Jones has issued determination letters finding that unfinished lower receivers are "firearms" or "receivers" merely due to the presence of different colors of material.  The color differences in the material are "content" of the manufacturer's speech.

108.  Through the private determination process that Defendant B. Todd Jones oversees, he maintains a "licensing scheme" which lacks adequate safeguards to ensure prompt issuance of determination letters by failing to provide for definite and reasonable time limitations for action by the Agency resulting in the possibility of the suppression of constitutionally protected speech.

109.   Through his dramatic threats and well-publicized raids Defendant B. Todd Jones has restrained the manufacture and distribution of unfinished lower receiver merely based on the presence of indexing marks or differing colors of material without seeking prompt judicial review by the Agency, or providing an expeditious process within the Agency to pursue Administrative remedies and ultimately the possibility of judicial review.

110.  Defendant B. Todd Jones has engaged in censorship, yet has refused to justify the basis for the censorship.  Defendant B. Todd Jones maintains a regulatory scheme which places "unbridled discretion in the hands of a government official or agency" which constitutes a prior restraint on speech and has actually resulted in censorship.  Defendant B. Todd Jones maintains his prior

First Amended Complaint

restraints of speech without any time limit within which he is required to make a decision.

111.   Plaintiff's unfinished lower receivers have been seized based on the censorship policy of B. Todd Jones, and are being held without any time limit for when they may be recovered.

112.   Defendant B. Todd Jones's restrictions on the presence of indexing marks on an unfinished lower receiver does not further a compelling government interest, nor are the means used by Defendant B. Todd Jones narrowly tailored to accomplish that governmental interest. Defendant B. Todd Jones bears the burden of proof on the validity of the restriction on indexing marks that such restrictions are content neutral.

113.   Defendant B. Todd Jones' restrictions on the presence of different colored materials comprising an unfinished lower receiver does not further a compelling government interest, nor are the means used by Defendant B. Todd Jones narrowly tailored to accomplish that governmental interest. Defendant B. Todd Jones bears the burden of proof on the validity of the restriction against manufacturing unfinished lower receivers with different colored materials.

114.   Plaintiff requests that the Court declare Defendant B. Todd Jones's determination letter issuance procedures as facially violating the First Amendment to the U.S. Constitution, in general, and as applied to those unfinished lower receivers seized from Plaintiff.

115.   Defendants' conduct has discouraged Plaintiff from engaging in its business, and has chilled the publication of indexing marks on unfinished lower receivers. Defendants' conduct has discouraged Plaintiff from the distribution of color-coded unfinished lower receivers.  Absent directive from this court, Plaintiff and others will be likewise "chilled" in their exercise of the First Amendment Speech through the medium of unfinished lower receivers.

116.   Plaintiff requests that the Court issue Preliminary and Permanent

1  Injunctive relief against the Agency to desist and refrain from considering the

2  content of speech, including indexing marks and differing colors of material, to

3  determine that unfinished lower receivers are firearms or receivers.  Plaintiff

4  requests an award of its costs and fees according to 28 U.S. Code § 2412.

## II.

1  **SECOND CLAIM FOR VIOLATION OF FIRST AMENDMENT**

**(PRIOR RESTRAINT OF SPEECH -**

**As Against EARL GRIFFITH and UNKNOWN NAMED TECHNOLOGIST)**

**[Damages, Attorneys Fees]**

10  118.  Plaintiff re-alleges, and incorporates herein as if set forth in full,

11  paragraphs 1 through 98, and 100 through 116.

12  119.  Defendants Earl Griffith and UNKNOWN NAMED

13  TECHNOLOGIST were aware of the legal authority set forth in *United States v.*

14  *Prince*, 2009 U.S. Dist. LEXIS 54116 (D. Kan. June 26, 2009), holding that

15  indexing marks on an otherwise unfinished lower receiver do not change the

16  unfinished nature of such receivers.

17  120.  Defendants Earl Griffith and UNKNOWN NAMED

18  TECHNOLOGIST were familiar with the EP Armory unfinished lower receivers,

19  as such defendants had personally inspected a sample.  Defendants knew that the

20  color differences between the polymer used to manufacture the EP Armory

21  unfinished lower receiver were non-functional and solely informational.

22  Defendants knew that the indexing marks on the EP Armory unfinished lower

23  receiver were non-functional and solely informational.

24  121.  Defendants intended to prevent Plaintiff and others in possession of

25  the EP Armory unfinished lower receiver from selling, transferring, completing, or

26  distributing such items because those items had the differing colors of material

27  and the indexing marks.

28  122.  The indexing marks and different colors on EP Armory unfinished

1   lower receiver were and remain non-functional and solely informational, and

2   thereby protected by the Speech clause of the First Amendment to the United

3   States Constitution.

4       123.   The indexing marks and different colors were not directed at inciting

5   or producing imminent lawless action and nor were such marks likely to incite or

6   produce such action. (*Brandenburg v. Ohio*, 1969, 395 U.S. 444, 447, 89 S. Ct.

7   1827, 1829, 23 L. Ed. 2d 430.)

8       124.   This First Amendment right to provide information which is already in

9   the public domain for informational purposes is "clearly established" such that a

10   reasonable agent with the BATFE in Defendants' situation would know it is wrong

11   to attempt to suppress speech as to matters that are in the public domain, and

12   which are not not directed at inciting or producing imminent lawless action and

13   nor were such marks likely to incite or produce such action.

14       125.   Defendants UNKNOWN NAMED TECHNOLOGIST and EARL

15   GRIFFITH'S intentional conduct set forth above was a substantial factor in the the

16   issuance of a warrant as a consequence of their knowingly false characterization of

17   the EP Armory unfinished lower receiver as a firearm or receiver.

18       126.   Plaintiff has suffered damages, and requests compensatory and

19   punitive damages against Defendants UNKNOWN NAMED TECHNOLOGIST

20   and EARL GRIFFITH.

21   <center>**III.**</center>

22   <center>**THIRD CLAIM FOR VIOLATION OF FIRST AMENDMENT**</center>

23   <center>**(RETALIATION FOR EXERCISE OF RIGHT TO PETITION As Against**</center>

24   <center>**Unknown Named Agent I and DOES I-X)**</center>

25   <center>**[Damages, Attorneys Fees]**</center>

26       127.   Plaintiff re-alleges, and incorporates herein as if set forth in full,

27   paragraphs 1 through 98, 100 through 116, 118 through 124 above.

28       128.   Defendant Agent I and DOES I-X lacked probable cause to conduct a

---

First Amended Complaint

1   search.

2       129.   Plaintiff petitioned the court for declaratory and injunctive relief in the

3   case styled as *Lycurgan, Inc. v. B. Todd Jones*, 14CV0548, in response to the

4   BATFE threatening to raid Lycurgan's businesses if Plaintiff did not relinquish its

5   valuable and private customer list, and its valuable and legal EP Arms unfinished

6   lower receivers.

7       130.   Three days following the filing of the instant action, Defendants

8   Unknown Named Agent I and DOES I-X , and each of them, acting under the

9   color of their authority, obtained a Warrant through means of deception.

10   Defendants Unknown Named Agents II through VII thereafter, and as a

11   consequence of the events set in motion by Unknown Named Agent I and DOES

12   I-X,  executed an unreasonably destructive search and seizure that caused Plaintiff

13   to suffer unnecessary damages.

14       131.   Under the circumstances set forth above, Plaintiff had the right to

15   petition the government for a redress of grievances without retaliation under the

16   "redress" clause and the "speech clause" of the First Amendment of the

17   Constitution of the United States by filing a lawsuit in the United States District

18   Court.

19       132.   The First Amendment right to speak out against the Government,

20   publish information, and to bring lawsuits in court, is so "clearly established" such

21   that a reasonable agent with the BATFE in Defendants' situation would know it is

22   wrong to submit a false or misleading affidavit to a magistrate in applying for a

23   search warrant, execute a search and seizure without probable cause, and conduct

24   a search and seizure in an unreasonably destructive manner, all in retaliation

25   against Plaintiff for previously filing a lawsuit against the BATFE.

26       133.   As a direct and proximate result of Defendants' actions, Plaintiff has

27   suffered, and will continue to suffer, special and general damages to the extent and

28   in an amount subject to proof at trial.  Plaintiff has also incurred, and will continue

First Amended Complaint

1  to incur, attorneys' fees, costs and expenses, including those authorized by 42

2  U.S.C. section 1988, to an extent and in an amount subject to proof at trial.

3       134.  On information and belief, Defendants, and each one of them, acted

4  with malice and with the intent to cause injury to Plaintiff.  Defendants, and each

5  one of them, engaged in a willful conscious disregard for the probable

6  consequences for injury of Plaintiff in a despicable, vile and contemptible manner.

7  Plaintiff is entitled to an award of punitive damages for the purpose of punishing

8  Defendants, and to deter them and others from such conduct in the future.  (*Smith*

9  *v. Wade* (1983) 461 U.S. 30.)

10  ## IV.

11  ## FOURTH CLAIM FOR VIOLATION OF THE SECOND AMENDMENT

12  ## (As Against B. Todd Jones)

13  ## [Declaratory Relief, Injunctive Relief, Attorneys Fees]

14       135.  Plaintiff re-alleges, and incorporates herein as if set forth in full,

15  paragraphs 1 through 98, 100 through 116, 118 through 123, and 127 through 131

16  above.

17       136.  "A well regulated militia being necessary to the security of a free state,

18  the right of the people to keep and bear arms shall not be infringed."  Second

19  Amendment to the United States Constitution.

20       137.  The Second Amendment to the United States Constitution protects a

21  fundamental, individual right to keep, and to bear, arms for self defense. *District*

22  *of Columbia v. Heller*, 128 S.Ct. 2783 (2008).

23       138.  The right to possess firearms for protection implies a corresponding

24  right to obtain those objects necessary to use them, including those parts which are

25  not firearms.

26       139.  Persons in the United States, not otherwise disqualified, have a right to

27  manufacture, assemble, and purchase non-NFA receivers, frames, and firearms for

28  their own personal use.

140.  Plaintiff has a right, protected by the Second Amendment, to purchase, distribute, and sell any firearm-related item which is not a firearm, a frame, or a receiver, including the subject EP Arms Unfinished Lower Receivers.  Plaintiff's customers have a corresponding right under the Second Amendment to purchase the same.

141.  Plaintiff requests preliminary and permanent injunctive relief to prevent B. Todd Jones from attempting to curtail the ownership, purchase or sale of any firearm-related item which is not a firearm, a frame, or a receiver.

142.  Plaintiff requests preliminary and permanent affirmative injunctive relief to require B. Todd Jones to deposit all copies of the customer list, under seal, with the United States District Court, and to execute an affidavit under penalty of perjury, that all such other, remaining copies in the possession of the United States have been destroyed, pending the ultimate disposition of this action.  Further, Plaintiff requests that B. Todd Jones certify that the copy of the list has not been provided, copied, published, or otherwise transmitted to any third party.  Plaintiff requests an award of its costs and fees according to 28 U.S. Code § 2412.

## V.

## FIFTH CLAIM FOR VIOLATION OF FOURTH AMENDMENT

## (As Against Unknown Named Agent I, Unknown Named Technologist, Earl Griffith, and DOES I-X)

### [Damages, Attorneys Fees]

143.  Plaintiff re-alleges, and incorporates herein as if set forth in full, paragraphs 1 through 98, 100 through 116, 118 through 123, 127 through 131, and 136 through 140 above.

144.  Plaintiff had the right to be free from unreasonable search and seizure under the Fourth Amendment of the Constitution of the United States.  This Fourth Amendment right is "clearly established" such that a reasonable agent with the BATFE in Defendants' situation would know it is wrong to submit a false or

1   misleading affidavit to a magistrate in applying for a search warrant, execute a

2   search and seizure without probable cause, and conduct a search and seizure in an

3   unreasonably destructive manner. *Franks v. Delaware*, 438 U.S. 154; 98 S. Ct.

4   2674; 57 L. Ed. 2d 667 (1978). Defendants through the use of willful omissions,

5   falsehoods, prevarications, lies, reckless misstatement, convinced a Magistrate

6   judge to issue a warrant on:

7   　　"... probable cause to believe that Title 18 United States Code,

8   　　Sections 922 (a) (l)(A), 922 (t), and 371 have been violated, and that

9   　　the property, evidence, fruits and instrumentalities of these offenses,

10   　　more fully described in Attachment B of this Affidavit, are located at

11   　　the [Plaintiff's locations]."

12   (Exhibit E, p. 22.)   In fact, there was no probable cause for the warrant as:

13   　　a.　　Title 18 USC 922(a)(1)(A) provides that it

14   　　"It shall be unlawful for any person except a licensed importer,
15   　　licensed manufacturer, or licensed dealer, to engage in the business of
     　　importing, manufacturing, or dealing in firearms, or in the course of
     　　such business to ship, transport, or receive any firearm in interstate or
16   　　foreign commerce". [Internal divisions omitted.]

17   　　　　i.　　Defendants knew that no crime was being committed because

18   　　　　　　the subject EP Arms unfinished lower receivers are not

19   　　　　　　firearms, thus there is no prohibition in dealing, shipping,

20   　　　　　　receiving or transporting such items.

21   　　b.　　Title 18 USC 922(t) requires that some transfers of firearms are

22   　　　　preceded by a background check of the transferee.

23   　　　　i.　　Defendants knew that the section 922(t) referenced as

24   　　　　　　substantiating a finding of probable cause for a search lacked

25   　　　　　　an essential element because the subject EP Arms unfinished

26   　　　　　　lower receivers are not firearms, thus there is no requirement of

27   　　　　　　a background check.

28   / / /

c.     Title 18 USC 371 in pertinent part provides:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

* * *

i.     Defendants knew that the "conspiracy" referenced as substantiating a finding of probable cause for a search lacked an essential element because the subject EP Arms unfinished lower receivers are not firearms.

145.   Defendants UNKNOWN NAMED TECHNOLOGIST and EARL GRIFFITH were aware that their false statements communicated to the other defendants would be used to deceive a Magistrate Judge and wrongfully obtain a search warrant.

146.   Plaintiff is informed and believes that Defendants, acting under the color of authority, knowingly and intentionally submitted the Affidavit that lacked probable cause of criminal activity.  Defendants intentionally mislead Magistrate Judge Skomol as the Affidavit states that the "investigation deals with the manufacturing of AR-15 variant lower receivers that are designed of kevlar reinforced polymer." [Affidavit, ¶ 18.] These variant lower receivers are also known as "'blank', 'an 80%,' 'an 80% blank,' 'an 80% lower,' 'casting' or 'an AR-15 80%.'" [Id., ¶ 15.] These items are unregulated by ATF.  [Id.]  In other words, variant lower receivers or 80% unfinished lower receivers are legal, may be lawfully possessed by anyone, and are not subject to the licensing and registration requirements of "firearms."  Defendants concede: "Because '80%' completed lower receivers are partially completed, they are not regulated as firearms, but are considered inert hunks of metal.  There is no prohibition for anyone to possess an 80% lower receiver or a firearm parts kit containing an 80% lower receiver." [Id., ¶ 45.] Consequently, the Defendants understood that Plaintiff and its customers

1    were engaged in admittedly lawful activity, absent of the requisite probable cause

2    for the issuance of a search warrant, yet they made other mistatements in order to

3    obtain the issuance of warrants.

4         147.  Plaintiff is informed and believes that the issuance of the search

5    warrant was not justified due to false statements or statements made with disregard

6    of the truth contained within the Affidavit to secure such warrant.  Specifically,

7         a.    Defendants falsely represented to Magistrate Skomol that the EP

8               Arms unfinished lower receivers were a "firearm". [Exhibit E, p. 9, ¶

9               20.]

10        b.    After misrepresenting that the EP Arms unfinished lower receivers

11              comprise a "firearm", Defendants asserted that the unfinished lower

12              receivers lacked a serial number but failed to disclose that unfinished

13              state did not compel the serialization of the item. [Exhibit E, p. 9, ¶

14              20.] Even if the unfinished lower receiver were finished by Plaintiff's

15              customers, there is no requirement that the resulting finished firearm

16              be serialized by the person who completed it.

17        c.    Defendants falsely or recklessly misrepresented the manufacturing

18              process of Lycurgan's 80% unfinished lower receivers.  [Exhibit E,

19              Affidavit, ¶¶ 18-19.]  Defendants also misrepresented that

20              "converting an 80% receiver into a 'firearm' requires only basic

21              machine work before it is ready to be used in the build of a gun."

22              [Id., ¶ 46.] Defendants inferred that the product could be turned into a

23              receiver, and thereby a firearm, without machine work.  Defendants'

24              misrepresentation of the manufacturing process was "knowingly and

25              intentionally" made because the BATFE was previously informed of

26              its misunderstanding of the manufacturing process on or about March

27              4, 2014 within the letter of Jason Davis at Exhibit C.   Unknown

28              Named Agent I failed to disclose the existence of Exhibit C, or the

1          information contained therein. [Exhibit E, p. 9, ¶ 23.]

2          148.  These false statements and misrepresentations were material to the

3   Magistrate's finding of probable cause.  Excluding the alleged misrepresentations

4   in the Affidavit, the search warrant would not have been issued.

5          149.  Plaintiff is informed and believes that the issuance of the search

6   warrant was not justified due to knowing and intentional omissions of material

7   facts in the Affidavit used to secure the Warrant.  Specifically, Defendants omitted

8   the fact that the BATFE previously examined a sample of an 80% unfinished

9   lower receiver, which is virtually identical to the unfinished polymer parts at issue

10  in the Affidavit, and the BATFE determined it "is not sufficiently complete to be

11  classified as the frame or receiver of a firearm and thus would <u>not</u> be a 'firearm' as

12  defined in the GCA."  A true and correct copy of the BATFE letter, dated July 15,

13  2013, is attached hereto as **Exhibit "E."**  A true and correct copy of the BATFE

14  letter, dated May 17, 2013, is attached hereto as **Exhibit "F."**  Including the

15  wrongfully omitted information in the Affidavit, the Warrant would not have been

16  issued.

17         150.  Defendants, acting under the color of authority, caused Plaintiff

18  damages through the execution of an unreasonable search and seizure in violation

19  of the Fourth Amendment.  Defendants' conduct was without proper justification

20  or authority, without probable cause, consent or exigency.  The search and seizure

21  was premised on an affidavit that lacked probable cause, and contained knowing

22  and intentional false statements, misrepresentations and omissions.  Furthermore,

23  the Unknown Named Agents II through VII executed the search and seizure in an

24  unreasonably destructive manner as a result of the events that Unknown Named

25  Agent I and DOES put into motion. Defendants are liable for damages for

26  violating Plaintiff's Fourth Amendment right to be free from unreasonable

27  searches and seizures.

28         151.  Unknown Named Agent I made the following statements, that without

limitation to additional mistatements to be identified, were false, misleading or omitted facts:

    a.    Unknown Named Agent I testified to Magistrate Skomol that Plaintiff was selling "firearms" that lacked a serial number, and manufacturer identification.  As set forth and explained above, that statement is false

    b.    Unknown Named Agent I made no disclosure to Magistrate Skomol of the fact of the then-pendency of a hearing on Plaintiff's preliminary injunction.

    c.    Unknown Named Agent I made no disclosure of the issuance of prior determination letters issued by the ATF both before and after the raid reflecting that substantially identical products, although lacking the EP Arms indexing marks and the differing colored material, had been deemed legal.

    d.    Unknown Named Agent I falsely suggested that the EP Arms unfinished receivers could be readily assembled into a firearm, rather than milled or fabricated into a frame or receiver.  Such distinction is significant the law does not classify an item that can be readily converted to a frame or a receiver as a "firearm."

    e.    Unknown Named Agent I failed to disclose to the Magistrate that fabricating a receiver from an unfinished receiver is lawful.

    f.    Unknown Named Agent I failed to disclose that the EP Arms unfinished receivers and the biscuit were one bonded piece. Indeed, Unknown Named Agent I lied, stating: "[a]s a result of the two plastics being poured at two different times, the receiver and plug being are formed in such a way that they are not adhered to each other.  As such, the plug can be removed and the firearm can readily be placed into firing condition." [*SIC*]  This statement is an utter

1    falsehood.

2    g.    Unknown Named Agent I failed to disclose that indexing marks do

3          not make a firearm. See, e.g., *United States v. Prince*, supra.

4    h.    Unknown Named Agent I failed to disclose that Dimitri Karras

5          offered the ATF a key and access to security cameras pending the

6          disposition of the preliminary injunction hearing.

7    i.    Unknown Named Agent I failed to disclose that there is no

8          requirement that "home-built" firearms bear a serial number, or that it

9          is even legal for individuals not otherwise disqualified to fabricate

10         their own non-NFA firearms. Instead, Unkown Named Agent I lied

11         when he stated, "Federal law also requires that both intact guns and

12         all completed lower receivers must be "Conspicuously engraved, cast

13         or stamped" with a serial number to a depth of no less than .003" and

14         a font size not less than 1/16 of an inch." a statement Defendants

15         knew to be false.

16   152.  Defendants falsehoods, misleading statements, and factual omissions,

17   were material to the finding of probable cause.

18   153.  Defendants misrepresentations or omissions were made intentionally

19   or with reckless disregard for the truth.  The fact that the affidavit did not report

20   important factual information that was within the Defendants' knowledge at the

21   time allows a reasonable fact-finder to conclude that the Defendants acted with at

22   least reckless disregard for the truth.

23   154.  Defendants were aware of their obligations avoid engaging in the

24   deception of judicial officers in order to obtain warrants as that conduct could

25   result in personal liability.  Such law was well-established years prior to March of

26   2014 in *Chism v. Washington*, 661 F.3d 380 (9th Cir. 2011).

27   155.  As a direct and proximate result of Defendants' actions, Plaintiff has

28   suffered, and will continue to suffer, special and general damages to the extent and

1  in an amount subject to proof at trial.  Plaintiff has also incurred, and will continue

2  to incur, attorneys' fees, costs and expenses to an extent and in an amount subject

3  to proof at trial.

4    156.  On information and belief, Defendants, and each one of them, acted

5  with malice and with the intent to cause injury to Plaintiff.  Defendants, and each

6  one of them, engaged in a willful conscious disregard for the probable

7  consequences for injury of Plaintiff in a despicable, vile and contemptible manner.

8  Plaintiff is entitled to an award of punitive damages for the purpose of punishing

9  Defendants, and to deter them and others from such conduct in the future.  (*Smith*

10  *v. Wade* (1983) 461 U.S. 30.)

## VI.

### SIXTH CLAIM FOR VIOLATION OF FOURTH AMENDMENT

#### (As Against Unknown Named Agents II-VII)

#### [Damages, Attorneys Fees]

15    157.  Plaintiff re-alleges, and incorporates herein as if set forth in full,

16  paragraphs 1 through 98, 100 through 116, 118 through 123, 127 through 131, and

17  136 through 140 above.

18    158.  Defendants Unknown Named Agents II-VII purloined Plaintiff's

19  "Rudius" unfinished pistol frames, plastic bins, and other property from the

20  National City location.  Those defendants failed to identify such items on any

21  inventory submitted to the Court following the raid. Defendants Unknown Named

22  Agents II-VII lacked probable cause to seize such non-inventoried items.

23    159.  Defendants vandalized and intentionally damaged the premises at

24  National City thereby conducting an unreasonable search and seizure.

25    160.  Defendants engaged in tomfoolery in the premises at National City as

26  an outward manifestation of their collective animus for Plaintiff's exercise of its

27  other rights under the First Amendment and Second Amendment as set forth

28  above, thereby conducting an unreasonable search and seizure.

161. John R. Spencer, Chief of the Firearms Technology Branch previously issued a determination letter finding that the Rudius unfinished pistol frames are not "firearms" as defined in 921(a)(3) as determined in 18 USC § 921(a)(3).

162. Defendants Unknown Named Agents II-VII seized the Rudius unfinished pistol frames and plastic bins without a warrant.

163. Plaintiff had the right to be free from unreasonable search and seizure under the Fourth Amendment of the Constitution of the United States. This Fourth Amendment right is "clearly established" such that a reasonable agent with the BATFE in Defendants' situation would know it is wrong to remove such items, vandalize the premises, and otherwise engage in tomfoolery.

164. As a direct and proximate result of Defendants' actions, Plaintiff has suffered special and general damages to the extent and in an amount subject to proof at trial. Plaintiff has also incurred, and will continue to incur, attorneys' fees, costs and expenses to an extent and in an amount subject to proof at trial.

165. On information and belief, Defendants, and each one of them, acted with malice and with the intent to cause injury to Plaintiff. Defendants, and each one of them, engaged in a willful conscious disregard for the probable consequences for injury of Plaintiff in a despicable, vile and contemptible manner. Plaintiff is entitled to an award of punitive damages for the purpose of punishing Defendants, and to deter them and others from such conduct in the future. (*Smith v. Wade* (1983) 461 U.S. 30.)

## VII.

### SEVENTH CLAIM FOR VIOLATION OF THE FIFTH AMENDMENT
### IMPROPER TAKING
### (As against Unknown Named Agent I and DOES I-X)
### [Damages, Attorneys Fees]

166. Plaintiff re-alleges, and incorporates herein as if set forth in full, paragraphs 1 through 98, 100 through 116, 118 through 123, 127 through 131, 136

1   through 140, 144 through 155, and 158 through 163 above.

2       167.   Plaintiff had the right under the Fifth Amendment of the Constitution

3   of the United States to not be deprived of its property without due process of law.

4   This Fifth Amendment right is "clearly established" such that a reasonable agent

5   with the BATFE in Defendants' situation would know it is wrong to submit a false

6   or misleading affidavit to a magistrate in applying for a search warrant, execute a

7   search and seizure without probable cause, and conduct a search and seizure in an

8   unreasonably destructive manner, in order to seize and detain lawfully owned

9   property.

10      168.   Plaintiff's customer list is recognized as "property" under California

11  law.   Defendant Unknown Named Agent I took that property.   Plaintiff has made

12  significant efforts to keep its customer list secret and private.

13      169.   Plaintiff maintained a liberty interest and a property interest in the

14  public's perception of Plaintiff's nature as a law abiding business.   The conduct of

15  Defendants Unknown Named Agent I and DOES I-X identified Plaintiff Lycurgan

16  as a violator of the laws, resulting in a stigma.

17      170.   Customers that formerly did business with Plaintiff are aware that the

18  Government, and worse – the ATF – have their name.   Plaintiff's customers are

19  now on the "ATF list."   Plaintiff has suffered stigma from that occurence.

20      171.   Plaintiff has suffered damages as a result of that stigmatization,

21  resulting in additional difficulty in obtaining sales, necessitating the discounting

22  of product and increased advertising.    Additionally, despite an improving

23  economy, Plaintiff has been forced to reduce its number of employees.

24      172.   Pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of*

25  *Narcotics* (1971) 403 U.S. 388, 389, a federal agent acting under color of his

26  authority gives rise to a cause of action for damages consequent upon his

27  unconstitutional conduct.   Accordingly, Defendants are liable for damages for

28  violating Plaintiff's Fifth Amendment right to not be deprived of life, liberty, or

property, without due process of law.  (*Davis v. Passman* (1979) 422 U.S. 228.)

173.  At no time did Plaintiff consent, constructively or otherwise, to such deprivation and detention of Plaintiff's lawful business inventory and confidential customer list, nor was the search and seizure conducted with probable cause or lawfully obtained.

174.  As a direct and proximate result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, special and general damages to the extent and in an amount subject to proof at trial.  Plaintiff has also incurred, and will continue to incur, attorneys' fees, costs and expenses, to an extent and in an amount subject to proof at trial.

175.  On information and belief, Defendants, and each one of them, acted with malice and with the intent to cause injury to Plaintiff.  Defendants, and each one of them, engaged in a willful conscious disregard for the probable consequences for injury of Plaintiff in a despicable, vile and contemptible manner. Plaintiff is entitled to an award of punitive damages for the purpose of punishing Defendants, and to deter them and others from such conduct in the future.  (*Smith v. Wade* (1983) 461 U.S. 30.)

## VIII.

## EIGHTH CLAIM FOR VIOLATION OF THE FIFTH AMENDMENT PROCEDURAL DUE PROCESS

### (As Against B. Todd Jones)

### [Declaratory Relief, Injunctive Relief, Attorneys Fees]

176.  Plaintiff re-alleges, and incorporates herein as if set forth in full, paragraphs 1 through 98, 100 through 116, 118 through 123, 127 through 131, 136 through 140, 144 through 155, 158 through 163, and 167 through 171 above.

177.  Plaintiff had the right under the Fifth Amendment of the Constitution of the United States to not be deprived of its liberty or property without due process of law.

First Amended Complaint

178.  Here, Plaintiff and its customers have a protected Second Amendment liberty interest implicated by the process Defendant B. Todd Jones determines whether an item constitutes a firearm.

179.  In *Jackson v. City & County of San Francisco* (9th Cir. Mar. 25, 2014) this Circuit found "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them". *Id.* at 24

180.  "The Second Amendment protects "arms," "weapons," and "firearms"; it does not explicitly protect ammunition. Nevertheless, without bullets, the right to bear arms would be meaningless.  A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Id.*

181.  By analogy, Ares Armor has a Second Amendment right to sell unfinished lower receivers ("firearm part") to its customers.

182.  Retail sale of firearms, parts and accessories must fall within protected Second Amendment conduct or else the government could regulate businesses to the extent that it amounts to the destruction of the core right to self-defense.

183.  Ares Armor's customers have a Second Amendment right to purchase the firearm's parts Ares Armor sells for the reasons shown above.

184.  Defendants' conduct also intrudes upon Ares Armor's customer's fundamental Second Amendment right to build firearms within their own home.

185.  In *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) this Circuit adopted a two-step analytical tool to evaluate Second Amendment challenges. "The two-step inquiry we have adopted "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Id.* at 1136.

186.  As established above Defendants conduct implicates Second Amendment conduct. This Court has no need to move on to the second stop of the Chovan analysis because as applied to Ares Armor due process, it is enough that

1   this Court find there is a protected liberty interest at stake.

2       187.  Additionally, there can be no dispute Ares Armor has a protected

3   property interest in conducting business. See *Board v. Roth*, 408 U.S. 564 (1972)

4   ("It is a purpose of the ancient institution of property to protect those claims upon

5   which people rely in their daily lives, reliance that must not be arbitrarily

6   undermined."). Allowing small businessmen to earn a living without undue

7   government intrusion assuredly is protected under this broad umbrella.  As there

8   is, Defendants' policies violate the Due Process Clause of the 5th Amendment.

9       188.  The Fifth Amendment protects against the deprivation of property or

10  liberty without due process. See *Carey v. Piphus*, 435U.S. 247, 259 (1978); *Brady*

11  *v. Gebbie* , 859 F.2d 1543, 1547 (9thCir. 1988). Courts employ a two-step test to

12  determine whether due process rights have been violated by the actions of a

13  government official. First, a court must determine whether a liberty or property

14  interest exists entitling a plaintiff to due process protections. If a constitutionally

15  protected interest is established, courts employ a three-part balancing test to

16  determine what process is due. *Hewitt v. Grabicki* , 794 F.2d 1373, 1380 (9thCir.

17  1986). The three-part balancing test set forth in *Mathews v. Eldridge* examines (1)

18  the private interest that will be affected by the official action; (2) the risk of an

19  erroneous deprivation of such interest through the procedures used, and the

20  probable value, if any, of additional or substitute procedural safeguards; and (3)

21  the Government's interest, including the function involved and the fiscal and

22  administrative burdens that the additional or substitute procedural requirement

23  would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

24      189.  The Supreme Court has interpreted those two clauses identically, as

25  Justice Felix Frankfurter once explained in a concurring opinion: "To suppose that

26  'due process of law' meant one thing in the Fifth Amendment and another in the

27  Fourteenth is too frivolous to require elaborate rejection." *Malinski v. New York*,

28  324 U.S. 401, 415 (1945), (Frankfurter, J., concurring)

190.   The ATF has in a place a system where parties who wish to sell firearms parts must submit an item for review. Afterwards the ATF mails the applicant a letter which informs them whether said item constitutes a firearm or a firearm part.  The ATF has no promulgated standards for how it makes these determinations.

191.   While these determinations are purportedly conducted by the ATF's firearm technology branch, BATFE does not reveal the parties who are ultimately responsible for making these determinations.

192.   There is no way to appeal a determination that an item is a firearm even if virtually identical products have been determined to be firearm parts by other ATF determinations.

193.   Accordingly, the ATF has unbridled discretion in making these determinations. See *Largent v. Texas*, 318 U.S. 418, 422 (1943) (striking ordinance allowing speech permit where mayor "deems it proper".) The risk of continued deprivation of the interest is great. The ATF's decision is absolute and final. Further, despite the clear deprivation of a liberty and property resulting in this policy or lack thereof, an applicant has no opportunity to seek judicial, appellate or even administrative review of the ATF's decision.

194.   Amending the determination process to comport with Due Process would impose only the imposition of some appellate process and guidelines. Accordingly the burden imposed on the ATF would be minimal.

195.   The current system is rife for erroneous determinations both due to mere oversight and due to retaliatory abuse. It further breeds a culture of nepotism where parties such as Plaintiff can have no assurance that a negative determination is the result of a fair and impartial process or a retaliatory attack for rocking the boat.

196.   Accordingly, the ATF's current determination system violates the Due process clause of the Fifth Amendment.  Plaintiff requests this Court find that this

First Amended Complaint

process violates the Fifth Amendment of the United States Constitution, and

impose affirmative injunctive relief requiring the ATF to comply with the

Administrative Procedures Act, 5 USC § 551, et seq..  Plaintiff requests an award

of its costs and fees according to 28 U.S. Code § 2412.

## IX.

### NINTH CLAIM - DECLARATORY RELIEF

### (As Against B. Todd Jones)

### [Declaratory Relief, Injunctive Relief, Attorneys Fees]

197.  Plaintiff re-alleges, and incorporates herein as if set forth in full,

paragraphs 1 through 98, 100 through 116, 118 through 123, 127 through 131, 136

through 140, 144 through 155, 158 through 163, 167 through 171, and 177

through 196 above.

198.  Through Defendant B. Todd Jones's conduct, he has violated the

Firearms Owners Protection Act 18 USC § 926:

> "No such rule or regulation prescribed [by the Attorney General] after
> the date of the enactment of the Firearms Owners Protection Act may
> require that records required to be maintained under this chapter or
> any portion of the contents of such records, be recorded at or
> transferred to a facility owned, managed, or controlled by the United
> States or any State or any political subdivision thereof, nor that any
> system of registration of firearms, firearms owners, or firearms
> transactions or disposition be established. Nothing in this section
> expands or restricts the Secretary's authority to inquire into the
> disposition of any firearm in the course of a criminal investigation."

199.  Defendant B. Todd Jones, through the seizure of the Plaintiff's

customer list, has attempted to determine the identity and thereby a system of

registration of those he perceives as firearms owners.

200.  The Court should issue affirmative equitable relief requiring

Defendant to desist and refrain from creating or maintaining such database, and

declaratory relief determining such effort unlawful and in violation of 18 USC §

926.  Plaintiff requests an award of its costs and fees according to 28 U.S. Code §

2412.

First Amended Complaint

## PRAYER

WHEREFORE, Plaintiff Lycurgan Inc. prays for judgment against Defendant as follows:

1.  General damages and special damages according to proof;

2.  Punitive damages as allowed by law;

3.  Special damages, including loss profits and diminished earning capacity;

4.  Injunctive, affirmative, and declaratory relief as described above;

5.  Attorneys fees pursuant to 42 U.S.C. § 1988, and any other appropriate statute;

6.  Costs of suit incurred herein; and

7.  Such further relief as the Court deems just and proper.

Respectfully submitted,

**Law Office of Alan A. Beck**

**The McMillan Law Firm, APC**

Dated: September 22, 2014          /s/ Scott A. McMillan

_____

Scott A. McMillan
Attorneys for Lycurgan, Inc.
Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff Lycurgan, Inc., demands a jury trial on all matters so determinable.

Respectfully submitted,

**Law Office of Alan A. Beck**

**The McMillan Law Firm, APC**

Dated:  September 22, 2014

/s/ Scott A. McMillan
_____

Scott A. McMillan
Attorneys for Lycurgan, Inc.
Plaintiff