1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| LYCURGAN, INC., a California corporation, d/b/a ARES ARMOR,<br><br>                                    Plaintiff,<br><br>v.<br><br>B. TODD JONES, in his official capacity as Head of the San Diego Bureau of Alcohol, Tobacco, Firearms and Explosives; DOES 1-10,<br><br>                                    Defendants. | Case No.:  14-CV-548 JLS (BGS)<br><br>**ORDER (1) GRANTING IN PART DEFENDANT JONES' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT, AND (2) DENYING AS MOOT PLAINTIFF'S MOTION TO STRIKE PORTIONS OF AND COMPEL COMPLETION OF THE ADMINISTRATIVE RECORD**<br><br>(ECF Nos. 68, 80) |

        Presently before the Court is Defendant B. Todd Jones' Motion to Dismiss and for Summary Judgment ("MTD/MSJ," ECF No. 68) and Plaintiff Lycurgan, Inc.'s Motion to Strike Portions of and Compel Completion of the Administrative Record ("Motion to Strike," ECF No. 80).  Also before the Court are Plaintiff's Opposition to (ECF No. 93) and Defendant Jones' Reply in Support of (ECF No. 98) the MTD/MSJ and Defendant Jones' Opposition to (ECF No. 91) and Plaintiff's Reply in Support of (ECF No. 99) the Motion to Strike.  The Court vacated the hearing and took the matter under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1). (ECF No. 105.) Having

/ / /

considered the parties' arguments and the law, the Court **GRANTS IN PART** Defendant Jones' MTD/MSJ and **DENIES AS MOOT** Plaintiff's Motion to Strike.

BACKGROUND

## I.    Factual Background

Former Marine Sergeant Dimitri Karras founded Plaintiff in Oceanside, California, in 2010.  (First Am. Compl. ("FAC") ¶¶ 18-19, ECF No. 42.)  Plaintiff was initially a manufacturing business, which designed and manufactured backpacks, slings, cummerbunds, and other textile-based equipment.  (*Id.* at ¶ 19.)  Presently, Plaintiff is principally a retailer of sporting goods and tactical equipment including clothing, firearm components, and firearms-related accessories.  (*Id.* at ¶ 21.)  Since 2011, Plaintiff has also provided milled or cast aluminum metal to its customers to fabricate and assemble their own sport-utility firearms.  (*Id.*)  Plaintiff operates at four locations: (1) a small retail store in Oceanside, California; (2) a small retail store in National City, California; (3) a sewing factory in Oceanside, California; and (4) a facility for mail order fulfillment.  (*Id.*)  Plaintiff does not hold a license issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to sell firearms.  (*Id.* at ¶ 55–57.)

In late 2013, Plaintiff began purchasing unfinished lower receivers from EP Arms, LLC.  (*Id.* at ¶ 23.)  The purchaser of an unfinished lower receiver must perform additional machining and drilling, such as machining out the fire-control cavity, machining out the trigger slot, and drilling out the pin and safety selector holes, before the unfinished lower receiver can function as a receiver.  (*Id.* at ¶ 35.)  These unfinished lower receivers are manufactured using polymer material (*id.* at ¶ 23); have a contrast-color core piece, or "biscuit" (*id.* at ¶ 39); and have pre-cast indices to guide purchasers in drilling certain holes required to build a functioning firearm receiver (*id.*).

In December 2012, Special Agent Gordon Geerdes, ATF, requested that Mr. Karras provide Plaintiff's customer list to the ATF.  (*Id.* at ¶ 58.)  Mr. Karras refused.  (*Id.*)

On July 20, 2013, EP Arms' attorney, Jason Davis, sent Defendant Earl Griffith, the ATF's Chief of Firearms Technology Branch, a letter seeking clarification on behalf of EP

2

Arms as to whether EP Arms' unfinished lower receivers are "firearms" under the ATF's interpretation of 18 U.S.C. § 921(a)(3).  (*Id.* at ¶ 24.)

On February 7, 2014, Defendant Griffith responded to EP Arms' counsel that "when the fire-control cavity was formed during the manufacturing process, the submitted casting reached a point in its manufacture to be classified as a 'firearm' as defined in 18 U.S.C. 921(a)(3)."  (FAC Ex. B at 3,[1] ECF No. 35-6.)  He explained that the "ATF has long held that any machining of the fire-control cavity is the legally significant step in making a receiver" and that, "[a]lthough the fire-control cavity was filled with plastic material that must be removed before fire control components may be installed, ATF has long held that this is not sufficient to destroy the receiver and remove the item from classification as a 'frame or receiver.'"  (*Id.*)  Defendant Griffith also noted that EP Arms' counsel "submitted this casting on behalf of your client, EP Arms" (*id.* at 2), and "caution[ed] that the information found in this correspondence with regard to the evaluation described above is intended only for use by the addressed recipient(s)" (*id.* at 3).

On March 4, 2014, EP Arms' counsel responded to Defendant Griffith, explaining that the "biscuit" of the EP Arms unfinished lower received was manufactured first, and then the remaining material was formed around the biscuit.  (FAC ¶ 26, ECF No. 42; *see also* FAC Ex. C, ECF No. 35-7.)

In an undated letter written sometime after March 4, 2014, Defendant Griffith acknowledged his misapprehension of the manufacturing process of the EP Arms unfinished lower receiver and provided additional reasoning that the ATF considered the casting a "firearm."  (FAC ¶ 27, ECF No. 42; *see also* FAC Ex. D, ECF No. 35-8.)  Griffith noted that the "fire control area is created during the manufacturing process through the use of the biscuit" and that the excess material extending past the exterior walls of the casting, indicating the approximate location of the holes to be drilled for the selector, hammer, and trigger pins, comprised location "indexing" marks sufficient to classify the

---

[1] For ease of reference, page numbers to docketed materials refer to the CM/ECF page number.

unfinished lower receiver as a firearm.  (FAC ¶ 27, ECF No. 42 (citing FAC Ex. D at 6–7, ECF No. 35-8).)

On March 10, 2014, ATF agents communicated to Plaintiff that the ATF was in the process of obtaining a warrant based upon the ATF's determination that the EP Arms unfinished lower receivers sold by Plaintiff were firearms.  (*Id.* at ¶ 59.)  The ATF informed Plaintiff that it would not obtain a warrant if Mr. Karras relinquished the unfinished lower receivers and Plaintiff's customer list.  (*Id.*)

On March 11, 2014, Plaintiff filed a complaint for deprivation of civil rights against the ATF.  (*Id.* at ¶ 66; *see also* ECF No. 1.)  Plaintiff also sought a temporary restraining order forbidding the ATF from seizing Plaintiff's EP Arms inventory and customer list.  (FAC ¶ 66, ECF No. 42; *see also* ECF No. 2.)  That same day, the Court granted Plaintiff's motion for a temporary restraining order.  (FAC ¶ 67, ECF No. 42; *see also* ECF No. 4.)

On March 12, 2014, an ATF agent appeared at Plaintiff's office to take possession of the unfinished lower receivers and customer list.  (FAC ¶ 68, ECF No. 42.)  Plaintiff served the ATF with a copy of the temporary restraining order.  (*Id.*)

On March 14, 2014, the United States Attorney's Office filed an ex parte application for an order extending the injunction to prevent Plaintiff from divesting itself of the unfinished lower receivers and clarifying that the temporary restraining order did not restrain lawful criminal proceedings.  (FAC ¶ 69, ECF No. 42; *see also* ECF No. 5.)  That same day, the Court granted the ex parte application (FAC ¶ 70, ECF No. 42; *see also* ECF No. 6), and that evening an unknown ATF agent submitted an affidavit to Magistrate Judge Bernard G. Skomal to request a search warrant for Plaintiff's four locations (FAC ¶¶ 72–73, ECF No. 42).  Magistrate Judge Skomal issued the warrants.  (*Id.* at ¶ 75.)

On March 15, 2014, unnamed ATF agents entered the premises of Plaintiff's four facilities.  (*Id.* at ¶ 78.)  The ATF agents took approximately 5,804 unfinished polymer lower receivers from Plaintiff's Oceanside retail location.  (*Id.* at ¶ 86.)  On April 5, 2014, Plaintiff submitted a verified claim for the seized property to ATF's forfeiture division.  (*Id.* at ¶ 91.)  On December 22, 2014, the ATF returned 5,786 of the unfinished lower

receivers, keeping 18 of the unfinished lower receivers and Plaintiff's customer list. (Opp'n to MTD/MSJ 18, ECF No. 93.)

## II.   Procedural Background

On March 11, 2014, Plaintiff filed a Complaint for Deprivation of Civil Rights, Declaratory and Injunctive Relief against Defendant Jones.  (ECF No. 1.)  Plaintiff also filed a motion for a temporary restraining order.  (ECF No. 2.)  The Court granted Plaintiff's temporary restraining order, noting that "any steps to deprive Ares Armor of the Property **SHALL NOT** be executed until after the Court holds a hearing as to whether a preliminary injunction should issue."  (ECF No. 4 (emphasis in original).)

On March 14, 2014, the United States Attorney's Office filed an Ex Parte Application for Order (1) Extending Injunction to Prevent Divestment of Subject Matter of Temporary Restraining Order, and (2) Clarifying That Temporary Restraining Order Does Not Restrain Lawful Criminal Proceedings (ECF No. 5), which the Court granted (ECF No. 6).

On March 19, 2014, the parties filed a Joint Motion to Take Hearing on Preliminary Injunction Off Calendar and Granting Leave to File an Amended Complaint.  (ECF No. 11.)  The Court granted the parties' joint motion.  (ECF No. 12.)

On September 22, 2014, Plaintiff filed a Motion for Leave to File Supplemental/Amended Complaint Pursuant to Federal Rules of Civil Procedure Section 15(d).  (ECF No. 35.)  After the Court granted Plaintiff's motion (ECF No. 41), Plaintiff filed its First Amended Complaint for Damages; Deprivation of Civil Rights (*Bivens* Action); Injunction and Declaratory Relief; Jury Trial Demand ("FAC") on December 17, 2014 (ECF No. 42).

On March 26, 2015, Defendants filed a Certified Set of Documents Comprising the [Administrative] Record.  (ECF Nos. 60–66.)

On March 27, 2015, Defendant Jones filed the instant MTD/MSJ (ECF No. 68), and on June 15, 2015, Plaintiff filed the instant Motion to Strike (ECF No. 80).

/ / /

1                         **LEGAL STANDARD**

2  **I.**    **Dismissal Under Rule 12(b)(1)**

3         Federal courts are courts of limited jurisdiction, and as such have an obligation to

4 dismiss claims for which they lack subject-matter jurisdiction. *Demarest v. United States*,

5 718 F.2d 964, 965 (9th Cir. 1983). Because the issue of standing pertains to the subject

6 matter jurisdiction of a federal court, motions raising lack of standing are properly brought

7 under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"). *White v. Lee*, 227 F.3d

8 1214, 1242 (9th Cir. 2000). "The party asserting jurisdiction bears the burden of

9 establishing subject matter jurisdiction on a motion to dismiss for lack of subject matter

10 jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d

11 981, 984 (9th Cir. 2008) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

12 377 (1994); *Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d

13 1221, 1225 (9th Cir. 1989)). "Dismissal for lack of subject matter jurisdiction is

14 appropriate if the complaint, considered in its entirety, on its face fails to allege facts

15 sufficient to establish subject matter jurisdiction." *Id.* (citing *Love v. United States*, 915

16 F.2d 1242, 1245 (9th Cir. 1990)).

17         Rule 12(b)(1) motions may challenge jurisdiction facially or factually. *Safe Air for*

18 *Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack is one where "the

19 challenger asserts that the allegations contained in a complaint are insufficient on their face

20 to invoke federal jurisdiction." *Id.* In evaluating such a challenge, the court accepts

21 the factual allegations in the complaint as true. *See Miranda v. Reno,* 238 F.3d 1156, 1157

22 n.1 (9th Cir. 2001). In contrast, where the defendant challenges the factual basis underlying

23 the allegations, the court need not accept the allegations as true and may instead

24 make factual determinations. *White*, 227 F.3d at 1242. "In ruling on a challenge

25 to subject matter jurisdiction, the district court is ordinarily free to hear evidence regarding

26 jurisdiction and to rule on that issue prior to trial, resolving factual disputes where

27 necessary." *Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir. 1983) (citing

28 *Thornhill Publ'g Co. v. Gen. Tel. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)). When making

such a ruling, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003) (citing *White*, 227 F.3d at 1242).

## II.   Dismissal Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss. The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (alteration in original). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "[F]acts that are 'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* at 678–79 (citing *Twombly*, 550 U.S.

at 555).  This review requires "context-specific" analysis involving the Court's "judicial experience and common sense."  *Id.* at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).  The Court will grant leave to amend unless it determines that no modified contention "consistent with the challenged pleading . . . [will] cure the deficiency."  *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schriber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

## ANALYSIS

Plaintiff asserts four claims against Defendant Jones: (1) First Claim for Violation of First Amendment (FAC ¶¶ 99–117, ECF No. 42), (2) Fourth Claim for Violation of the Second Amendment (*id.* at ¶¶ 135–42), (3) Eighth Claim for Violation of the Fifth Amendment Procedural Due Process (*id.* at ¶¶ 176–96), and (4) Ninth Claim – Declaratory Relief [for Violation of the Firearm Owners' Protection Act, 18 U.S.C. § 926] (*id.* at ¶¶ 197–200).  Defendant Jones argues that he is entitled to dismissal under Rule 12(b)(1) of all claims against him for lack of subject matter jurisdiction (MTD/MSJ Mem. 21–22, ECF No. 68-1), dismissal under Rule 12(b)(6) of all claims against him for failure to state a claim (*id.* at 32–40), and summary judgment under Rule 56(a) "as to Plaintiff's claim that the classification of the [EP Arms' unfinished lower receiver] as a firearm was arbitrary" (*id.* at 22–32).

## I.   Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

### A.   *Jurisdiction Under* Bivens

In its FAC, Plaintiff claims that subject matter jurisdiction exists under *Bivens*: "This is a civil action for damages, equitable, and declaratory relief, brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202."  (FAC ¶ 1, ECF No. 42.)

/ / /

As a preliminary matter, the Court notes that *Bivens* authorizes recovery only of monetary damages from individual defendants.   *See Bivens*, 403 U.S. at 397. Consequently, *Bivens* does not confer jurisdiction over claims for recovery of non-monetary damages, *see Norton v. Alcohol, Tobacco & Fire Arms*, No. ED CV 06-00746-VAP (VBK), 2008 WL 683397, at *6 (C.D. Cal. Jan. 29, 2008) ("Here, Plaintiff seeks equitable remedies against the ATF . . . , which she cannot do under *Bivens*) (citing *Tomas-Lazear v. Fed. Bureau of Investigation*, 851 F.2d 1202, 1207 (9th Cir. 1988)), or for claims against federal agencies or federal employees sued in their official capacities, *see Norton*, 2008 WL 683397 at *5 ("It is clear that this Court has no subject matter jurisdiction over . . . claims against official actors brought pursuant to *Bivens*.") (citing *Daly-Murphy v. Winston*, 837 F.2d 348, 355 (9th Cir. 1987)); *see also W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1119 (9th Cir. 2009) ("[T]he Supreme Court has held that no *Bivens* remedy is available against a federal agency . . . .") (citing *FDIC v. Meyer*, 510 U.S. 471, 484 (1994)); *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007) ("[A] Bivens action can be maintained against a defendant in his or her individual capacity only, and not in his or her official capacity.") (quoting *Daly-Murphy*, 837 F.2d at 355) (internal quotation marks omitted).

Although Plaintiff's claims against Defendant Jones request only declaratory relief, injunctive relief, and attorneys fees[2] (*see generally* FAC, ECF No. 42), Plaintiff does sue Defendant Jones in his official capacity (*see id.* at ¶ 9).   Consequently, to the extent Plaintiff's claims against Defendant Jones assert subject matter jurisdiction under *Bivens*, those claims must be dismissed for lack of subject matter jurisdiction.

///

///

---

[2] The Court notes that "[b]ecause *Bivens* actions are against governmental employees in their individual capacities . . . , [the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412] does not authorize fee awards in such suits." *Lauritzen v. Lehman*, 736 F.2d 550, 559 (9th Cir. 1984) (citing *Holloman v. Watt*, 708 F.2d 1399, 1402 (9th Cir. 1983); *Saxner v. Benson*, 727 F.2d 669, 673 (7th Cir. 1984)).

**B.**     ***Sovereign Immunity***

"[T]he doctrine of sovereign immunity . . . 'is an important limitation on the subject matter jurisdiction of federal courts.'"  *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1087 (9th Cir. 2007) (quoting *Vacek v. U.S. Postal Serv.*, 447 F.3d 1248, 1250 (9th Cir. 2006)).  As a sovereign, the United States "is immune from suit unless it has expressly waived such immunity and consented to be sued."  *Dunn & Black,* 492 F.3d at 1087–88 (quoting *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985)).  "[A] suit against [agency] employees in their official capacity is essentially a suit against the United States" and, "absent express statutory consent to sue, dismissal is required."  *Gilbert*, 756 F.2d at 1458 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949)); *see also Nurse v. United States*, 226 F.3d 996, 1004 (9th Cir. 2000) ("Appellant cannot state a claim against the federal officers in their *official* capacities unless the United States waives its sovereign immunity.") (emphasis in original) (citing *Gilbert*, 756 F.2d at 1458). Plaintiffs bear the burden of showing that the United States has waived its sovereign immunity.  *Cato v. United States,* 70 F.3d 1103, 1107 (9th Cir. 1995) (citing *Baker v. United States*, 817 F.2d 560, 562 (9th Cir. 1987)).

Defendant Jones claims that Plaintiff's first, fourth, eighth, and ninth claims must be dismissed for lack of subject matter jurisdiction because "Plaintiff has not met its burden of pointing to an unequivocal waiver of sovereign immunity" since "the Constitution does not waive sovereign immunity" and "the Firearm Owners' Protection Act . . . does not contain a waiver of sovereign immunity."  (MTD/MSJ Mem. 21, ECF No. 68-1.) Defendant Jones adds that neither 28 U.S.C. § 1331 nor the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, waive sovereign immunity.  (*Id.* at 21–22.)  Defendant Jones concludes that "[t]he only statute possibly capable of providing the requisite waiver of sovereign immunity for plaintiff's claims is the Administrative Procedure Act ('APA'), 5 U.S.C. §§ 701-706."  (*Id.* at 13.)

In its Opposition, Plaintiff argues that "it[']s beyond peradventure that the agency is subject to suits under the Constitution, so long as there is no claim for money damages."

(Opp'n to MTD/MSJ 19, ECF No. 93.)  Plaintiff relies chiefly on Section 702 of the APA (*id.* at 19–20), which provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5. U.S.C. § 702.  Plaintiff correctly notes that "[i]n *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989), the Ninth Circuit held that § 702's waiver of sovereign immunity is [not] limited to instances of agency action as defined by the APA." (Opp'n to MTD/MSJ 20, ECF No. 93 (internal quotation marks omitted) (citing *Presbyterian Church*, 870 F.2d at 525).)

The Ninth Circuit decided *Presbyterian Church* in 1989.  In 1998, the Ninth Circuit held in *Gallo Cattle Co. v. United States Department of Agriculture*, 159 F.3d 1194 (9th Cir. 1998), that Section 704 of the APA restricts Section 702's waiver of sovereign immunity:

> [T]he APA's waiver of sovereign immunity contains several limitations.  Of relevance here is § 704, which provides that only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court, are subject to judicial review." . . .  [Thus, the agency action here] is only reviewable if it constitutes "final agency action" for which there is no other remedy in a court.

*Id.* at 1198.

The Ninth Circuit has twice recognized the internal division between *Presbyterian Church* and *Gallo Cattle*.  *See Equal Emp't Opportunity Comm'n v. Peabody W. Coal Co.*, 610 F.3d 1070, 1086 (9th Cir. 2010) ("[T]here is 'no way to distinguish *The Presbyterian Church* from *Gallo Cattle*.'") (quoting *Gros Ventre Tribe v. United States,* 469 F.3d 801,

809 (9th Cir. 2006)).   However, the Ninth Circuit has twice declined to resolve the "conflict" between these two cases.   *Gros Ventre*, 469 F.3d at 809; *see also Peabody W. Coal*, 610 F.3d at 1086.

Since *Presbyterian Church* was decided, the Supreme Court has weighed in on the question of whether sovereign immunity is limited by Section 704.   In *Lujan v. National Wildlife Federation,* 497 U.S. 871 (1990), the Supreme Court made clear that the waiver of sovereign immunity under Section 702 is in fact constrained by the provisions contained in Section 704:

> [T]he person claiming a right to sue [under Section 702] must identify some "agency action" that affects him in the specified fashion . . . .   When . . . review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the "agency action" in question must be "final agency action."

*Id.* at 882 (citing 5 U.S.C. § 704).   Because the decisions in *Gallo Cattle* and *Lujan* postdate *Presbyterian Church*, the Court concludes that waiver of sovereign immunity under Section 702 of the APA is limited by Section 704, as have other district courts within the Ninth Circuit.   *See, e.g.*, *City of Oakland v. Holder*, No. C 12-05245 MEJ, 2013 WL 8812581, at *2 (N.D. Cal. Feb. 14, 2013) ("[Section] 704's latter requirements control and Plaintiff must demonstrate that the action it challenges . . . qualifies as a 'final agency action for which there is no other adequate remedy in court.'") (citing *Gallo Cattle*, 159 F.3d at 1198; *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006)); *Veterans for Common Sense v. Nicholson*, No. C-07-3758 SC, 2008 WL 114919, at *3–5 (N.D. Cal. Jan. 10, 2008) ("[W]aiver of sovereign immunity under § 702 of the APA is limited by § 704.").   Consequently, because Plaintiff does not identify a statutory basis for providing judicial review, Plaintiff must demonstrate a "final agency action for which there is no other adequate remedy in a court."   5 U.S.C. § 704.

"As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process—it

must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 591 (9th Cir. 2008) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (internal quotation marks omitted). Plaintiff's FAC alleges two possible final agency actions: the February 7, 2014 letter from Defendant Griffith to EP Arms' counsel (FAC ¶ 25, ECF No. 42; *see also* FAC Ex. B, ECF No. 35-6),[3] and the March 15, 2014 execution of the search warrant and resulting seizure (FAC ¶¶ 78-98, ECF No. 42). Neither of these, however, meets the *Bennett* test for a final agency action.

With regard to the letter, the Ninth Circuit has previously held that an informal letter with an indirect effect upon the complaining party is neither a definitive statement of the agency's position nor a document with the status of law. *Air Cal. v. U.S. Dep't of Transp.*, 654 F.2d 616, 620 (9th Cir. 1981). In *Air California*, two airlines were granted permission to operate turbojet service from Orange County Airport. *Id.* at 618. Due to noise, the Orange County Board of Supervisors ("Board") froze the level of airport operations, resulting in the exclusion of new carriers. *Id.* The Federal Aviation Administration issued a notice of hearing to investigate claims by unsuccessful airline applicants that the Board was violating federal law. *Id.* Following the hearing, the FAA's Western Regional Counsel issued a report recommending that the FAA pursue administrative and legal sanctions against the Board if it refused to authorize new carriers. *Id.* The FAA's Chief

---

[3] Plaintiff appears to concede that the ATF's second, undated letter is not a final agency action. Plaintiff argues that the second letter was "created" on March 31, 2014 (Opp'n to MTD/MSJ 18, ECF No. 93; *see also* Decl. of Scott A McMillan in Support of Mot. to Strike ("McMillan Strike Decl.") ¶ 8, ECF No. 80-2), and therefore "is not contemporaneous to the final agency action" (McMillan Strike Decl. ¶ 9, ECF No. 80-2), since "[t]he consummation of the agency's decision making process . . . occurred on February 7, 2014" when Defendant Griffith send the first letter to EP Arms' counsel (*id.*). Even if Plaintiff were to argue that the ATF's second letter was a final agency action, the Court would have to find that, like the first letter, the ATF's second letter was not a final agency action. *See supra* pp. 13–15. Furthermore, Plaintiff filed its Complaint on March 11, 2014 (ECF No. 1), before the ATF sent the second letter on March 31, 2014, meaning that the second letter would not be subject to judicial review under the APA. *See, e.g.*, *Jones v. Rose*, No. CV 00-1795-BR, 2005 WL 2218134, at \*10 (D. Or. Sept. 9, 2005) (granting summary judgment where plaintiff filed complaint before consummation of final agency action).

1    Counsel then sent a letter to the chairman of the Board concurring with the report and

2    warning that a failure to undertake negotiations to accommodate new carriers "will warrant

3    our pursuance of contractual, injunctive, and civil penalty remedies."  *Id.*  One of the

4    airlines authorized to provide service sought judicial review of the FAA Chief Counsel's

5    letter, contending the airline would suffer substantial economic loss if the Board reallocated

6    flights from itself to new carriers.  *Id.* at 619.  In determining whether it had jurisdiction,

7    the Ninth Circuit noted that the "letter was neither a definitive statement of the agency's

8    position nor a document with the status of law."  *Id.* at 620.  With regard to the first point,

9    the court reasoned that the letter concurred in the opinion that the Board was in violation

10   of statutes and indicated an intention to pursue sanctions, but that such an averment of

11   "reason to believe" a violation existed was a "threshold determination that further inquiry

12   is warranted" and not a definitive statement of position.  *Id.* at 620–21.  With regard to the

13   second point, the court noted that "the effect of the FAA's actions on Air California was

14   not direct and immediate" because "the Board controlled the availability of judicial review

15   of the challenged interpretations, as well as the consequences which flowed from them."

16   *Id.* at 621.  Ultimately, the Ninth Circuit concluded that there was no "final agency action"

17   and that it lacked jurisdiction to review the FAA's actions.  *Id.* at 622.

18        Here, as in *Air California*, there is no final agency action because a third party is

19   seeking judicial review of informal letter providing a "threshold determination."  The letter

20   EP Arms' counsel sent to Defendant Griffith "ask[ed] for clarification as to whether the

21   incomplete AR-type lower that [EP Arms] intends to manufacture is a 'firearm' as defined

22   in 18 U.S.C. §921(a)(3) or . . . merely a casting."  (FAC Ex. A at 2, ECF No. 35-5.)

23   Defendant Griffith responded that "[i]t is [the ATF's] determination that when the fire-

24   control cavity was formed during the manufacturing process, the submitted casting reached

25   a point in its manufacture to be classified as a 'firearm' as defined in 18 U.S.C. 921(a)(3)."

26   (FAC Ex. B at 3, ECF No. 35-6.)  He added that, "[i]f [EP Arms] require[s] further

27   information concerning [the ATF's] findings, [the ATF] can be contacted at any time." (*Id.*

28   at 4.)  There was no mention of any intention to pursue sanctions or any other adverse

consequences.  (*See generally* FAC Ex. B, ECF No. 35-6.)  Like the letter at issue in *Air California*, the February 7, 2014 letter appears to be a threshold determination indicating a reason to believe that a violation *could* exist if EP Arms did manufacture the lowers in question, rather than a definitive statement of position.

Additionally, Defendant Griffith's letter emphasized both at the beginning and at the end that EP Arms' counsel "submitted this casting *on behalf of [his] client, EP Arms*, for classification under the Gun Control Act" (*id.* at 2 (emphasis added)) and that the ATF "caution[s] that the information found in this correspondence with regard to the evaluation described above is intended *only for use by the addressed recipient(s)*" (*id.* at 3 (emphasis added)).  Plaintiff freely admits that the letter was addressed to EP Arms and not Plaintiff (*see* FAC ¶¶ 24–27, ECF No. 42; Opp'n to MTD/MSJ 5, ECF No. 93) and that the "letter expressly limited its audience to EP ARMS" (Mot. to Strike Mem. 7, ECF No. 80-1 (emphasis in original)).  Like the authorized airline in *Air California*, there could be no direct and immediate effect on Plaintiff from the letter in question because Plaintiff was a third party to the agency correspondence.  Additionally, the letter did not "impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process" with respect to Plaintiff.  *Air Cal.*, 654 F.2d at 621 (internal quotation marks omitted) (citing *Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 112–13 (1948); *Nev. Airlines, Inc. v. Bond*, 622 F.2d 1017, 1020 n.5 (9th Cir. 1980)).  Consequently, the ATF letter was not a "final agency action" capable of review under the APA.

With regard to the execution of the search warrant and the resulting seizure, the Ninth Circuit has recognized that "[a]n investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action."  *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 779–81 (9th Cir. 2000) (citing cases); *see also Martin v. Naval Criminal Investigative Serv.*, 539 F. App'x 830, 832 (9th Cir. 2013) (quoting *Ass'n of Am. Med. Colls.*, 217 F.3d at 781) (mem.).

/ / /

In *Martin*, the plaintiff brought a *Bivens* action against a Naval Criminal Investigative Service Special Agent for retaliation in violation of the First Amendment. 539 F. App'x at 831.  The complaint alleged an "early-morning confrontation" at the plaintiff's home, "which could not have served any valid law enforcement purpose," and "other allegations of a perpetual and pretextual investigation." *Id.*  The court noted that there were "no alternative avenues of relief" available to the plaintiff, since "no APA remedy is available because there is no 'final agency action' for [plaintiff] to challenge." *Id.* at 832.  The court explained that "[a]n investigation . . . is . . . quintessentially non-final" and that "[t]he very gravamen of [plaintiff]'s complaint is that the alleged retaliatory 'investigation' of her is pretextual and perpetually open, rendering the APA's provision for judicial review of 'final' agency actions particularly illusory." *Id.*

In *Genendo Pharmaceutical N.V. v. Thompson*, 308 F. Supp. 2d 881 (N.D. Ill. 2003), the district court concluded that it lacked jurisdiction where plaintiffs, an importer of prescription drugs and a parent corporation of a drug re-packer and re-labeler, filed an action for declaratory and injunctive relief against the Food and Drug Administration after federal agents executed a criminal search warrant. *Id.* at 882, 886.  The district court noted that "'[f]inal agency action' is . . . a necessary element of a cause of action under the APA" and that "Plaintiffs' Complaint [does not] purport to identify any action on the part of the FDA that would even arguably rise to the level of 'final agency action' under the APA." *Id.* at 884.  Although plaintiffs alleged "negotiations and discussions with various federal agents," the court held that these were merely "statements of subordinate agency officials in the course of conducting routine, preliminary investigative activity," which did not constitute final agency action. *Id.*  The court concluded that plaintiffs failed to allege a final agency action:

> Therefore, whatever negotiations or discussions [p]laintiffs and their attorneys may have had with the government in the context of the ongoing criminal investigation and the execution of the . . . search warrant, such activities do not amount to the creation of an "unpromulgated rule" as [p]laintiffs suggest.  Likewise, the

allegations fall short of anything approaching final agency action sufficient to support a cause of action under the APA or otherwise invoke the jurisdiction of this [c]ourt.

*Id.* at 885.

Here, as in *Martin* and *Genendo Pharmaceutical*, no APA remedy is available because the challenged investigation is not a final agency action. Plaintiff itself admits that the "ATF target[ed] Lycurgan *for Investigation*" when it requested Plaintiff's customer list and sought a warrant. (FAC ¶¶ 58–65, ECF No. 42 (emphasis added).) Plaintiff's allegations concerning communications between agents and Mr. Karras pertaining to the warrant (*id.* at ¶¶ 58–63) and the ultimate execution of the warrant (*id.* at ¶¶ 79–98) concern investigative activity that does not rise to the level of final agency action as required for review under the APA.

Because Plaintiff fails to allege any final agency action, the Court **DISMISSES** Plaintiff's claims against Defendant Jones for lack of subject matter jurisdiction.

### C.    *Ripeness*

"Whether a claim is ripe for adjudication goes to a court's subject matter jurisdiction under the case or controversy clause of article III of the federal Constitution." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989). "[I]n evaluating ripeness, courts assess 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Ass'n of Am. Med. Colls*, 217 F.3d at 779–80 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 97 (1977)). "The fitness element requires that the issue be primarily legal, need no further factual development, and involve a final agency action." *Dietary Supplemental Coal., Inc. v. Sullivan*, 978 F.2d 560, 562 (9th Cir. 1992) (citing *Winter v. Cal. Med. Review, Inc.*, 900 F.2d 1322, 1325 (9th Cir. 1990)).

In light of the Court's conclusion above that Plaintiff has failed to demonstrate a final agency action, *see supra* Part I.B, the Court also must conclude that Plaintiff's claims

/ / /

against Defendant Jones are not yet ripe.  Consequently, the Court **DISMISSES** Plaintiff's claims against Defendant Jones for lack of subject matter jurisdiction.

## II.    Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

Although the Court finds that it lacks subject matter jurisdiction over Plaintiff's claims against Defendant Jones and that those claims must therefore be dismissed under Rule 12(b)(1), the Court also addresses the merits of Defendant Jones' Rule 12(b)(6) motion out of an abundance of caution.

### A.    *Claim 1: First Amendment*

In pertinent part, the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  The crux of Plaintiff's first claim for violation of the First Amendment is that "[p]roviding information or instruction through the use of different colors in the material is 'speech', which is protected by the First Amendment."  (FAC ¶ 105, ECF No. 42.)  Defendant Jones argues that this claim must be dismissed because "[t]he coloration and markings placed on the EP80 during its manufacture are measurement aids, not speech" and, "even if these measurement features could be considered some form of speech, they are not constitutionally protected speech" because "[t]hey do not express any ideas, and insofar as EP Arms intended to convey a particularized message, that message is not understandable to those who view it." (MTD/MSJ Mem. 34, ECF No. 68-1.)

There is a "scarcity of precedent concerning what constitutes speech under the First Amendment."  Katherine A. Moerke, *Free Speech to a Machine? Encryption Software Source Code Is Not Constitutionally Protected "Speech" Under the First Amendment*, 84 Minn. L. Rev. 1007, 1012 (2000).  The parties agree, however, that "for conduct to express an idea that is constitutionally protected, 'a[n] intent to convey a particularized message' must be present and there must be a 'great' likelihood 'that the message w[ill] be understood by those who view [] it.'"  (MTD/MSJ Mem. 33–34, ECF No. 68-1 (citing *Spence v. Washington*, 418 U.S. 405, 409–11 (1974)); *accord* Opp'n to MTD/MSJ 40, ECF No. 93 (citing same).)

In *Waugh v. Nevada State Board of Cosmetology*, 36 F. Supp. 3d 991 (D. Nev. 2014), plaintiffs sought to operate makeup artistry schools in Nevada without being licensed as cosmetology or aesthetics instructors and without their facilities being licensed as cosmetology schools. *Id.* at 997. When inspectors informed plaintiffs that the Nevada State Board of Cosmetology ("Board") believed that their businesses were illegal unlicensed cosmetology schools, plaintiffs filed suit under 42 U.S.C. § 1983 alleging various constitutional violations, including violation of the Free Speech Clause of the First Amendment. *Id.* at 997–99. The district court noted that "[t]he Supreme Court has made clear that First Amendment protection does not apply to conduct that is not 'inherently expressive.'" *Id.* at 1006 (quoting *Pickup v. Brown*, 740 F.3d 1208, 1225 (9th Cir. 2013)). Noting that "[t]eaching makeup artistry involves demonstrating and explaining how to apply makeup," *id.* at 1010, the district court observed that "there is nothing to indicate that teaching how to perform the act of applying makeup—even if that teaching involves verbal communication as to makeup theory in general or specific methodologies—is intended to communicate a particular message beyond how to perform the task at issue," *id.* at 1011. Consequently, the court held that "teaching makeup artistry is non-expressive conduct." *Id.* at 1010.

As in *Waugh*, Plaintiff's allegations amount only to non-expressive conduct, which the parties agree is not entitled to First Amendment protection. Plaintiff alleges that the "[d]ifferent colored material is non-functional and informational[, p]roviding information or instruction through the use of different colors" (FAC ¶ 105, ECF No. 42) and that "[t]he color differences in the material are 'content' of the manufacturer's speech" (*id.* at ¶ 107). Even assuming that Plaintiff has standing to bring a First Amendment claim on behalf of EP Arms, who manufactures the receivers at issue, the Court finds that Plaintiff's claim must fail because the different colored material in EP Arms' unfinished receivers is indistinguishable from teaching cosmetology: there is no intent to communicate a particular message beyond the task at issue, *i.e.*, how to convert an unfinished lower receiver into a finished lower receiver. Because this conduct is not inherently expressive, it is not entitled

to First Amendment protection. *See Vivid Entm't, LLC v. Fielding*, 965 F. Supp. 2d 1113, 1124 (C.D. Cal. 2013) ("[O]nly expressive conduct is considered speech and implicates the First Amendment.") (citing *Nordyke v. King*, 319 F.3d 1185, 1189 (9th Cir. 2003)), *aff'd*, 774 F.3d 566 (9th Cir. 2014). Consequently, Plaintiff fails to make out a claim against Defendant Jones for violation of the First Amendment, and the Court **DISMISSES** Plaintiff's first claim.

## B.   Claim 4: Second Amendment

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has concluded that the Second Amendment confers "an individual right to keep and bear arms." *Dist. of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

The Ninth Circuit has adopted a two-step inquiry in cases asserting a violation of the Second Amendment: first, the Court "asks whether the challenged law burdens conduct protected by the Second Amendment and [second] if so, directs courts to apply an appropriate level of scrutiny." *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 187 (2014). Although the Ninth Circuit has left determining the scope of the Second Amendment "for another day," *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc), it has instructed that "[t]o determine whether a challenged law falls outside the historical scope of the Second Amendment," courts are to ask "whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*, 554 U.S. at 627 n.26 . . . , or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (citing *Chovan*, 735 F.3d at 1137; *United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012)). "If a challenged law is a 'presumptively lawful regulatory measure' as identified in *Heller*, or if it falls outside the historical scope of the Second Amendment, the inquiry ends—the challenged law does not violate

the Second Amendment.  *Bauer v. Harris*, 94 F. Supp. 3d 1149, 1153–54 (E.D. Cal. 2015) (citing *Jackson*, 746 F.3d at 960; *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1151 (9th Cir. 2014)).

Plaintiff alleges that it "has a right, protected by the Second Amendment, to purchase, distribute, and sell any firearm-related item which is not a firearm, a frame, or a receiver, including the subject EP Arms Unfinished Lower Receivers.  Plaintiff's customers have a corresponding right under the Second Amendment to purchase the same."[4]   (FAC ¶ 140, ECF No. 42.)   Plaintiff later explains in support of its Fifth Amendment claim that,

> [i]n *Jackson v. City & County of San Francisco* (9th Cir. Mar. 25, 2014) this Circuit found "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them".  *Id.* at 24.
>
> "The Second Amendment protects "arms," "weapons," and "firearms"; it does not explicitly protect ammunition.  Nevertheless, without bullets, the right to bear arms would be meaningless.  A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose."  *Id*.
>
> By analogy, Ares Armor has a Second Amendment right to sell unfinished lower receivers ("firearm part") to its customers.

---

[4] It is likely that Plaintiff has standing to assert this Second Amendment claim on behalf of its customers. "In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). Plaintiff, however, as a supplier of unfinished lower receivers, has alleged that it was harmed by its inability to sell unfinished lower receivers (*see, e.g.*, FAC ¶ 115, ECF No. 42 ("Defendants' conduct has discouraged Plaintiff from engaging in its business . . . ."; *id.* at ¶ 89), and is also permitted to "act[ ] as [an] advocate[ ] of the rights of third parties who seek access to" its services. *See Craig v. Boren,* 429 U.S. 190, 195 (1976) (allowing beer vendor to challenge alcohol regulation based on its patrons' equal-protection rights); *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 536 (1925) (allowing private schools to assert parents' rights to direct the education of their children).

(*Id.* at ¶¶ 179–81.)  Defendant Jones argues that this claim must be dismissed because "the Second Amendment does not address the ability to sell or purchase firearms . . . ." (MTD/MSJ Mem. 35, ECF No. 68-1.)

First, the Court agrees with Defendant Jones that the Second Amendment does not extend to the unrestricted manufacture, distribution, sale, or purchase of firearms or their parts.  In *Teixeira v. County of Alameda*, No. 12-CV-03288-WHO, 2013 WL 4804756 (N.D. Cal. Sept. 9, 2013), the district court noted that,

> [w]hile both the Supreme Court and the Ninth Circuit left unanswered precisely how broad the scope of the Second Amendment is . . . , they have not extended the protections of the Second Amendment to the sale or purchase of guns. . . .  The Ninth Circuit observed that "[t]he Supreme Court has made it clear that the government can continue to regulate commercial gun dealing."

*Id.* at *6 (citing *Nordyke*, 681 F.3d at 1044; *United States v. Castro*, No. 10-50160, 2011 WL 6157466, at *1 (9th Cir. Nov. 28, 2011), *cert. denied*, 132 S. Ct. 1816 (2012)); *see also Peña v. Lindley*, No. 2:09-CV-01185-KJM-CKD, 2015 WL 854684, at *11 n.10 (E.D. Cal. Feb. 26, 2015) ("[A]lthough the Second Amendment protects an individual's right to bear arms, it does not necessarily give rise to a corresponding right to sell a firearm.") (quoting *Teixera*, 2013 WL 4804756, at *6) (internal quotation marks omitted); *Mont. Shooting Sports Ass'n v. Holder*, No. CV-09-147-DWM-JCL, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010) ("*Heller* said nothing about extending Second Amendment protection to firearm manufacturers or dealers.") (citing *Heller*, 554 U.S. at 626–28).  Courts outside of the Ninth Circuit have similarly recognized that "the Second Amendment . . . does not necessarily give rise to a corresponding right to sell a firearm" or its parts, *United States v. Chafin,* 423 Fed. App'x 342, 344 (4th Cir. 2011) (citing *United States v. 12 200-Ft. Reels of Super 8mm. Film*, 413 U.S. 123, 128 (1973)), or to manufacture them, *Def. Distributed v. U.S. Dep't of State*, No. 1-15-CV-372 RP, 2015 WL 4658921, at *21 (W.D. Tex. Aug. 4, 2015) ("Plaintiffs suggest, at the origins of the United States, blacksmithing and forging would have provided citizens with the ability to create their own firearms, and thus bolster

their ability to 'keep and bear arms.'  While Plaintiffs' logic is appealing, Plaintiffs do not cite any authority for this proposition, nor has the Court located any.  The Court further finds telling that in the Supreme Court's exhaustive historical analysis set forth in *Heller*, the discussion of the meaning of 'keep and bear arms' did not touch in any way on an individual's right to manufacture or create those arms.").

Even assuming that the Second Amendment does protect Plaintiff's right to "purchase, distribute, and sell any firearm-related item which is not a firearm" and Lycurgan's customers' right to purchase such items (FAC ¶ 140, ECF No. 42), the ATF's regulation on sales of unfinished lower receivers fits comfortably among the categories of regulation that *Heller* suggested would be "presumptively lawful" because it "impos[es] conditions and qualifications on the commercial sale of arms."  *Heller,* 554 U.S. at 626–27; *see also Bauer*, 94 F. Supp. 3d at 1155 (finding that use of Dealer's Record of Sale fee to fund the Armed Prohibited Persons System did not violate Second Amendment in part because the fee "is a presumptively lawful regulatory measure" which was "constitutional because it 'falls outside the historical scope of the Second Amendment'") (citing *Jackson*, 746 F.3d at 960); *Peña*, 2015 WL 854684, at *13 (holding that California law placing restrictions and regulations on, among other things, the sale of handguns is "'one of the presumptively lawful regulatory measures identified in *Heller*' and, as such, 'falls outside the historical scope' of the Second Amendment") (quoting *Jackson*, 746 F.3d at 960).

Moreover, restricting sales of unfinished lower receivers imposes prohibitions that fall outside the historical scope of the Second Amendment.  Unlike gunpowder, *see Heller*, 554 U.S. at 632, bullets, *see Jackson*, 746 F.3d at 967–68, or firing ranges, *see Ezell v. City of Chicago*, 651 F.3d 684, 704–06 (7th Cir. 2011), restricting access to unfinished lower receivers does not burden conduct protected by the Second Amendment, namely, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Peruta,* 742 F.3d at 1181 (quoting *Heller,* 554 U.S. at 635) (internal quotation marks omitted), because it in no way prevents citizens from obtaining a wide array of firearms. *See, e.g.*, *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) ("In light of the

ample alternative means of acquiring firearms for self-defense purposes, § 922(a)(3)[, which prohibits the transportation into one's state of residence firearms acquired outside the state,] does not impose a substantial burden on the exercise of [plaintiff]'s Second Amendment rights."); *Draper v. Healey*, 98 F. Supp. 3d 77, at *7 (D. Mass. 2015) ("The regulation does not substantially burden the right to bear arms in self-defense in one's home because the ban on two kinds of Glock pistols in no way prevents citizens from obtaining a wide array of firearms."); *Kampfer v. Cuomo,* 993 F. Supp. 2d 188, 196 (N.D.N.Y.2014) ("Here, the SAFE Act[, which restricts possession of assault weapons,] does not impose a substantial burden on [plaintiff]'s exercise of his Second Amendment rights. Indeed, . . . the SAFE Act's alteration of the definition of 'assault weapon' and the corresponding Penal Law sections restricting or prohibiting them does not substantially burden the fundamental right to obtain a firearm sufficient for self-defense. . . . [T]he restrictions and prohibitions do not create a categorical ban on an entire class of weapons, and ample firearms remain available to carry out the '*central component*' of the Second Amendment right: self-defense.") (emphasis in original and internal quotation marks omitted) (citing *Decastro*, 682 F.3d at 168–69).

Finally, under any level of scrutiny, restricting the sale of unfinished lower receivers is constitutional because it places only a marginal burden on the right to bear arms in self-defense of one's home.  *See, e.g.*, *Draper*, 98 F. Supp. 3d at *7 ("Even if the regulation [requiring a load indicator or magazine safety disconnect in handguns sold in Massachusetts] did impinge on Second Amendment rights, the Court finds that it passes constitutional muster under any standard of scrutiny."); *Bauer*, 94 F. Supp. 3d at 1155 ("Under any level of scrutiny, the DROS fee is constitutional because it places only a marginal burden on 'the core of the Second Amendment,' which is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.') (quoting *Peruta,* 742 F.3d at 1181).  Consequently, Plaintiff's Fourth Amendment claim fails and the Court **DISMISSES** Plaintiff's fourth claim.

/ / /

1  **C.      Claim 8: Fifth Amendment**

2           The relevant portion of the Fifth Amendment provides that "[n]o person shall . . . be

3  deprived of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend.

4  V.  To successfully allege a procedural due process claim, Plaintiff must provide sufficient

5  facts establishing the plausible existence of two elements: "(1) a deprivation of a

6  constitutionally protected liberty or property interest, and (2) a denial of adequate

7  procedural protections."  *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d

8  971, 982 (9th Cir. 1998).

9           Plaintiff's eighth claim for violation of the Fifth Amendment relies upon "Plaintiff

10 and its customers['] . . . protected Second Amendment liberty interest."  (FAC ¶ 178, ECF

11 No. 42.)  Plaintiff elaborates that "Ares Armor has a Second Amendment right to sell

12 unfinished lower receivers ('firearm part') to its customers" (*id.* at ¶ 181), "Ares Armor's

13 customers have a Second Amendment right to purchase the firearm[]s parts Ares Armor

14 sells" (*id.* at ¶ 183), and "Ares Armor's customer[]s [have a] fundamental Second

15 Amendment right to build firearms within their own home" (*id.* at ¶ 184).  Because the

16 Court determined above that there is no Second Amendment right to sell or purchase

17 firearms or their parts, *see supra* Part II.B, Plaintiff has failed to allege a deprivation of a

18 constitutionally protected liberty or property interest.  *See, e.g.*, *Wilson v. Holder*, 7 F.

19 Supp. 3d 1104, 1123 (D. Nev. 2014) (dismissing procedural due process claim where court

20 also dismissed First and Second Amendment claims).

21          Plaintiff also alleges that it "has a protected property interest in conducting

22 business."  (*Id.* at ¶ 187 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577

23 (1972).)  But "the Constitution does not guarantee an *unrestricted* privilege to engage in a

24 particular profession or a privilege to conduct a business as one pleases."  *Hawkins v. Agric.*

25 *Marketing Serv., Dep't of Agric.*, 10 F.3d 1125, 1133 (5th Cir. 1993) (emphasis in original)

26 (citing *Nebbia v. New York,* 291 U.S. 502, 527–28 (1934)); *see also Zwick v. Freeman*, 373

27 F.2d 110, 118 (2d Cir. 1967) ("[T]he Constitution does not guarantee an unrestricted

28 privilege to engage in business or a privilege to conduct a business as one pleases.") (citing

*Nebbia v. New York*, 291 U.S. at 527–28).  Additionally, Plaintiff "has not been deprived of the right to earn a living," but has only been denied the ability to sell unfinished lower receivers.  *See Dorfmont v. Brown*, 913 F.2d 1399, 1403 (9th Cir. 1990); *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 976 (9th Cir. 1994).  "The ability to pursue such employment stands on precisely the same footing as" the ability to sell unfinished lower receivers.  *Dorfmont*, 913 F.2d at 1403.  Because Plaintiff has no property interest in being able to sell unfinished lower receivers, *see supra* Part II.B, there is no property interest in conducting a business requiring the sale of unfinished lower receivers.  *See id.* ("If there is no protected interest in a security clearance, there is no liberty interest in employment requiring such clearance."); *accord Greenwood*, 28 F.3d at 976.  Plaintiff "simply can no longer pursue a certain line of business," *Greenwood*, 28 F.3d at 976, which does not deprive Plaintiff of its other lines of business, such as "retail[] of sporting goods and tactical equipment including clothing, firearm components, and firearms related accessories" (FAC ¶ 21, ECF No. 42).

Moreover, Plaintiff has not adequately alleged a denial of adequate procedural protections.  "'[W]ithout notice and comment' an agency may issue an interpretation that 'changes a prior statutory interpretation.'" *Firearms Imp./Exp. Roundtable Trade Grp. v. Jones*, 854 F. Supp. 2d 1, 12–13 (D.D.C. 2012) (alteration in original) (quoting *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997), *aff'd*, 498 F. App'x 50 (D.C. Cir. 2013).  As Plaintiff itself concedes, the February 7, 2014 letter was an interpretive rule (Mot. to Strike Mem. 15, ECF No. 80-1), which consequently "do[es] not require notice-and-comment rulemaking."  (Opp'n to MTD/MSJ 35, ECF No. 93; *see also* Mot. to Strike Mem. 14, ECF No. 80-1 (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1201 (2015)).)  Additionally, "[t]here is . . . no requirement of a prior hearing before the seizure of possessions under a search warrant."  *Perkins v. City of W. Covina*, 113 F.3d 1004, 1010–11 (9th Cir. 1997).  Consequently, Plaintiff has not alleged—and, in fact, cannot allege—a denial of adequate procedural protections.

/ / /

Because Plaintiff has failed to establish a deprivation of a constitutionally protected liberty or property interest or a denial of adequate procedural protections, the Court **DISMISSES** its eighth claim for procedural due process.

### D.    Claim 9: Firearm Owners' Protection Act, 18 U.S.C. § 926

Plaintiff alleges that Defendant "Jones, through the seizure of the Plaintiff's customer list, has attempted to determine the identity and thereby a system of registration of those he perceives as firearms owners."  (FAC ¶ 199, ECF No. 42.)  Defendant Jones argues that Plaintiff's ninth claim must be dismissed because "Plaintiff's allegations do not satisfy <u>Iqbal</u>'s plausibility standard," since "[t]he Complaint does not allege any facts that would establish that defendant established a system of registration or firearms owners, that it created a 'database' of any kind with the customer lists, or that it otherwise violated the Firearms Owners' Protection Act."  (MTD/MSJ Mem. 40, ECF No. 68-1.)

The Firearm Owners' Protection Act ("FOPA"), 18 U.S.C. § 926, provides:

> No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established.  Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation.

*Id.* at § 926(a).  FOPA further requires that "[t]he Attorney General shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations."  *Id.* at § 926(b).

Where there is no "rule or regulation," Section 926(a) does not apply.  *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007) ("Nor was the [ATF's] demand letter a new 'rule or regulation' simply because it represented a departure from the Bureau's prior interpretation of its authority . . . .  Thus, § 926(a)'s provision barring new rules and

regulations is plainly inapposite to the discussion at hand."); *see also Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 212 (D.C. Cir. 2013) ("The [ATF's] demand letter is not a rule or regulation and, therefore, section 926(a) does not apply."); *RSM, Inc. v. Buckles*, 254 F.3d 61, 66 (4th Cir. 2001) ("Section 926(a)'s prohibitions apply only to a '*rule or regulation* prescribed *after* the date of the enactment of the Firearms Owners' Protection Act.'") (emphasis in original) (quoting 18 U.S.C. § 926(a)). Defendant Jones' seizure of Plaintiff's customer list is not a rule or regulation; consequently, Plaintiff cannot make out a claim under Section 926(a).

Additionally, the Court agrees with Defendant Jones (*see* MTD/MSJ Mem. 40, ECF No. 68-1) that Plaintiff fails to allege any facts showing that Defendant Jones established "any system of registration of . . . firearms owners" beyond Plaintiff's conclusory allegation that Defendant "Jones, through the seizure of the Plaintiff's customer list, has attempted to determine the identity and thereby a system of registration of those he perceives as firearms owners" (FAC ¶ 199, ECF No. 42). The Court need not accept as true "legal conclusions" contained in the complaint. *Iqbal*, 556 U.S. at 678–79. Consequently, the Court **DISMISSES** Plaintiff's ninth claim alleging a violation of FOPA.

## III.   Motion for Summary Judgment

Because the Court dismisses Plaintiff's claims against Defendant Jones under Rules 12(b)(1) and 12(b)(6), it need not reach Defendant Jones' Motion for Summary Judgment. Consequently, the Court **DENIES AS MOOT** Defendant Jones' Motion for Summary Judgment.  (ECF No. 68.)

## IV.   Motion to Strike

Because the Court did not rely upon the Administrative Record in resolving Defendant Jones' MTD/MSJ, the Court **DENIES AS MOOT** Plaintiff's Motion to Strike (ECF No. 80).

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant Jones' Motion to Dismiss (ECF No. 68) and **DISMISSES WITHOUT PREJUDICE** Plaintiff's first,

fourth, eighth, and ninth claims against Defendant Jones under both Rule 12(b)(1) and 12(b)(6).   The Court **DENIES AS MOOT** Defendant Jones' Motion for Summary Judgment (ECF No. 68) and Plaintiff's Motion to Strike (ECF No. 80).

 **IT IS SO ORDERED.**

Dated:  November 19, 2015

Hon. Janis L. Sammartino
United States District Judge

14-CV-548 JLS (BGS)