1  Scott A. McMillan, SBN 212506
**The McMillan Law Firm, APC**
2  4670 Nebo Dr., Suite 200
La Mesa, CA 91941-5230
3  Tel. 619-464-1500 x 14
Fax. 619-828-7399
4
Attorneys for Plaintiff,
5  Lycurgan, Inc.

6                    **UNITED STATES DISTRICT COURT**

7                  **SOUTHERN DISTRICT OF CALIFORNIA**

8

9  LYCURGAN, INC., a California          Case No.:14-cv-00548-JLS-BGS
corporation, d/b/a Ares Armor,
10                                        **SECOND AMENDED COMPLAINT
       Plaintiff,                    FOR DAMAGES; DEPRIVATION OF
11                                        CIVIL RIGHTS (BIVENS ACTION);
       vs.                           JURY TRIAL DEMAND.**
12
EARL GRIFFITH, an individual,          **(1) First Amendment
13  UNKNOWN NAMED                        (2) Second Amendment
TECHNOLOGIST, an individual,       (3) Fourth Amendment
14  UNKNOWN NAMED AGENTs I-              (4) Fifth Amendment**
VII, individuals, and DOES I-X, in
15  their individual capacities.           **DEMAND FOR JURY TRIAL**

16       Defendants.

17
         Plaintiff  LYCURGAN, INC., a California corporation, f/k/a Ares Armor
18
alleges:
19
                              **JURISDICTION**
20
         1. This is a civil action for damages, brought pursuant to *Bivens v. Six*
21
*Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).
22
The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343,
23
2201, and 2202.
24
                                 **VENUE**
25
         2.  Venue is proper in the Southern District of California pursuant to Title
26
28, United States Code, Section 1391(e)(1)(B), because a substantial part of the
27
events or omissions giving rise to the claim occurred in this district.
28

**PARTIES**

3.  At all times relevant to this Complaint, Plaintiff LYCURGAN, INC. (hereinafter referred to as "Plaintiff" or "LYCURGAN"), a California corporation, is a corporation which does business in San Diego County, California under the fictitious business name of "Ares Armor."  Plaintiff is a manufacturer and distributor of "sporting goods" merchandise and "tactical" equipment used by law enforcement and military.  The subject merchandise which was the ostensible subject of the raid of March 15, 2014, is known in the sporting goods market as AR-15 variant "unfinished lower receiver." Unfinished lower receivers are marketed to be finished by hobbyists consumers as a component of a semiautomatic, magazine fed, sport-utility rifle of the style commonly referred to as an "AR-15."  LYCURGAN's sales of items which individuals use to make their own firearms is in keeping with longstanding American tradition. The freedom to make a firearm has been passed down through the Second Amendment. Thomas Jefferson, in 1793, noted:

> "[O]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Thomas Jefferson, 3 *Writings* 558 (H.A. Washington ed., 1853).

This tradition remains alive today, on May 16, 2016 the Second Amendment right of the individual to acquire arms has been affirmed by the Ninth Circuit Court of Appeals in *Teixeira V. County of Alameda*, 822 F.3d 1047 (2016).

4.  During the subject raid on LYCURGAN's premises, Defendants obtained possession of LYCURGAN's customer list. That "customer list" is "property" of LYCURGAN and A protected asset according to California Civil Code section 3426.1, subd. (d).

5. LYCURGAN's customers include:

a.     Individuals who lawfully purchased such unfinished lower receivers prior to the BUREAU OF ALCOHOL, TOBACCO, FIREARMS,

AND EXPLOSIVES (hereinafter referred to as "BATFE") deeming some unfinished lower receivers to be firearms. As a result of the incipient interpretation, and the BATFE's use of such interpretation to subsequently implement regulatory and criminal investigations against Plaintiff and its customers, those individual customers cannot sell or transfer such unfinished lower receivers in their possession.

b.   Individual and business entity customers who are not federal firearm licensees and who possess or have sold the unfinished lower receivers now deemed by the BATFE to be firearms. As a result of the new interpretation, these customers can no longer manufacture or sell unfinished lower receivers with characteristics defendants herein have now deemed to subject such products to regulation as a firearm. The new interpretation is inconsistent with law, regulation, and the prior interpretations and opinions of the BATFE, and these resulting inconsistencies render the affected customers unable to understand or comply with the law; and

c.   Individual and business entity customers who are not federal firearm licensees and who have sought to distribute a product similar to the subject product now deemed by the BATFE to be a firearm. These customers desire to distribute or resell their unfinished lower receivers with characteristics defendants herein have now deemed to subject such products to regulation as a firearm. Customers rely upon fair and objective application of the laws and regulations regarding firearm purchases, modifications, manufacture, and sales in order to comply with the law in engaging in such activities with firearms or the constituent parts that may become firearms. In the absence of fair, consistent, and objective application of such laws and regulations, the resulting inconsistencies render affected customers unable to

understand or comply with the law.

6. LYCURGAN and its customers have a reasonable expectation of privacy in their transactions of unfinished lower receivers and other non-regulated parts. Further, the BATFE and other Federal Government agencies are specifically prohibited from directly linking non-National Firearms Act firearms to their owners, as set forth in 18 USC § 926:

> "No such rule or regulation prescribed [by the Attorney General] after the date of the enactment of the Firearms Owners Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or disposition be established. Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation."

7. Plaintiff has lost customers as a result of public fear of the BATFE and its agents and the unjustified and unlawful conduct described herein.

8. LYCURGAN brings the following claims set forth in First Claim for Relief, *infra*, on its own behalf as well as on behalf of its customers, and the remainder on its own behalf.

9. EARL GRIFFITH is the Chief of the Firearms Technology Branch of the BATFE. EARL GRIFFITH is sued in his individual capacity.

a. EARL GRIFFITH falsely suggested that persons in the same class as Plaintiff, i.e., those in possession of the EP Arms unfinished lower receivers, were in possession of un-serialized firearms, or otherwise receivers or frames, a suggestion which he knew or reasonably should have expected would result in the deception of a judicial officer resulting in the issuance of search warrants, the execution of those warrants and such injury and upset resulting therefrom, and possible unjust criminal prosecution against the Plaintiff or those similarly situated as Plaintiff.

b. EARL GRIFFITH intended to suppress the communication of

information contained on the EP Arms unfinished lower receiver
published through the "indexing" and use of different colored
materials.

10.  Defendant UNKNOWN NAMED TECHNOLOGIST is sued in his or
her individual capacity.

a.  Defendant UNKNOWN NAMED TECHNOLOGIST is identified by
the reference to him or her as "FTB Enforcement Officer [redaction]"
at paragraph 19 of the Affidavit that deceptively formed the basis for
the issuance of the Search Warrants executed against Plaintiff herein.
[Exhibit E, p. 8, ¶ 19.]  Defendant UNKNOWN NAMED
TECHNOLOGIST falsely suggested that persons in the same class as
Plaintiff were in possession of un-serialized firearms, or otherwise
receivers or frames, a suggestion which he or she knew or reasonably
should have expected would result in the deception of a judicial
officer resulting in the issuance of search warrants, the execution of
those warrants and such injury and upset resulting therefrom, and
possible unjust criminal prosecution against the Plaintiff or those
similarly situated as Plaintiff.  In truth, those not "engaged in the
business" of manufacturing firearms, i.e., Plaintiff's customers that
are hobbyist-consumers completing unfinished lower receivers for
their own personal use or education rather than "as a regular course of
trade or business with the principal objective of livelihood and profit
through the sale or distribution of the firearms manufactured," need
not affix a serial number to either their unfinished lower receiver or
completed functional lower receiver.

b.  Plaintiff is informed and believes that Defendant UNKNOWN
NAMED TECHNOLOGIST falsely stated that he or she had
"determined that the material that comprises the main body of the

Second Amended Complaint                                    5

1  variant lower receiver is formed at a different time in the

2  manufacturing process than that which comprises the plug. As a result

3  of the two plastics being poured at two different times, the receiver

4  and plug being are formed in such a way that they are not adhered to

5  each other. As such, the plug can be removed and the firearm can

6  readily be placed into a firing condition." [Exhibit E, p. 8, ¶ 19.]

7      c.   Defendant UNKNOWN NAMED TECHNOLOGIST intended to

8           suppress the communication of information contained on the EP

9           Arms unfinished lower receiver published through the "indexing" and

10          use of different colored materials.

11  11.  Defendant UNKNOWN NAMED AGENT I is the affiant on that

12  Affidavit signed in support of the Search Warrant executed on March 14, 2014.

13  Despite an effort to determine the name of said Defendant, Plaintiff remains

14  ignorant of the true name of UNKNOWN NAMED AGENT I and thus refers to

15  such defendant accordingly.  A redacted copy of such warrant attested to by this

16  defendant is attached hereto as Exhibit 'A'.

17      a.   Defendant UNKNOWN NAMED AGENT I falsely cited the Statute

18           defining firearms in order to deceive the magistrate Judge into

19           believing that there was probably cause to believe that a crime had

20           been committed. Specifically, UNKNOWN NAMED AGENT I, The

21           agent wrote in the affidavit at Paragraph 9, page 3, the following:

22               Definition of a "Firearm"
23               9. A "firearm" is "any weapon . . . which will or is designed to
                 or may readily be converted to expel a projectile by the action
                 of an explosive." 18 U.S.C. §921 (a)(3)(A). This definition
24               includes "the frame or receiver of any such weapon," 18 U.S.C.
                 § 92l(a)(3)(B), and "any combination of parts either designed
25               or intended" from which a firearm can be "readily assembled."
                 18 U.S.C. §921(a)(4)(C). A "receiver" under 18 U.S.C. §
26               921(a)(3)(B) includes a "lower receiver."
                 [Exhibit E, P.3, ¶ 9.]
27

28  However, the above "description" is false, and does not set forth the

correct definition of a "firearm" under the cited federal statute. The probable cause created by the Affidavit, is that of a violation of a fictional statute wholly created by UNKNOWN NAMED AGENT I. UNKNOWN NAMED AGENT I materially changed 18 U.S.C. §921(a)(4)(C), which relates only to a specific group of "firearms" known as "Destructive Devices."[1] Sans UNKNOWN NAMED AGENT I's creative statutory additions and omissions, 18 U.S.C. §921(a)(4)(C) is completely unrelated to this case. By picking and choosing words from inapplicable sections, removing any reference to "Destructive Device" and instead using the general term "firearm" in proximity to 18 U.S.C. § 92l(a)(3)(B) to give the invented statute the appearance of proper context, UNKNOWN NAMED AGENT I was able to present to the Magistrate a deceptive document which the Magistrate relied upon, during the night, in determining that a warrant should be issued.

b.   Defendant UNKNOWN NAMED AGENT I falsely attested that Plaintiff was in possession of un-serialized firearms, or otherwise receivers or frames, a suggestion which he or she knew or reasonably should have expected would result in the deception of a judicial officer resulting in the issuance of search warrants, the execution of those warrants and such injury and upset resulting therefrom, and possible unjust criminal prosecution against the Plaintiff or those

---

[1] A "destructive device" relates to items such as grenades, rocket launchers, mines, missiles, bombs, and some weapons with a bore of more than one-half inch in diameter. The regulation and laws concerning "destructive devices" carry more stringent requirements than other types of "firearms." By replacing the term "destructive device" with the term "firearm," the agent was deceptively able to lift the more stringent statutory requirements relating to bombs, rockets, and missiles and place those requirements onto every other class of "firearm." See 18 U.S.C. §921(a)(4).

1   similarly situated as Plaintiff.  In truth, those not "engaged in the
2   business" of manufacturing firearms, i.e., such as Plaintiff's
3   customers that are hobbyist-consumers completing unfinished lower
4   receivers for their own personal use or education, rather than "as a
5   regular course of trade or business with the principal objective of
6   livelihood and profit through the sale or distribution of the firearms
7   manufactured" need not affix a serial number to either their
8   unfinished lower receiver, or a completed functional lower receiver.
9        c.   Defendant UNKNOWN NAMED AGENT 1 intended to suppress the
10            communication of information contained on the EP Arms unfinished
11            lower receiver published through the "indexing" and use of different
12            colored materials.
13       12.  Defendants UNKNOWN NAMED AGENTs II through VII are those
14   agents that participated in the search of the Ares Armor location in National City
15   on March 15, 2014, who engaged in the vandalism of those premises, the
16   asportation of the goods that were not listed on the inventory list, misuse of the
17   comfort facilities, and damaging of the furniture and fixtures therein.  Despite an
18   effort to determine the name of said Defendants, Plaintiff remains ignorant of the
19   true name of UNKNOWN NAMED AGENTs II through VII and thus refers to
20   such defendants accordingly.
21       13.  Plaintiff is informed and believes, and based thereon, alleges that each
22   of the Defendants designated as DOES I-X are intentionally or negligently
23   responsible, in some manner, for the events and happenings described herein.  The
24   true names and capacities of the various DOES are not known to Plaintiff.
25   Plaintiff is informed and believes that DOES I-X are special agents of the BATFE
26   who unlawfully obtained and executed a search warrant at the four San Diego
27   County business locations of Plaintiff.  The BATFE has refused to disclose the
28   names of its participating agents, including the affiant who applied for the search

1   warrant.  Plaintiff will amend this Complaint to reflect the true names and

2   identifies of the aforementioned parties at such time as they become known.

3       14.  At all times relevant to this Complaint, each Defendant DOE was an

4   individual residing, on information and belief, in San Diego County, California,

5   and an officer, agent, and employee of the BATFE.

6       15.  Plaintiff is informed and believes and on such basis alleges that at all

7   relevant times, that the defendants, including the Defendants DOES I-X

8   (hereinafter referred to as "Defendants"), and each of them, were the knowing

9   agents of one another, and that Defendants directed, ratified, and/or approved the

10  conduct of each of the other Defendants, and each of their agents or employees,

11  and are therefore vicariously liable for the acts and omissions of their co-

12  defendants, their agents and employees, as more fully alleged herein.  Moreover,

13  all of the Defendants, and each of them, agreed upon, approved, ratified, and/or

14  conspired to commit all of the acts and/or omissions alleged in this Complaint.

15

16                      **FACTUAL ALLEGATIONS**

17      16.  LYCURGAN brings this action against those Defendants sued in their

18  individual capacities, to recover among other things: lost profits, impaired earning

19  capacity, personal property damages, real property damages, remedies for

20  violations of its Civil Rights, attorney's fees, costs of suit and expenses,

21  compensatory, punitive and exemplary damages, and any other relief the Court

22  deems appropriate.

23

24                          **BACKGROUND**

25      17.  Plaintiff was founded by former Marine Sergeant Dimitri Karras

26  following his Honorable Discharge after eight years of service in foreign lands in

27  defense of the United States.  Sgt. Karras had served in the Marines as

28  infantryman, completing separate deployments in Theaters of Operation Iraq and

then Afghanistan.   After eight years of service to this country, Mr. Karras was inspired to pursue the American Dream by starting a business which would provide manufacturing jobs utilizing skilled labor in San Diego County, California. Sgt. Karras is the Chief Executive Officer of LYCURGAN.

18.  LYCURGAN began operations in Oceanside, California in 2010. Plaintiff began as a manufacturing business, designing and manufacturing backpacks, slings, cumberbunds and other textile based equipment for use by Marines and soldiers.

19.  Although lacking formal training in business, Dimitri Karras had been trained in leadership and organization skills by the Marine Corps.  Although infantryman skills found little purpose in business, the values and traits instilled by the Marine Corps such as courage, resourcefulness, flexibility and the ability to inspire proved applicable in building a company.[2]  Mr. Karras applied Marine Corps principles such as "lead by example" and "make sound and timely decisions" in the infant company.[3]  As a result, LYCURGAN burgeoned.

20.  The principal business of manufacturing textile based tactical equipment diverged into another line after Mr. Karras and other employees of Plaintiff began making their own custom firearms.  At the start of this litigation, LYCURGAN was a retailer of sporting goods and tactical equipment including clothing, firearm components, and firearms related accessories.  Since 2011, Plaintiff has provided milled or cast aluminum metal to its customers for those customers to fabricate and assemble their own sport-utility firearms. Plaintiff set up a small retail store in City of Oceanside, and one in National City.  Plaintiff also operated a sewing factory in Oceanside, sewing and assembling the tactical gear.  Plaintiff maintained a fourth location for mail order fulfillment. In addition,

---

[2] http://www.marines.com/being-a-marine/leadership

[3] http://www.marines.com/history-heritage/principles-values?nav=lp1

it operated a Website (www.aresarmor.com) through which it sold sporting goods and tactical equipment, including "80%" AR-15 unfinished lower receivers.

21.  From its modest beginnings in 2010 when Sgt. Karras sold his couch to finance Ares Armor, Plaintiff grew from a small one person business to employ about 40 people at the time of the raid.  Plaintiff's operations grew from no revenue to a multi-million dollar operation employing many former Marines and spouses of Marines.  In a time when manufactured goods are imported into the United States, Plaintiff provided training to otherwise unskilled workers, employment to skilled workers in manufacturing, and provided a starting point for others in the retail distribution trade.

22.  In late 2013, Plaintiff began purchasing unfinished lower receivers from EP Arms, LLC ("EP Arms").  Said unfinished lower receivers are manufactured using polymer material, rather than cast or forged metal.

23.  On or about July 20, 2013, Attorney Jason Davis ("Davis") whilst acting on behalf of EP Arms, sent by FedEx a letter to EARL GRIFFITH, in his capacity as the Chief of the Firearms Technology Branch of the BATFE, seeking clarification as to whether the unfinished lower receiver manufactured by EP Arms was a "firearm" under the ATF's interpretation of 18 U.S.C. § 921(a)(3) .  A copy of that letter is attached as **Exhibit 'A.'**

24.  On or about February 7, 2014, EARL GRIFFITH provided a response to Davis's letter.  A copy of that letter is attached hereto as **Exhibit 'B.'**  Within that letter, EARL GRIFFITH articulated his misapprehension that the EP Arms had manufactured a lower receiver with a empty fire-control cavity, and then backfilled that cavity with a different colored polymer material: "We further note that the fire-control cavity has been formed and then, at a later time, filled in with plastic material." [Exhibit B, page 2.] In fact: the fire-control cavity *was not* formed and then, at a later time, filled in with plastic material.

25.  On March 4, 2014, Davis responded by mailing a letter by FedEx to

Second Amended Complaint

EARL GRIFFITH, explaining that the "biscuit" of the EP Arms unfinished lower receiver which EARL GRIFFITH had believed to be the filling, was actually manufactured first, before the remaining material had been formed surrounding that biscuit.  A copy of that letter is attached hereto as **Exhibit 'C.'**

26.  The ATF responded to Davis's letter set forth at Exhibit 'C', in that undated letter attached as **Exhibit 'D.'** That undated letter was written sometime after March 4, 2014, but lacked a date. In such undated letter, EARL GRIFFITH acknowledged his misapprehension of the manufacturing process of the EP Arms unfinished lower receiver.  But, EARL GRIFFITH provided new and different reasons why the EP Arms unfinished receiver was a "firearm receiver." EARL GRIFFITH in this letter now proffered that the biscuit differentiated the fire-control area from the rest of the receiver and thus facilitated the process of making the receiver into a functional firearm. [Exhibit D, page 6.] And he stated that the "fire control area is created during the manufacturing process through the use of the biscuit." [Id.]   Further, for the first time, EARL GRIFFITH claimed that the excess material extending past the exterior walls of the casting, indicating the approximate locations of the holes to be drilled for the selector, hammer, and trigger pins comprised location "indexing" marks sufficient to classify the unfinished lower receiver as a firearm.   [Exhibit D, pages 5-6.]

27.  Plaintiff is informed and believes, and based thereon alleges, that Defendants EARL GRIFFITH, UNKNOWN NAMED TECHNOLOGIST, and DOES I-X, intentionally failed to affix a date to the letter shown in Exhibit D. The omission was intentionally made in order to conceal the timing of the decision making and thereby to provide "plausible deniability" of sinister intentions preceding or contemporaneous with the threatening behavior by the ATF beginning on or about March 9, 2014 towards Plaintiff herein.

28.  Plaintiff is informed and believes, and based thereon alleges, that the rationale expressed by Defendants EARL GRIFFITH, UNKNOWN NAMED

1  TECHNOLOGIST, and DOES I-X within Exhibit D was pretextual, and merely

2  intended to provide a basis to leverage a bargain with Plaintiff herein to satisfy the

3  individually named defendants' covetous urge to obtain Plaintiff's customer list.

4  Specifically, Plaintiff could either hand over the customer list and its valuable

5  supply of EP Arms unfinished lower receiver, or face the ostensible threat of a

6  raid, seizure, and a criminal prosecution contrived from the reasoning set forth in

7  the undated letter set forth in Exhibit D.

8                    **The Subject Unfinished Lower Receivers Are Not Regulated**

9        29.   A "firearm" is defined pursuant to 18 U.S.C. § 921(a)(3) as:

10                (A) any weapon (including a starter gun) which will or is

11                designed to or may readily be converted to expel a projectile by

12                the action of an explosive;

13                (B) the frame or receiver of any such weapon;

14                (C) any firearm muffler or firearm silencer; or

15                (D) any destructive device.

16       30.   A "firearm frame or receiver" is defined in CFR 478.11 as:

17                "[t]hat part of a firearm which provides housing for the hammer, bolt

18                or breechblock, and firing mechanism, and which is usually threaded

19                at its forward portion to receive the barrel."

20       31.   A firearm is *not* an unfinished receiver under 18 U.S.C. § 921(a)(3).

21  See, *United States v. McMurty*, 24 Fed. Appx. 594 (7th Cir. 2001).  The *McMurty*

22  Court, by a panel that included the Hon. Richard A. Posner, Circuit Judge, upheld

23  a jury instruction that defined a firearm as:

24                "any weapon which will expel a projectile by the action of an
                  explosive; or any weapon which is designed to expel a projectile by
25                the action of an explosive; or any weapon which may be readily
                  converted to expel a projectile by the action of an explosive; *or* the
26                frame or receiver of such weapon."

27  [*United States v. McMurty*, 24 Fed. Appx. 594 (7th Cir. 2001)(*Emphasis added*).]

28       32.   Thereby, the law was well-established on March 14, 2014 that whether

an unfinished receiver was "readily convertible" into a finished receiver was of no moment:  an unfinished receiver that is readily convertible into a finished receiver is still *not* a firearm.

33.  An unfinished lower receiver is akin to an incomplete engine block that requires additional cutting, sanding, and shaping before it will function and can be installed into an engine bay as part of a complete automobile.

34.  As sold to Plaintiff's customers, unfinished lower receivers cannot function as "receivers" in a "firearm" without undergoing significant machining work. Before an unfinished lower receiver can actually function as a receiver, the purchaser must perform the following additional machining and drilling using machining tools such as a drill press:

    a.      Machining out the Fire-Control Cavity

    b.      Machining out the Trigger slot

    c.      Drilling out the Pin and Safety Selector Holes.

35.  Only after this additional machining by the individual purchaser is performed is an unfinished lower receiver actually able to function as a "receiver" and thereby accept the attachment of other constituent firearm parts to become a part of a functional –  and thereby legally regulated –  "firearm."

36.  With the exception of the EP Arms unfinished lower receiver which the BATFE has now deemed to constitute a "firearm," per federal law and regulation, unfinished lower receivers are not deemed to be firearms and are not subject to regulation by a state or federal agency.

37.  While all unfinished lower receivers require extensive machining before they are considered firearms under federal law and regulation, with respect to the EP Arms unfinished lower receiver, the BATFE claims two distinct characteristics and the manufacturing process of the precursor as transmuting an otherwise unregulated unfinished lower receiver into a firearm subject to regulation. The two apparently material characteristics are a contrast-color core

piece (sometimes referred to as a "biscuit") and pre-cast indices to guide where an individual purchaser who machines a firearm receiver from the unfinished lower receiver should drill certain holes required to build a functioning firearm receiver. This latter feature, along with the colored biscuit, are collectively referred to by the BATFE as "indexing." An unfinished lower receiver with these two additional characteristics will be hereinafter referred to as an "EP Arms unfinished lower receiver." But for these two additional "indexing" features on an unfinished lower receiver, the BATFE would not deem an unfinished lower receiver to be a "firearm" subject to regulation. As set forth below, the BATFE's use of these two characteristics to differentiate between an otherwise unfinished lower receiver and a challenged unfinished lower receiver is a distinction without logical or legal support, and the implementation of the policy by defendants regulating such unfinished lower receiver is a violation of federal law and the First Amendment to the United States Constitution.

38.  The BATFE also alleged that a "fire-control cavity" was created during the process of manufacturing the EP Arms unfinished lower receiver. It is BATFE's long-standing position that the creation of a "fire-control cavity" causes a precursor to meet the definition of a "firearm."  BATFE claims the process to make an EP Arms unfinished lower receiver, requiring the creation of the biscuit first and the rest of the precursor is formed around the biscuit, creates a "cavity" and consequently a "firearm." (Exhibit D).

39.  **Distinction No. 1: The Biscuit**

a.    Unlike other unfinished lower receivers, there is a "reference" point for where the fire-control cavity in the center of the precursor can be machined out. The polymer material constituting the central area in the EP Arms unfinished lower receiver where the "fire-control cavity" will eventually be hollowed out is a different color from the other surrounding portions of the precursor. Because of this, in the

1    extensive process of machining and transforming a precursor into a
2    functional "receiver," the EP Arms unfinished lower receiver
3    effectively has a color-coded "guide" indicating some of the
4    dimensions that need to be machined or drilled out of the unfinished
5    lower receiver by the person machining it into a firearm receiver.
6    b.    The creation of the EP Arms unfinished lower receiver is a two-part
7          process. (Exhibit D, depicted on pg. 4) First, the lighter colored center
8          portion of the precursor is formed by using a liquid form of the
9          polymer material. This center material is identical to the material used
10         to make the full precursor, except for its color. This center portion is
11         referred to as the core-piece, or "biscuit."
12   c.    After the biscuit is cured for two days, it is then suspended in the
13         center of a mold. The biscuit has holes through it. When the
14         additional material is poured into the mold, it flows into and through
15         the biscuit's holes, forming interlocking "bars" that are permanent in
16         nature. The biscuit and additional material become a permanently
17         bonded homogenous material, varying only in shade of color.
18   40.   **Distinction No. 2: Positive Indexing**
19   a.    In the BATFE's reasoning, three cylindrical projections on each side
20         (six in total) extending beyond the surface of the precursor indicating
21         where the holes for the hammer pin, trigger pin, and the safety
22         selector should be drilled. An individual who purchases the EP Arms
23         unfinished lower receiver must still drill the holes on his or her own.
24         The holes must be drilled with skill to ensure that the holes are the
25         correct diameters for the pins or safety selector. This means using a
26         drill press or other reliable method for ensuring proper completion.
27   b.    Last, with the EP Arms unfinished lower receiver, as with every
28         unfinished lower receiver, the trigger slot has to be drilled out to

accommodate the trigger. Nothing in the EP Arms unfinished lower receiver is different from any other precursor in this regard. The only differentiation made by BATFE is the presence of the colored biscuit and indexing. As addressed below, these two distinctions are minor, non-functional, and informational only and do not lawfully bring otherwise unregulated unfinished lower receivers into the ambit of the BATFE's regulation as firearm receivers.

c.    Such positive indexing and color coding is for informational purposes only, and is subject to protection as such under the First Amendment to the United States Constitution.  Obtaining a warrant on the account of providing material that bears indexing marks comprises a prior restraint on otherwise lawful speech and subjects the BATFE's reliance on positive indexing to strict scrutiny.

d.    The EP Arms unfinished receivers, with the two indexing features incomplete, still require significant additional drilling and machining work to be performed by a purchaser in order to make them a functioning receiver.

41.   **Distinction No. 3: Alleged Creation of the "Fire-Control Cavity"**

a.    The "fire-control cavity" for complete receivers houses the parts making up the trigger group of the firearm, i.e. the moving parts that allow the firearm to discharge.   With respect to the EP Arms unfinished receiver, the BATFE stated that during its manufacture the "fire-control cavity" was created.  But, as explained above, the creation of the precursor is a two-part process where the biscuit is created first and the rest of the precursor is formed around and permanently bonded to the biscuit. An actual "cavity" never exists during the creation of the EP Arms unfinished lower receiver. Nevertheless, BATFE's knowing of its falsity took the position that

the biscuit was non-existent and therefore the EP Arms unfinished lower receiver was a therefore a "firearm."  (Exhibit D).

42.  **Transforming the Unfinished Lower Receiver into a Functional "Receiver": Machining out the Fire-Control Cavity**

a.   Only by the extensive and time-consuming act of physically removing the biscuit and "bars" in their entirety using machinery can a fire-control cavity be created. The colored biscuit provides visual guidance of where a person must further machine the EP Arms unfinished lower receiver in order to create a "fire-control cavity." Using great skill, an individual who purchases an EP Arms unfinished lower receiver must not only remove the biscuit during process of machining and drilling the EP Arms unfinished lower receiver into a functional firearm receiver, but that person must also machine away the 1/16 of an inch of  polymer material surrounding the core. This 1/16 of an inch of material is the same color as the rest of the EP Arms unfinished lower receiver. Without removing the biscuit and the surrounding, undifferentiated material by precise machining, an individual cannot create a fire-control cavity large enough to accept the necessary trigger/hammer mechanism to create a functioning receiver.

b.   Only after such painstaking machinations is a fire-control cavity sufficiently created for the finished product to eventually be deemed under federal law and regulations to be a "receiver" and thus a "firearm" that is regulated. Thus, even the presence of a different colored core does not obviate the need for additional significant and precise machining and drilling to be performed on the  EP Arms unfinished lower receiver to make it a receiver under federal law and regulation.

43.  **Transforming the Unfinished Lower Receiver into a Functional "Receiver": Drilling out the Pin and Safety Selector Holes**

a.    Painstakingly machining out the fire control cavity in the manner described above is not sufficient by itself to create a functioning receiver because additional work is needed to make the Regulated Precursor able to accept a trigger/hammer mechanism.

b.    In addition to drilling out the biscuit, holes for the hammer and trigger pins, and safety selector must also be drilled into the sides of the EP Arms unfinished lower receiver before it can actually function as a receiver for a firearm. These holes hold the pins that keep the hammer, trigger and safety mechansim in place in the fire-control cavity.

44.    The BATFE's Historical positions on Unfinished Lower Receivers are inconsistent with the incipient position taken with the EP Arms unfinished lower receiver.

a.    The BATFE has repeatedly issued agency opinion letters finding that precursors do not qualify as a "frame" or "receiver" under federal law or regulations because precursors do not and cannot provide a housing for firing mechanisms, and because precursors require additional work in order to be put into a condition where they could accept firing mechanisms or have other firearm parts attached to make a functional firearm.

b.    Over the years, the BATFE has issued written opinions about unfinished lower receivers to at least four manufacturers confirming that such unfinished lower receivers with certain machining operations incomplete are not "firearms." See, e.g., BATFE letter to Bradley Reece [attached as **Exhibit I**] ("an AR-10 type receiver blank which has no machining of any kind performed in the area of the

trigger/hammer (fire-control) recess might not be classified as a firearm. [and] The sample is completely solid and un-machined in the fire-control recess area and, accordingly, is not a 'firearm' as defined in the GCA.") (emphasis in original); BATFE letter to Quentin Laser, LLC [attached as **Exhibit F**] ("an AR-15 type receiver which has no machining of any kind performed in the area of the trigger/hammer recess might not be classified as a firearm.") (emphasis in original); and see also BATFE letter to Kenney Enterprises, Inc. and BATFE letter to 80 Percent Arms , attached as **Exhibits G** and **H**.

c.  The BATFE's prior opinions and rulings confirm that products which require (1) milling out the fire-control cavity, (2) drilling of the selector-level hole, (3) cutting the trigger slot, (4) drilling the trigger pin hole, and (5) drilling the hammer pin hole are not "firearms." The EP Arms unfinished receivers require all of these actions, and so cannot be considered "firearms" under law.

d.  In reliance on federal law and regulations, and on the BATFE's prior opinions, interpretations and letter rulings regarding what constitutes a "firearm" "frame" or "receiver," Plaintiff and hundreds of other Americans have established businesses selling unfinished lower receivers.  Thousands of Americans have established businesses selling firearm accessories, and an estimated tens of thousands of Americans have purchased and currently possess unfinished lower receivers so they can make their own firearm.

e.  According to federal law and regulations, and the BATFE's prior consistent opinions on this issue, only when a fire-control cavity is created is there an actual "frame" or "receiver" of a firearm that is properly subject to regulation.

f.  Notwithstanding the additional work required to turn an unfinished

lower receiver into a functioning receiver, BATFE now contends that the EP Arms unfinished lower receiver is a "firearm" under federal law. It so contends for two reasons:

    i.    First, BATFE claims the design of the core and the projections (respectively) constitute "indexing."

    ii.    Second, BATFE claims that the process of making the EP Arms unfinished lower receiver created a "cavity."

45. As it is sold, the EP Arms unfinished lower receiver must, in fact, be machined in ways that BATFE has historically consistently approved, and does not require additional machining in the fire-control area. The excess material provides information to identify to the homebuilder, or hobbyist, and show where to drill or machine. Such information is protected by the First Amendment to the United States Constitution.

46. BATFE's recent, contrived and pretextual position regarding the EP Arms unfinished lower receiver is arbitrary, and not based upon any of its prior opinions, rulings, or reasoning. Unfinished lower receivers and jigs have been on the market with BATFE's explicit blessing for years. Unlicensed manufacturers create and sell jigs to show the purchaser of unfinished lower receivers where to drill. The BATFE has determined that these jigs, which perform the exact same function as the EP Arms unfinished lower receiver cylindrical and color indexing, are permissible and not subject to regulation as consistent with historical application. Over the years, some of these jigs have evolved, and in some cases, have become integral to the unfinished lower receiver itself. These evolved jigs attach to the unfinished lower receiver allowing the consumer to complete the receiver more easily. (See **Exhibit J** included pictures of unfinished lower receivers and jigs.) Still, the BATFE – rightly and consistent with historical application -- has declared these integrated jigs do not somehow turn a nonfirearm into a regulated receiver. These unfinished lower receivers are no different from

the EP Arms unfinished lower receiver in any legally-significant sense. They all require the fire-control cavity to be created by the purchaser and holes for the trigger, hammer, and selector to be drilled or machined by the purchaser.

47.  As a result of the BATFE arbitrarily, and in violation of federal law and regulation, deeming the EP Arms unfinished lower receiver to be "receivers" subject to regulation as "firearms," Plaintiff's customers have had their EP Arms unfinished lower receivers rendered untransferable.

48.  By the BATFE's incipient, arbitrary, and historically inconsistent designation of the EP Arms unfinished lower receiver as a firearm, Plaintiff's customers have also been unable to manufacture, transfer, or sell EP Arms unfinished lower receiver, and have had prior sales or transfers of EP Arms unfinished lower receiver brought within the ambit of a criminal act, potentially making such customers unknowing criminals where they had no intent or notice that sale or transfer of such a precursor required compliance with federal and state laws regarding the transfer or sale of firearms.

49.  By the BATFE's incipient, arbitrary, and historically inconsistent designation of the EP Arms unfinished lower receiver as a firearm, all such affected customers who engaged in the above activity who are federal firearms licensees are subject to potential regulatory penalty, including revocation of their FFL by defendants, and subject to potential criminal penalty. Such customers potentially acquired, held, and disposed of EP Arms unfinished lower receiver without recording such transactions as required under state and federal law for firearm acquisitions and dispositions. Such customers are effectively in a state of criminal and regulatory "limbo," subject to criminal prosecution until the statute of limitations on such a "crime" runs, and in fear of losing their Federal Firearms Dealer's License ("FFL") for an interminable period of time.

50.  As a further result of the BATFE arbitrarily, and in violation of federal law and regulation, deeming the EP Arms unfinished lower receiver to be a

Second Amended Complaint

"receiver," Plaintiff's customers who wish to manufacture their own firearm, have been denied the ability to purchase the EP Arms unfinished lower receiver for such activity. Further, such customers are unaware whether products similar to the EP Arms unfinished lower receiver now or in the future would be considered firearms by defendants, and would require such licensees to acquire, dispose of, and record such receivers they stock as firearms. In the event such licensees were obligated to treat such unfinished lower receivers as firearms, or, alternatively, chose to treat such objects as firearms due to the BATFE's arbitrary and inconsistent rules and regulations on the issue, such licensees would be subject to a hardship, insomuch as treating such unfinished lower receivers as firearms would necessitate serializing and recording each and every such precursor bought or sold by such licensees, at significant cost for each such precursor acquired or disposed of.

51.  Plaintiff contends that the EP Arms unfinished lower receiver is not a firearm within the meaning of 18 U.S.C. § 921(a)(3) and that the EP Arms unfinished lower receiver is not a frame or receiver of a firearm within the meaning of 27 C.F.R. § 478.11.

**LYCURGAN d/b/a Ares Armor is a lawful business**

52.  The Gun Control Act of 1968 was enacted to reduce crime, not place an undue burden on legal firearms owners from legal possession and use of firearms. See GCA68, 90-618 sec. 101. The Gun Control Act of 1968 ("the Act") provisions contained in Title 18, Chapter 44, provide by exclusion under the definitions of prohibited conduct, that an otherwise not prohibited person may make a firearm as described in section 18 USC 921(a)(3):

Section 922(a)(1)(A) of the Gun Control Act of 1968 (act)
provides that it is unlawful for any person except a licensed importer,
licensed manufacturer, or licensed dealer, to engage in the business of
importing, manufacturing, or dealing in firearms, or in the course of

such business to ship, transport, or receive any firearm in interstate or foreign commerce. 18 U.S.C.S. § 922(a)(1)(A).

The Act defines a manufacturer as any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this chapter. 18 U.S.C.S. § 921(a)(10).

"Engaged in the business" as applied to a manufacturer of firearms is defined as a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured. 18 U.S.C.S. § 921(a)(21)(C).

"With the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, that proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which—

> (A) is committed by an individual who is not a national or permanent resident alien of the United States;
>
> (B) involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and
>
> (C) is intended—

1               (i) to intimidate or coerce a civilian population;

2               (ii) to influence the policy of a government by

3           intimidation or coercion; or

4               (iii) to affect the conduct of a government by

5           assassination or kidnapping.

6     18 U.S.C.S. § 921(a)(22)(C).

7     53.  LYCURGAN does not sell firearms as defined under 18 USC 921(a)(3).

8 LYCURGAN does not sell receivers or frames as defined under 18 USC §

9 921(a)(3)(B).

10     54.  LYCURGAN does not hold a license issued by the BATFE, nor is

11 Plaintiff required to be licensed by the BATFE.

12               **BATFE targets LYCURGAN for Investigation**

13     55.   On or about December 2012, Special Agent Gordon Geerdes,

14 employed by the BATFE, requested that Dimitri Karras provide the BATFE

15 LYCURGAN's customer list.  Karras refused to provide its customer list.

16     56.  On or about March 10, 2014, agents from the BATFE communicated to

17 Plaintiff that the BATFE was in the process of obtaining a warrant against Plaintiff

18 based upon the BATFE's incorrect determination that the subject unfinished lower

19 receivers were firearms.   The BATFE also communicated to LYCURGAN that so

20 long as Karras relinquished both: all of the subject unfinished lower receivers, and

21 Plaintiff's customer list  to the BATFE, then BATFE would not obtain a warrant.

22     57.  Said BATFE agents communicated words to the effect that "[in]

23 exchange for turning over our customer's private information the BATFE, the

24 agents stated that they would not "raid" Plaintiff's facilities and would not pursue

25 "criminal charges."

26     58.  Said threats by the BATFE agents were extortionate.  Said threats were

27 unlawful.

28     59.  Karras agreed to the BATFE agents' terms in order to delay an

1  impending and unjust raid against Plaintiff long enough to obtain legal protection

2  under the law from this court.

3      60.  Plaintiff is informed and believes, and based thereon alleges, that the

4  promise to not pursue "criminal charges," i.e., a promise of immunity, was made

5  without basis, was false, and entirely unauthorized.   Plaintiff is further informed

6  and believes that the BATFE agents were unable to promise or agree to any

7  immunity from prosecution or other consideration by a Federal Prosecutor's Office

8  or a Court in exchange for the demanded cooperation since the decision to confer

9  any such benefit lies within the exclusive discretion of the Federal Prosecutor's

10  Office and the Court.   Plaintiff is informed and believes, and based thereon

11  alleges, that said BATFE agents had not consulted with any United States

12  Attorney's office prior to making such an offer of immunity.

13      61.  LYCURGAN has an existing property interest in its reputation as a law

14  abiding business.

15      62.  LYCURGAN has an existing property interest in its customer list, and

16  that such list has not been made available to the public.

17  / / /

18  / / /

19  / / /

20

21

22

23

24

25

26

27

28

## LYCURGAN seeks relief in this Court

63. On March 11, 2014, Plaintiff filed the initial complaint herein in this case for deprivation of Civil Rights against the BATFE, styled as *Lycurgan, Inc. v. B. Todd Jones*. Plaintiff then sought declaratory judgment that the EP Armory 80% lower receiver (LYCURGAN's primary retail product) is not a firearm. Plaintiff also sought a temporary restraining order and injunctive relief forbidding the BATFE and/or its officers, agents, servants, and employees from seizing LYCURGAN's EP Armory inventory and customer list. LYCURGAN filed the complaint in response to the aforementioned demands from the BATFE to turn over LYCURGAN's unfinished lower receiver parts and confidential customer list.

64. On March 11, 2014, Judge Sammartino, District Judge for the District Court for the Southern District of California, granted LYCURGAN's request for a temporary restraining order ruling:

> " Presently before the Court is Plaintiff Lycurgan Inc. DBA Ares Armor's ("Ares Armor") Motion for Temporary Restraining Order ("TRO"). (Mot. for TRO, ECF No. 2.) Ares Armor seeks to restrain Defendants B. Todd Jones—Head of the San Diego Field Office of the Bureau of Alcohol, Tobacco, Firearms and Explosives—and Does 1 through 10 (collectively, "ATF") from seizing the Ares Armor customer list and approximately $300,000 in inventory ("the Property") at 11 a.m. on Wednesday, March 12, 2014. (Id. at 1–2.)
>  Having reviewed the materials submitted, the Court HEREBY ORDERS that any steps to deprive Ares Armor of the Property SHALL NOT be executed until after the Court holds a hearing as to whether a preliminary injunction should issue. ATF SHALL FILE an opposition to Ares Armor's Motion for TRO on or before Friday, March 14, 2014. Ares Armor MAY FILE a reply, if any, at or before 9 a.m. on Monday, March 17, 2014. The parties are HEREBY ORDERED to appear for a preliminary injunction hearing on Thursday, March 20, 2014, at 1:30 p.m. in Courtroom 4A.
>  IT IS SO ORDERED."

[ECF No. 4.]

65. On March 12, 2014, an BATFE agent appeared at Plaintiff's office with the stated purpose of taking possession of Plaintiff's unfinished lower receivers and the customer list for those customers that had purchased the EP Arms unfinished lower receivers. At that time, Plaintiff caused the BATFE to be served

1   with a copy of the Court's order issued on March 11, 2014 [ECF No. 4.].  Said

2   BATFE agents left without LYCURGAN's customer database or supply of EP

3   Arms unfinished receivers.

4        66.  On March 14, 2014, the United States Attorney's Office filed an ex

5   parte application challenging the temporary restraining order.  Paul J. Ware, the

6   Division Counsel for the Los Angeles Field Division, of the BATFE supported the

7   ex-parte application with his unverified statement referring to the EP Arms

8   unfinished receivers as both "receivers" and "firearms."  [ECF No. 5-1.]

9        67.  On the same day, Judge Sammartino ruled on the United States's ex

10  parte application, stating:

11      "        Presently before the Court is Defendants' Ex Parte Application
         for Order: (1) Extending Injunction to Prevent Divestment of Subject
12       Matter of Temporary Restraining Order; and (2) Clarifying that
         Temporary Restraining Order Does NotRestrain Lawful Criminal
13       Proceedings. (ECF No. 5.)
                  Having reviewed Defendants' Ex Parte Application, the Court
14       finds Defendants' requested relief to be reasonable and equitable.
         Accordingly, the Court HEREBY ORDERS that: (1) Plaintiff
15       Lycurgan Inc. DBA Ares Armor ("Plaintiff") and its owners, officers,
         managers, employees, and agents ARE HEREBY PROHIBITED from
16       taking any steps to destroy, transfer, sell, or otherwise divest
         themselves of the items that are the subject matter of the Court's
17       March 11, 2014 Temporary Restraining Order ("TRO") (see ECF No.
         4);
18       (2) the Court's March 11, 2014 TRO DOES NOT ENJOIN lawful
         criminal proceedings, including the application for or lawfully
19       executed seizure of evidence and contraband pursuant to a search
         warrant issued by a sworn United States Magistrate Judge pursuant to
20       Federal Rule of Criminal Procedure 41; and (3) the hearing on
         Plaintiff's motion for TRO SHALL REMAIN SCHEDULED for 1:30
21       p.m. on Thursday, March 20, 2014. However, so that the parties may
         fully address all of the facts and circumstances as alleged by one
22       another, the Court now orders that Defendants SHALL FILE a
         response to Plaintiff's motion at or before 9 a.m. on Monday, March
23       17, 2014. Plaintiff SHALL FILE a reply at or before 12 p.m. on
         Tuesday, March 18, 2014.
24       IT IS SO ORDERED."

25  [ECF No. 6.]

26       68.  Plaintiff is informed and believes, and on that basis alleges, that all

27  Defendants were aware of the Court's partial modification of its prior restraining

28  order to allow "lawful criminal proceedings" as opposed to pretextual, baseless,

1   retaliatory, contrived, and otherwise unlawful criminal proceedings.

2   **UNKNOWN NAMED AGENT 1 makes false Affidavit before Magistrate**

3       69.  During the night of March 14, 2014, Defendant UNKNOWN NAMED

4   AGENT 1, with full knowledge of the Court's order limiting the proceedings to

5   only those "lawful criminal proceedings," submitted a materially false affidavit to

6   the Honorable Bernard G. Skomal of this Court for the purpose of applying for a

7   search warrant (hereinafter referred to as "Warrant") authorizing the search of

8   LYCURGAN's four business facilities, all located in San Diego County,

9   California. A copy of the Affidavit, as redacted is, attached hereto as **Exhibit 'E.'**

10      70.  Magistrate Skomol relied upon the statements of UNKNOWN NAMED

11  AGENT 1 within the Affidavit in making his decision to issue the search warrant.

12      71.  Based on the prevarications, dissembling, wilful non-disclosures and

13  intentionally misleading statements contained therein, Magistrate Judge Skomol

14  issued warrants for the search of four separate premises.

15      72.  Plaintiff is informed and believes that the BATFE's efforts to obtain the

16  Warrant were undertaken to punish Plaintiff for refusing to turn over the customer

17  list when it was demanded and then filing the lawsuit styled as *Lycurgan, Inc. v. B.*

18  *Todd Jones*, 14CV0548.  Plaintiff is informed and believes that the BATFE

19  conducted its ensuing raid on March 15, 2014 in order to moot the lawsuit of

20  *Lycurgan, Inc. v. B. Todd Jones*, rather than as a sincere "crime control" effort.

21      73.  Plaintiff is informed and believes, and alleges herein and in greater

22  detail below, that Defendants knowingly and intentionally provided the magistrate

23  with false statements, misrepresentations and/or omissions to obtain the Warrant.

24  Plaintiff is informed and believes that the affidavit (hereinafter referred to as

25  "Affidavit") used to secure the Warrant misrepresented the manufacturing process

26  of LYCURGAN's 80% unfinished polymer receivers, which Defendants

27  inaccurately contended transformed the innocuous parts into "firearms."  Also, the

28  Affidavit omitted the fact that the BATFE previously determined that a virtually

1   identical unfinished lower receiver as that at issue in the Affidavit did not

2   constitute a "firearm" within the meaning of the Gun Control Act of 1968.

3   Plaintiff is informed and believes that the magistrate who issued the Warrant was

4   misled by the information contained in the Affidavit; and, that Defendants knew

5   the information was false or would have known was false except for their reckless

6   disregard for the truth.  Plaintiff is informed and believes that, if these false

7   statements are excised and removed from the submitted Affidavit and the

8   wrongfully omitted information was included, the remaining contents of the

9   Affidavit are insufficient to support the issuance of the Warrant.

10       74.  In the morning of March 15, 2014, with the unlawfully and deceptively

11   obtained Warrant in hand, heavily armed personnel - draped in body armor, some

12   toting fully automatic weapons, all with pistols strapped to their thighs in urban-

13   assault/tactical configuration - conducted a simultaneous raid of Plaintiff's four

14   locations.  Agents of the BATFE entered the premises of LYCURGAN's four

15   separate facilities, located at: (1) 206/208 N. Freeman Street, Oceanside, (2) 416

16   National City Blvd., National City, California, (3) 180 Roymar Street, Oceanside,

17   California, and (4) 2420 Industry, Oceanside, CA.  The raid was executed pursuant

18   to the Warrant, as redacted at Exhibit 'E.'

19                          **National City Raid**

20       75.  During the course of the search at 416 National City Blvd., National

21   City, California, the Defendants UNKNOWN NAMED AGENTs II through VII

22   unnecessarily caused property damage and disarray.  Defendants UNKNOWN

23   NAMED AGENTs II through VII damaged the door frames of the glass doors in

24   order to enter the building.  In order to gain entry rather than simply break the

25   glass, which could be inexpensively replaced, the UNKNOWN NAMED AGENTs

26   II through VII  caused substantial destruction to the metal door frames through the

27   use of a battering ram against the aluminum.

28       76.  As an outward manifestation of the animus, one, or possibly more, of

Defendants UNKNOWN NAMED AGENTs II through VII, used the restroom facilities at the National City store in a manner intended to vex, shock, disgust and annoy Plaintiff's principals and employees.

77. Defendants UNKNOWN NAMED AGENTs II through VII took valuable Rudius unfinished pistol frames from the National City store. Said items had an aggregate value in excess of $950. The items were owned by Plaintiff. Plaintiff did not consent to the UNKNOWN NAMED AGENTs II through VII taking such items. Defendants UNKNOWN NAMED AGENTs II through VII intended to permanently deprive Plaintiff of its property.

78. Plaintiff is informed and believes, and based thereon alleges that the Defendants UNKNOWN NAMED AGENTs II through VII failed to provide a list of the items taken in order prevent Plaintiff from recovering through legal process such property as such items did not appear on the inventory of seized items for that store. Indeed, Plaintiff is informed and believes, based on the circumstances of the raid, the level of vandalism, the gratuitous "tossing" of the premises, and the circumstances preceding the raid, that Defendants UNKNOWN NAMED AGENTs II through VII intended to steal the Rudius unfinished pistol frames, and possibly other items from Plaintiff. Such acts comprise a violation of California Penal Code section 487, e.g., "Grand Theft."

79. Because Defendants UNKNOWN NAMED AGENTs II through VII also removed the computers with the then-existing inventory of the store within its accounting system, through Defendants' conduct Plaintiff is impaired in determining all that which had been pilfered by Defendants UNKNOWN NAMED AGENTs II through VII.

80. Defendants UNKNOWN NAMED AGENTs II through VII were observed using the store's property to pack up the documents they seized. Specifically, defendants dumped the contents of LYCURGAN's storage bins on the floor, and then used the emptied bins to pack up the documents that they

1    seized.  Papers were strewn all about the store.

2        81.  Defendants UNKNOWN NAMED AGENTs II through VII used a

3    sledge hammer that was at the National City store which had been used to do

4    remodeling to beat open a safe.  Members of the public watched through the

5    window as the National City store raid took place.  One of those members of the

6    public recorded a video of the agents beating the safe open.  That video has now

7    been published on YouTube.[4]  The safe is destroyed, and the sledge hammer is

8    damaged.

9                                **Oceanside Raids**

10       82.  During the course of the search at 180 Roymar Street, Oceanside,

11   California, the BATFE agents took approximately 5,804 unfinished polymer parts

12   otherwise known as "unfinished polymer lower receivers."

13       83.  Plaintiff is the owner of the 5,804 unfinished polymer parts.

14       84.  Such 5,804 unfinished polymer parts are not "contraband" or "other

15   property that the person from whom the property was seized may not legally

16   possess" as such terms are used within the meaning of 18 U.S.C. § 983(a)(1)(F).

17   Nor are such 5,804 unfinished polymer parts "contraband" or "other property that

18   is illegal to possess" as such terms are used within the meaning of 18 U.S.C. §

19   983(d).

20       85.  The search and seizure of LYCURGAN, and its pending criminal

21   investigation, has gained substantial public news coverage and attention.

22   Consequently, there is a cloud over LYCURGAN, and customers are reluctant to

23   continue engaging in business with LYCURGAN.  Before the search and seizure,

24   LYCURGAN was a highly profitable small business.  Since the day of the search

25   and seizure, LYCURGAN struggled simply to stay open.  Thereafter,

26   LYCURGAN sold its business.

27

28

---

[4] https://www.youtube.com/watch?v=6KFjjLXDZ4E

86.  On March 27, 2014, the BATFE purported to give notice of seizure and administrative forfeiture proceedings of 5,804 unfinished polymer parts otherwise known as "unfinished polymer lower receivers" ("Notice")   The BATFE referred to the proceeding as BATFE Case Number:  784090-13-0011-01, Asset ID: 14-ATF-009592.

87. On April 5, 2014, Plaintiff submitted a Verified Claim for the seized property to the BATFE's forfeiture division.

88.  On June 11, 2014, LYCURGAN filed a motion to unseal the Affidavit in the case styled as *In the Matter of the Search of: Ares Armor, 206/208 N Freeman St, Oceanside; Ares Armor, 416 National City Blvd; Ares Armor Warehouse, 180 Roymar St, Suite  D; and 2420 Industry, Oceanside, CA*, Case No. 14CV1424 DMS JLB, United States District Court, Southern District of California.  On July 10, 2014, the BATFE opposed the motion.  On July 17, 2014, LYCURGAN filed a response to the BATFE's opposition.  The matter was scheduled to be heard before Judge Sammartino on July 31, 2014.

89.  On July 3, 2014, the BATFE executed a written statement that it would not be instituting Civil Forfeiture Proceedings against the 5,804 EP Arms unfinished lower receivers seized from Plaintiff.

90.  On July 9, 2014, Plaintiff through its attorney of record made written request for the release of the subject unfinished polymer parts to Assistant United States Attorney assigned to a related action currently pending in this court entitled *Lycurgan, Inc., d/b/a Ares Armor, Petitioner v. Bureau of Alcohol, Tobacco, Firearms and Explosives, Respondent (In the Matter of the Search of: Ares Armor, 206/208 N Freeman St, Oceanside; Ares Armor, 416 National City Blvd; Ares Armor Warehouse, 180 Roymar St D; and 2420 Industry, Oceanside, CA)*, So. Dist. Cal. Case No. 14-cv-1424-JLS.

91.  On July 10, 2014, the United States Attorney's office stated, "[i]n this case, there is an ongoing criminal investigation that is still in the

1   early stage of its proceedings. Gov. Exh. 4.  To date, ***an indictment has not***

2   ***been sought or obtained*** . . ."

3   [Case 14-cv-1424-JLS; Docket 8, page 9 (***emphasis added***.)]

4

5   Such statement was made in an opposition filed within that related action

6   opposing the disclosure of the affidavit which accompanied the request for the

7   search warrant issued to effect the March 15, 2014 raid on Plaintiff's facilities,

8   e.g., *Lycurgan, Inc., d/b/a Ares Armor, Petitioner v. Bureau of Alcohol, Tobacco,*

9   *Firearms and Explosives, Respondent (In the Matter of the Search of: Ares Armor,*

10   *206/208 N Freeman St, Oceanside; Ares Armor, 416 National City Blvd; Ares*

11   *Armor Warehouse, 180 Roymar St D; and 2420 Industry, Oceanside, CA*), So.

12   Dist. Cal. Case No. 14-cv-1424-JLS, that:

13       92.  On July 16, 2014, Plaintiff initiated in the United States District Court

14   for the Southern District of California an "anti-Forfeiture" action to recover its

15   5,804 EP Arms unfinished lower receivers styled *Lycurgan, Inc. v. Todd Jones*, *in*

16   *his official capacity as Director of the Bureau of Alcohol, Tobacco, and Firearms*

17   *Enforcement*, case no. 3:14-cv-01679-JLS-BGS.

18       93.  At the July 31, 2014 hearing in case 14-cv-1424-JLS, Judge

19   Sammartino ordered the BATFE to file a supplemental brief to substantiate the

20   continued sealing of the Affidavit.

21       94.  On August 14, 2014, the BATFE, rather than substantiating the

22   continued sealing of the affidavit through the requested supplemental briefing,

23   filed and disclosed a redacted version of the Affidavit attached as Exhibit E.

24   [Case 14-cv-1424-JLS; Docket 14-1.]

25       95.  On December 23 2014, the BATFE acknowledged that it did not require

26   the seized EP Arms unfinished receivers for any ongoing criminal investigation.

27       96.  On December 23, 2014, the BATFE attempted to return all of the siezed

28   EP Arms unfinished receivers to LYCURGAN. However the BATFE returned

5,786 items instead of the 5,804 which it had originally confiscated during the March 15, 2014 raid. The BATFE failed to return 18 units. The Defendants lost 18 items which they contend are firearms.

97.  Despite returning some of the unfinished lowers to LYCURGAN, the BATFE has warned LYCURGAN that the items are subject to regulation as firearms. As the BATFE knows, the returned EP80s are essentially valueless as any attempt to transfer, sell, or otherwise recoup from the items would surely be met with harsh repercussion.

98.  Based on information and belief, the BATFE has maintained copies of LYCURGAN's private customer database, despite the lack of ongoing criminal investigation, and despite the fact that the customer list taken from LYCURGAN is in an electronic database format, including personal details about each customer and their associated purchases, residencies, and personal information such as limited private financial data.

# I.

## FIRST CLAIM FOR VIOLATION OF FIRST AMENDMENT
### (PRIOR RESTRAINT OF SPEECH -
### As Against EARL GRIFFITH and UNKNOWN NAMED TECHNOLOGIST)
### [Damages, Attorneys Fees]

99.  Plaintiff re-alleges, and incorporates herein as if set forth in full, paragraphs 1 through 98.

100.  Plaintiff, and its customers described above, have a right to engage in speech as protected by the First Amendment to the United States Constitution, which provides:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

101.  Plaintiff has an implied right to sue derived from the First Amendment

1  to the United States Constitution, as first set out in *Bivens*, and as recently

2  assumed in *Wood v. Moss*, 134 S. Ct. 2056, 2066 (U.S. 2014).

3      102.  Defendants EARL GRIFFITH and UNKNOWN NAMED

4  TECHNOLOGIST were aware of the legal authority set forth in *United States v.*

5  *Prince*, 2009 U.S. Dist. LEXIS 54116 (D. Kan. June 26, 2009), holding that

6  indexing marks on an otherwise unfinished lower receiver do not change the

7  unfinished nature of such receivers.

8      103.  The subject indexing marks were not illegal.  Instruction or

9  information relating to education in the process of manufacturing firearms is

10  neither illegal, or even regulated.  Neither the United States Government or the

11  State of California has imposed any licensing regulation on educational

12  communications regarding gunsmithing, firearms manufacture, or firearms repair

13  as related to the subject unfinished receivers.  Defendants EARL GRIFFITH and

14  UNKNOWN NAMED TECHNOLOGIST were aware that there were no such

15  limitations on publicizing instructional material, whether or not engraved on

16  physical material.

17      104.  Defendants EARL GRIFFITH and UNKNOWN NAMED

18  TECHNOLOGIST were familiar with the EP Armory unfinished lower receivers,

19  as such defendants had personally inspected a sample.  Defendants knew that the

20  color differences between the polymer used to manufacture the EP Armory

21  unfinished lower receiver were non-functional and solely informational.

22  Defendants knew that the indexing marks on the EP Armory unfinished lower

23  receiver were non-functional and solely informational.

24      105.  Defendants intended to prevent Plaintiff and others in possession of

25  the EP Armory unfinished lower receiver from selling, transferring, completing, or

26  distributing such items because those items had the differing colors of material

27  and the indexing marks.

28      106.  The indexing marks and different colors on EP Armory unfinished

lower receiver were and remain non-functional and solely informational, and thereby protected by the Speech clause of the First Amendment to the United States Constitution.

107.  The indexing marks and different colors were not directed at inciting or producing imminent lawless action and nor were such marks likely to incite or produce such action. (*Brandenburg v. Ohio*, 1969, 395 U.S. 444, 447, 89 S. Ct. 1827, 1829, 23 L. Ed. 2d 430.)

108.  This First Amendment right to provide information which is already in the public domain for informational purposes is "clearly established" such that a reasonable agent with the BATFE in Defendants' situation would know it is wrong to attempt to suppress speech as to matters that are in the public domain, and which are not not directed at inciting or producing imminent lawless action and nor were such marks likely to incite or produce such action.

109.  Defendants UNKNOWN NAMED TECHNOLOGIST and EARL GRIFFITH'S intentional conduct set forth above was a substantial factor in the the issuance of a warrant as a consequence of their knowingly false characterization of the EP Armory unfinished lower receiver as a firearm or receiver.

110.  Plaintiff has suffered damages, and requests compensatory and punitive damages against Defendants UNKNOWN NAMED TECHNOLOGIST and EARL GRIFFITH.


## II.

## SECOND CLAIM FOR VIOLATION OF FIRST AMENDMENT (RETALIATION FOR EXERCISE OF RIGHT TO PETITION As Against UNKNOWN NAMED AGENT I and DOES I-X)

### [Damages, Attorneys Fees]

111.  Plaintiff re-alleges, and incorporates herein as if set forth in full, paragraphs 1 through 110 above.

112.  Defendant Agent I and DOES I-X lacked probable cause to conduct a search.

113.  Plaintiff petitioned the court for declaratory and injunctive relief in the case styled as *Lycurgan, Inc. v. B. Todd Jones*, 14CV0548, in response to the BATFE threatening to raid LYCURGAN's businesses if Plaintiff did not relinquish its valuable and private customer list, and its valuable and legal EP Arms unfinished lower receivers.

114.  Three days following the filing of the instant action, Defendants UNKNOWN NAMED AGENT I and DOES I-X , and each of them, acting under the color of their authority, obtained a Warrant through means of deception. Defendants UNKNOWN NAMED AGENTs II through VII thereafter, and as a consequence of the events set in motion by UNKNOWN NAMED AGENT I and DOES I-X,  executed an unreasonably destructive search and seizure that caused Plaintiff to suffer unnecessary damages.

115.  Under the circumstances set forth above, Plaintiff had the right to petition the government for a redress of grievances without retaliation under the "redress" clause and the "speech clause" of the First Amendment of the Constitution of the United States by filing a lawsuit in the United States District Court.

116.  The First Amendment right to speak out against the Government, publish information, and to bring lawsuits in court, is so "clearly established" such that a reasonable agent with the BATFE in Defendants' situation would know it is wrong to submit a false or misleading affidavit to a magistrate in applying for a search warrant, execute a search and seizure without probable cause, and conduct a search and seizure in an unreasonably destructive manner, all in retaliation against Plaintiff for previously filing a lawsuit against the BATFE.

117.  As a direct and proximate result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, special and general damages to the extent and

1  in an amount subject to proof at trial.  Plaintiff has also incurred, and will continue
2  to incur, attorneys' fees, costs and expenses, including those authorized by 42
3  U.S.C. section 1988, to an extent and in an amount subject to proof at trial.

4      118.  On information and belief, Defendants, and each one of them, acted
5  with malice and with the intent to cause injury to Plaintiff.  Defendants, and each
6  one of them, engaged in a willful conscious disregard for the probable
7  consequences for injury of Plaintiff in a despicable, vile and contemptible manner.
8  Plaintiff is entitled to an award of punitive damages for the purpose of punishing
9  Defendants, and to deter them and others from such conduct in the future.  (*Smith*
10 *v. Wade* (1983) 461 U.S. 30.)

11                                **III.**

12      **THIRD CLAIM FOR VIOLATION OF FOURTH AMENDMENT**
13      **(As Against UNKNOWN NAMED AGENT I, UNKNOWN NAMED**
14          **TECHNOLOGIST, EARL GRIFFITH, and DOES I-X)**
15                    **[Damages, Attorneys Fees]**

16      119.  Plaintiff re-alleges, and incorporates herein as if set forth in full,
17 paragraphs 1 through 118 above.

18      120.  Plaintiff had the right to be free from unreasonable search and seizure
19 under the Fourth Amendment of the Constitution of the United States.  This Fourth
20 Amendment right is "clearly established" such that a reasonable agent with the
21 BATFE in Defendants' situation would know it is wrong to submit a false or
22 misleading affidavit to a magistrate in applying for a search warrant, execute a
23 search and seizure without probable cause, and conduct a search and seizure in an
24 unreasonably destructive manner. *Franks v. Delaware*, 438 U.S. 154; 98 S. Ct.
25 2674; 57 L. Ed. 2d 667 (1978). Defendants through the use of willful omissions,
26 falsehoods, prevarications, lies, reckless misstatement, convinced a Magistrate
27 judge to issue a warrant on:

28      ". . .  probable cause to believe that Title 18 United States Code,

---

Sections 922 (a) (l)(A), 922 (t), and 371 have been violated, and that the property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the [Plaintiff's locations]."

(Exhibit E, p. 22.)    In fact, there was no probable cause for the warrant as:

a.    Title 18 USC 922(a)(1)(A) provides that it

"It shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce".
[Internal divisions omitted.]

    i.    Defendants knew that no crime was being committed because the subject EP Arms unfinished lower receivers are not firearms, thus there is no prohibition in dealing, shipping, receiving or transporting such items.

b.    Title 18 USC 922(t) requires that some transfers of firearms are preceded by a background check of the transferee.

    i.    Defendants knew that the section 922(t) referenced as substantiating a finding of probable cause for a search lacked an essential element because the subject EP Arms unfinished lower receivers are not firearms, thus there is no requirement of a background check.

c.    Title 18 USC 371 in pertinent part provides:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

* * *

    i.    Defendants knew that the "conspiracy" referenced as substantiating a finding of probable cause for a search lacked an essential element because the subject EP Arms unfinished

1                    lower receivers are not firearms.

2         121. Defendants UNKNOWN NAMED TECHNOLOGIST and EARL

3 GRIFFITH were aware that their false statements communicated to the other

4 defendants would be used to deceive a Magistrate Judge and wrongfully obtain a

5 search warrant.

6         122. Plaintiff is informed and believes that Defendants, acting under the

7 color of authority, knowingly and intentionally submitted the Affidavit that lacked

8 probable cause of criminal activity.  Defendants intentionally mislead Magistrate

9 Judge Skomol as the Affidavit states that the "investigation deals with the

10 manufacturing of AR-15 variant lower receivers that are designed of kevlar

11 reinforced polymer." [Affidavit, ¶ 18.]  These variant lower receivers are also

12 known as "'blank', 'an 80%,' 'an 80% blank,' 'an 80% lower,' 'casting' or 'an

13 AR-15 80%.'" [Id., ¶ 15.]  These items are unregulated by BATFE. [Id.]  In other

14 words, variant lower receivers or 80% unfinished lower receivers are legal, may be

15 lawfully possessed by anyone, and are not subject to the licensing and registration

16 requirements of "firearms."  Defendants concede: "Because '80%' completed

17 lower receivers are partially completed, they are not regulated as firearms, but are

18 considered inert hunks of metal.  There is no prohibition for anyone to possess an

19 80% lower receiver or a firearm parts kit containing an 80% lower receiver." [Id.,

20 ¶ 45.]  Consequently, the Defendants understood that Plaintiff and its customers

21 were engaged in admittedly lawful activity, absent of the requisite probable cause

22 for the issuance of a search warrant, yet they made other wrongful statements in

23 order to obtain the issuance of warrants.

24         123. Plaintiff is informed and believes that the issuance of the search

25 warrant was not justified due to false statements or statements made with disregard

26 of the truth contained within the Affidavit to secure such warrant.  Specifically,

27         a. Defendants falsely represented to Magistrate Skomol that the EP

28             Arms unfinished lower receivers were a "firearm". [Exhibit E, p. 9, ¶

1    20.]

2    b.    Defendants falsely cited 18 U.S.C. §921(a)(4) when they modified the

3          more stringent federal statute concerning rockets, bombs, and

4          grenades to generally apply to all "firearms." Despite citing the law

5          concerning "destructive devices" as the basis for probable cause, the

6          Defendants did not make any allegation that LYCURGAN was in any

7          way dealing "destructive devices." The phrase "destructive device" is

8          entirely absent from the affidavit. Instead, Defendants cleverly

9          changed the federal statute to paint an ex post facto target on

10         LYCURGAN's lawful activities.[Exhibit E, p. 3, ¶ 9.]

11   c.    After misrepresenting that the EP Arms unfinished lower receivers

12         comprise a "firearm", Defendants asserted that the unfinished lower

13         receivers lacked a serial number but failed to disclose that the

14         unfinished state did not compel the serialization of the item. [Exhibit

15         E, p. 9, ¶ 20.] Even if the unfinished lower receiver were finished by

16         Plaintiff's customers, there is no requirement that the resulting

17         finished firearm be serialized by the person who completed it.

18   d.    Defendants falsely or recklessly misrepresented the manufacturing

19         process of LYCURGAN's 80% unfinished lower receivers.  [Exhibit

20         E, Affidavit, ¶¶ 18-19.]

21         i.    Defendants misconstrued the temporal property of the

22               manufacturing process. Defendants stated that the Firearms and

23               Technology Branch:

24                     "determined that the material that comprises the main
                       body of the variant lower receiver is formed at a different
25                     time in the manufacturing process than that which
                       comprises the plug."
26                     [Exhibit E, Affidavit, ¶¶ 19.]

27         However, the referenced determination actually stated:

28                     "It is our determination that when the fire-control cavity
                       was formed during the manufacturing process, the

submitted casting reached a point in its manufacture to be classified as a 'firearm' ... filling of the cavity at a later point does not change our classification" [Exhibit B, p.2].

ii.    Defendants misconstrued the result of the manufacturing process, which in reality produces a single material that is inseparable without cutting into the material. Instead of telling the truth, Defendants stated that:

"As a result of the two plastics being poured at two different times, the receiver and plug being are formed in such a way that they are not adhered to each other." [Exhibit E, Affidavit, ¶¶ 19.]

This statement was not only untrue but completely lacking in reasonable basis. No such determination was made. [see Exhibit B]. The plug and receiver are fully adhered to each other.

iii.    Defendants misconstrued the end use properties of the subject unfinished receivers after the manufacturing process was complete. Defendants stated that:

"As such, the plug can be removed and the firearm can readily be placed into a firing condition." [Exhibit E, Affidavit, ¶¶ 19.]

This statement is completely untrue. Defendants' misrepresentations of the manufacturing process and product properties were "knowingly and intentionally" made. The BATFE was previously informed of its misunderstanding of the manufacturing process on or about March 4, 2014 within the letter of Jason Davis at Exhibit C.  UNKNOWN NAMED AGENT I failed to disclose the existence of the letter at Exhibit C, or the information contained therein. [Exhibit E, p. 9, ¶ 23.]

124.  These false statements and misrepresentations were material to the Magistrate's finding of probable cause.  Excluding the alleged misrepresentations

1    in the Affidavit, the search warrant would not have been issued.

2        125.  Plaintiff is informed and believes that the issuance of the search

3    warrant was not justified due to knowing and intentional omissions of material

4    facts in the Affidavit used to secure the Warrant.  Specifically, Defendants omitted

5    the fact that the BATFE previously examined a sample of an 80% unfinished

6    lower receiver, which is virtually identical to the unfinished polymer parts at issue

7    in the Affidavit, and the BATFE determined it "is not sufficiently complete to be

8    classified as the frame or receiver of a firearm and thus would <u>not</u> be a 'firearm' as

9    defined in the GCA."  A true and correct copy of the BATFE letter, dated July 15,

10   2013, is attached hereto as **Exhibit "E."**  A true and correct copy of the BATFE

11   letter, dated May 17, 2013, is attached hereto as **Exhibit "F."**  Including the

12   wrongfully omitted information in the Affidavit, the Warrant would not have been

13   issued.

14       126.  Defendants, acting under the color of authority, caused Plaintiff

15   damages through the execution of an unreasonable search and seizure in violation

16   of the Fourth Amendment.  Defendants' conduct was without proper justification

17   or authority, without probable cause, consent or exigency.  The search and seizure

18   was premised on an affidavit that lacked probable cause, and contained knowing

19   and intentional false statements, misrepresentations and omissions.  Furthermore,

20   the UNKNOWN NAMED AGENTs II through VII executed the search and

21   seizure in an unreasonably destructive manner as a result of the events that

22   UNKNOWN NAMED AGENT I and DOES I-X put into motion. Defendants are

23   liable for damages for violating Plaintiff's Fourth Amendment right to be free

24   from unreasonable searches and seizures.

25       127.  UNKNOWN NAMED AGENT I made the following statements, that

26   without limitation to additional mistatements to be identified, were false,

27   misleading or omitted facts:

28       a.    UNKNOWN NAMED AGENT I testified to Magistrate Skomol that

---

14-cv-00548-JLS-BGS              Second Amended Complaint                    44

Plaintiff was selling "firearms" that lacked a serial number, and manufacturer identification.  As set forth and explained above, that statement is false

b.   UNKNOWN NAMED AGENT I made no disclosure to Magistrate Skomol of the fact of the then-pendency of a hearing on Plaintiff's preliminary injunction.

c.   UNKNOWN NAMED AGENT I made no disclosure of the issuance of prior determination letters issued by the BATFE both before and after the raid reflecting that substantially identical products, although lacking the EP Arms indexing marks and the differing colored material, had been deemed legal.

d.   UNKNOWN NAMED AGENT I falsely suggested that the EP Arms unfinished receivers could be readily assembled into a firearm, rather than milled or fabricated into a frame or receiver.  Such distinction is significant the law does not classify an item that can be readily converted to a frame or a receiver as a "firearm."

e.   UNKNOWN NAMED AGENT I falsely construed the BATFE's previous holdings relevant to the subject unfinished receivers in the Affidavit. He stated:

> "ATF has consistently held that the indexing of the fire-control-cavity of the AR-type receiver (or any of the mounting pin holes for the fire-control-components) is the same as if it were formed ..."

[Exhibit E, Affidavit, ¶¶ 19.]

However, UNKNOWN NAMED AGENT I failed to disclose that while making the determination specifically concerning the EP Arms unfinished receivers, the BATFE determination clearly stated that,

> "ATF has long held that any machining of the fire-control cavity is the legally significant step in making a receiver." [Exhibit B, p.2]

These two separate statements are irreconcilable. In the first breath,

1    the Defendants told the public that the "legally significant step" is

2    "any machining." Then about one month later, UNKNOWN NAMED

3    AGENT I, in secret and sealed documents, told a Magistrate Judge

4    that he wanted to raid the public because marking, or "indexing," has,

5    according to Unkown Named Agent I, has been consistently held by

6    the BATFE as the legally significant step.

7        f.    UNKNOWN NAMED AGENT I falsely cited 18 U.S.C. §921(a)(4)

8            as,

9                 " 'any combination of parts either designed or intended' from
             a firearm can be 'readily assembled.' 18

10                U.S.C.§92l(a)(4)(C)." [Exhibit E, P.3, ¶ 9.]

11       The true reading of the referenced portion of  18 U.S.C.

12   §921(a)(4)(C) is,

13                "any combination of parts either designed or intended *for use in*

14                *converting any device into any destructive device described in*
             *subparagraph (A) or (B) and from which a destructive device*

15                *may be* readily assembled."18 U.S.C. §921(a)(4)(C)
             [Emphasis added to portion intentionally omitted by

16                UNKNOWN NAMED AGENT I in his sworn Affidavit].

17   18 U.S.C. §921(a)(4)(C) relates exclusively to "Destructive Devices."

18   The words "Destructive Device" do not appear any where in the

19   Affidavit against LYCURGAN. [See Exhibit E]. "Destructive

20   Devices" are not related to this case in any way whatsoever, nor was

21   LYCURGAN even allegedly accused of any criminal activity relating

22   to "Destructive Devices." [*id*.] A Destructive Device relates to items

23   such as missiles, grenades, bombs, rockets, mines and some weapons

24   with a bore diameter greater than one and one half inches. [18 U.S.C.

25   §921(a)(4)] Congress enacted more stringent statutory requirements

26   for missiles, bombs, mines, and grenades than other more general

27   types of "firearms."  UNKNOWN NAMED AGENT I, took 18 U.S.C.

28   §921(a)(4)(C), and deceitfully changed the statutory construction in

1   order to subject all other types of "firearms" to the more stringent

2   requirements which Congress explicitly and exclusively applied only

3   to "Destructive Devices." This new fictional construction of the

4   statute allowed UNKNOWN NAMED AGENT I to create an ex post

5   facto law. UNKNOWN NAMED AGENT I knew that LYCURGAN

6   was a lawful business. Under the true laws he would not have

7   obtained a warrant. He instead chose to usurp Congressional authority

8   and created his own law which would allow him to attack

9   LYCURGAN.

10   g.   UNKNOWN NAMED AGENT I falsely cited 18 U.S.C.§92l(a)(3)(A)

11   as defining the "making of a firearm frame or receiver." Specifically

12   he stated:

13       "... and thus, constitutes the making of a firearm frame or
         receiver as defined by 18 U.S.C. §92l(a)(3)(A)."
14       [Exhibit E, Affidavit, ¶¶ 19.]

15   However, 18 U.S.C. §92l(a)(3)(A) does not define the "making of a

16   firearm frame or receiver." In fact, neither of the words "frame" or

17   "receiver" even exist in 18 U.S.C. §92l(a)(3)(A). A "firearm" is

18   defined separately in 18 U.S.C. §92l(a)(3)(C) as including "the frame

19   or receiver of any such weapon." However, unlike the representations

20   made to Magistrate Skomal, "firearm frame or receiver" is not further

21   defined by statute—instead, it is defined by regulation CFR 478.11

22   which states:

23       "Firearm frame or receiver. That part of a firearm which
         provides housing for the hammer, bolt or breechblock, and
24       firing mechanism, and which is usually threaded at its forward
         portion to receive the barrel."
25       [CFR 478.11]

26   UNKNOWN NAMED AGENT I—with full knowledge that the items

27   in question did not meet the only relevant definition of a "[f]irearm

28   frame or receiver"—intentionally omitted such important definition.

1   The omitted definition was the product of agency notice-and-

2   comment rule making and so carries the full force and effect of law.

3   This case is entirely about allegations concerning "firearm frames;"

4   the fact that the only legally binding definition of "firearm frame" is

5   conspicuously absent from the affidavit demonstrates how far

6   UNKNOWN NAMED AGENT I was willing to go in order to

7   complete his deception and punish LYCURGAN.

8   h.   UNKNOWN NAMED AGENT I failed to disclose to the Magistrate

9         that fabricating a firearm receiver from an unfinished receiver is

10        lawful.

11   i.   UNKNOWN NAMED AGENT I failed to disclose that the EP Arms

12        unfinished receivers and the biscuit were one bonded piece. Indeed,

13        UNKNOWN NAMED AGENT I lied, stating: "[a]s a result of the

14        two plastics being poured at two different times, the receiver and plug

15        being are formed in such a way that they are not adhered to each

16        other.  As such, the plug can be removed and the firearm can readily

17        be placed into firing condition." [*SIC*]  This statement is an utter

18        falsehood.

19   j.   UNKNOWN NAMED AGENT I failed to disclose that indexing

20        marks do not make a firearm. See, e.g., *United States v. Prince*, supra,

21        2009 U.S. Dist. LEXIS 54116.

22   k.   UNKNOWN NAMED AGENT I failed to disclose that Dimitri

23        Karras offered the BATFE a key and access to security cameras

24        pending the disposition of the preliminary injunction hearing.

25   l.   UNKNOWN NAMED AGENT I failed to disclose that there is no

26        requirement that "home-built" firearms bear a serial number, or that it

27        is even legal for individuals not otherwise disqualified to fabricate

28        their own non-NFA firearms. Instead, Unkown Named Agent I lied

Second Amended Complaint

1        when he stated, "Federal law also requires that both intact guns and

2        all completed lower receivers must be "Conspicuously engraved, cast

3        or stamped" with a serial number to a depth of no less than .003" and

4        a font size not less than 1/16 of an inch." a statement Defendants

5        knew to be false.

6        128.   Defendants falsehoods, misleading statements, and factual omissions,

7   were material to the finding of probable cause.

8        129.   Defendants misrepresentations or omissions were made intentionally

9   or with reckless disregard for the truth.  The fact that the affidavit did not report

10   important factual information that was within the Defendants' knowledge at the

11   time allows a reasonable fact-finder to conclude that the Defendants acted with at

12   least reckless disregard for the truth.

13        130.   Defendants were aware of their obligations avoid engaging in the

14   deception of judicial officers in order to obtain warrants as that conduct could

15   result in personal liability.  Such law was well-established years prior to March of

16   2014 in *Chism v. Washington*, 661 F.3d 380 (9th Cir. 2011).

17        131.   As a direct and proximate result of Defendants' actions, Plaintiff has

18   suffered, and will continue to suffer, special and general damages to the extent and

19   in an amount subject to proof at trial.  Plaintiff has also incurred, and will continue

20   to incur, attorneys' fees, costs and expenses to an extent and in an amount subject

21   to proof at trial.

22        132.   On information and belief, Defendants, and each one of them, acted

23   with malice and with the intent to cause injury to Plaintiff.  Defendants, and each

24   one of them, engaged in a willful conscious disregard for the probable

25   consequences for injury of Plaintiff in a despicable, vile and contemptible manner.

26   Plaintiff is entitled to an award of punitive damages for the purpose of punishing

27   Defendants, and to deter them and others from such conduct in the future.  (*Smith*

28   *v. Wade* (1983) 461 U.S. 30.)

# IV.

## FOURTH CLAIM FOR VIOLATION OF FOURTH AMENDMENT

### (As Against UNKNOWN NAMED AGENTs II-VII)

### [Damages, Attorneys Fees]

133. Plaintiff re-alleges, and incorporates herein as if set forth in full, paragraphs 1 through 132 above.

134. Defendants UNKNOWN NAMED AGENTs II-VII purloined Plaintiff's "Rudius" unfinished pistol frames, plastic bins, and other property from the National City location. Those defendants failed to identify such items on any inventory submitted to the Court following the raid. Defendants UNKNOWN NAMED AGENTs II-VII lacked probable cause to seize such non-inventoried items.

135. Defendants vandalized and intentionally damaged the premises at National City thereby conducting an unreasonable search and seizure.

136. Defendants engaged in tomfoolery in the premises at National City as an outward manifestation of their collective animus for Plaintiff's exercise of its other rights under the First Amendment and Second Amendment as set forth above, thereby conducting an unreasonable search and seizure.

137. John R. Spencer, Chief of the Firearms Technology Branch previously issued a determination letter finding that the Rudius unfinished pistol frames are not "firearms" as defined in 921(a)(3) as determined in 18 USC § 921(a)(3).

138. Defendants UNKNOWN NAMED AGENTs II-VII seized the Rudius unfinished pistol frames and plastic bins without a warrant.

139. Plaintiff had the right to be free from unreasonable search and seizure under the Fourth Amendment of the Constitution of the United States. This Fourth Amendment right is "clearly established" such that a reasonable agent with the BATFE in Defendants' situation would know it is wrong to remove such items, vandalize the premises, and otherwise engage in tomfoolery.

140.  As a direct and proximate result of Defendants' actions, Plaintiff has suffered special and general damages to the extent and in an amount subject to proof at trial.  Plaintiff has also incurred, and will continue to incur, attorneys' fees, costs and expenses to an extent and in an amount subject to proof at trial.

141.  On information and belief, Defendants, and each one of them, acted with malice and with the intent to cause injury to Plaintiff.  Defendants, and each one of them, engaged in a willful conscious disregard for the probable consequences for injury of Plaintiff in a despicable, vile and contemptible manner. Plaintiff is entitled to an award of punitive damages for the purpose of punishing Defendants, and to deter them and others from such conduct in the future.  (*Smith v. Wade* (1983) 461 U.S. 30.)

## V.

## FIFTH CLAIM FOR VIOLATION OF THE FIFTH AMENDMENT
## IMPROPER TAKING
### (As against UNKNOWN NAMED AGENT I and DOES I-X)
### [Damages, Attorneys Fees]

142.  Plaintiff re-alleges, and incorporates herein as if set forth in full, paragraphs 1 through 141 above.

143.  Plaintiff had the right under the Fifth Amendment of the Constitution of the United States to not be deprived of its property without due process of law. This Fifth Amendment right is "clearly established" such that a reasonable agent with the BATFE in Defendants' situation would know it is wrong to submit a false or misleading affidavit to a magistrate in applying for a search warrant, execute a search and seizure without probable cause, and conduct a search and seizure in an unreasonably destructive manner, in order to seize and detain lawfully owned property.

144.  Plaintiff's customer list is recognized as "property" under California law.  Defendant UNKNOWN NAMED AGENT I took that property.  Plaintiff has

1    made significant efforts to keep its customer list secret and private.

2        145.   Plaintiff maintained a liberty interest and a property interest in the

3    public's perception of Plaintiff's nature as a law abiding business.  The conduct of

4    Defendants UNKNOWN NAMED AGENT I and DOES I-X identified

5    LYCURGAN as a violator of the laws, resulting in a stigma.

6        146.   Customers that formerly did business with Plaintiff are aware that the

7    Government, and worse – the BATFE – have their name.  Plaintiff's customers are

8    now on the "BATFE list."  Plaintiff has suffered stigma from that occurrence.

9        147.   Plaintiff has suffered damages as a result of that stigmatization,

10   resulting in additional difficulty in obtaining sales, necessitating the discounting

11   of product and increased advertising.

12       148.   Pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of*

13   *Narcotics* (1971) 403 U.S. 388, 389, a federal agent acting under color of his

14   authority gives rise to a cause of action for damages consequent upon his

15   unconstitutional conduct.  Accordingly, Defendants are liable for damages for

16   violating Plaintiff's Fifth Amendment right to not be deprived of life, liberty, or

17   property, without due process of law.  (*Davis v. Passman* (1979) 422 U.S. 228.)

18       149.   At no time did Plaintiff consent, constructively or otherwise, to such

19   deprivation and detention of Plaintiff's lawful business inventory and confidential

20   customer list, nor was the search and seizure conducted with probable cause or

21   lawfully obtained.

22       150.   As a direct and proximate result of Defendants' actions, Plaintiff has

23   suffered, and will continue to suffer, special and general damages to the extent and

24   in an amount subject to proof at trial.  Plaintiff has also incurred, and will continue

25   to incur, attorneys' fees, costs and expenses, to an extent and in an amount subject

26   to proof at trial.

27       151.   On information and belief, Defendants, and each one of them, acted

28   with malice and with the intent to cause injury to Plaintiff.  Defendants, and each

1   one of them, engaged in a willful conscious disregard for the probable

2   consequences for injury of Plaintiff in a despicable, vile and contemptible manner.

3   Plaintiff is entitled to an award of punitive damages for the purpose of punishing

4   Defendants, and to deter them and others from such conduct in the future.  (*Smith*

5   *v. Wade* (1983) 461 U.S. 30.)

6

7                               **PRAYER**

8          WHEREFORE, Plaintiff Lycurgan Inc. prays for judgment against

9   Defendant as follows:

10      1.      General damages and special damages according to proof;

11      2.      Punitive damages as allowed by law;

12      3.      Special damages, including loss profits and diminished earning

13              capacity;

14      4.      Attorneys fees pursuant to 42 U.S.C. § 1988, and any other

15              appropriate statute;

16      5.      Costs of suit incurred herein; and

17      6.      Such further relief as the Court deems just and proper.

18                              Respectfully submitted,

19                              **The McMillan Law Firm, APC**

20   Dated: August 5, 2016        /s/ Scott A. McMillan

21                              _____

22                              Scott A. McMillan
                                Attorneys for Lycurgan, Inc.
23                              Plaintiff

24

25

26

27

28

1

**DEMAND FOR JURY TRIAL**

2  Plaintiff Lycurgan, Inc., demands a jury trial on all matters so determinable.

3  Respectfully submitted,

4  **The McMillan Law Firm, APC**

5  Dated:  August 5, 2016

6  /s/ Scott A. McMillan

7  _____

8  Scott A. McMillan
Attorneys for Lycurgan, Inc.
Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 'A'



*The Law Offices of*
# DAVIS & ASSOCIATES

27201 Puerta Real, Suite 300, Mission Viejo, CA 92691
Direct (949) 310-0817/Fax (949) 288-6894 Jason@CalGunLawyers.com
www.CalGunLawyers.com

July 20, 2013

Earl Griffith
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Firearms Technology Branch
244 Needy Road
Martinsburg, West Virginia 25405 USA
**VIA FED-EX**

Re:        **In re: EP ARMS, LLC**

Dear Mr. Griffith:

I write regarding my client, EP ARMS, LLC (EPA) and their intent to manufacture a partial
lower receiver.  Specifically, we are asking for clarification as to whether the incomplete AR-
type lower that my client intends to manufacture is a "firearm" as defined in 18 U.S.C.
§921(a)(3) or a merely a casting.

We have enclosed an exemplar EPA AR-15 type casting for your review and examination.  The
following features are included on the AR-15 casting:

- Magazine well;
- Magazine catch;
- Receiver extension/buffer tube;
- Pistol-grip area;
- Pistol-grip screw hole;
- Pistol-grip upper receiver tension hole;
- Pistol-grip tension screw hole;
- Bolt catch;
- Front pivot-pin takedown hole;
- Rear-pivot pin takedown hole.

We believe that these features molded into the raw casting do not render the casting a firearm for
the reasons detailed below.  But, in an abundance of caution, we request clarification from the
Bureau of Alcohol, Tobacco, Firearms, and Explosives – Firearms Technology Branch.

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:     **In re: EP ARMS, LLC**
July 20, 2013
Page 2

## DEFINITION OF FIREARM

Title I of the Gun Control Act, 18 U.S.C. §§ 921 *et seq.*, primarily regulates conventional firearms (i.e., rifles, pistols, and shotguns).  Title II of the Gun Control Act, also known as the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*, stringently regulates machine guns, short barreled shotguns, and other narrow classes of firearms.  "Firearm" is defined in § 921(a)(3) as:

> (B) Any weapon (including a starter gun) which will or is designed to or may readily be converted expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device.  Such term does not include an antique firearm.

As noted, the term "firearm" means a "weapon . . . which will or is designed to or may readily be converted to expel a projectile," and also "the *frame or receiver* of any such weapon."  (18 U.S.C. §921(a)(3).)  Both the "designed" definition and the "may readily be converted" definition apply to a weapon that expels a projectile, not to a frame or receiver.  A frame or receiver is not a "weapon," will not and is not designed to expel a projectile, and may not readily be converted to expel a projectile.

The issue therefore becomes whether the raw material "casting," with the specified features, may constitute a "frame or receiver."

ATF's regulatory definition, 27 C.F.R. §478.11, provides: "*Firearm frame or receiver*.  That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.  (The same definition appears in 27 C.F.R. §479.11.)  "Breechblock" is defined as the locking and cartridge head supporting mechanism of a firearm that does not operate in line with the axis of the bore."  (*Glossary of the Association of Firearms and Toolmark Examiners* (2nd Ed. 1985, 21).)

Assuming that a lower receiver is deemed a "frame or receiver" for licensing purposes, the statute refers to "the frame or receiver of any such weapon," not raw material which would require further milling, drilling, and other fabrication to be usable as a frame or receiver.  Referring to ATF's definition in §478.11, an unfinished piece of metal is not a "part" that "provides housing" (in the present tense) for the hammer, bolt, or breechblock, and other components of the firing mechanism, unless and until it is machined to accept these components.  The definition does not include raw materials that "would provide housing" for such components ". . . if further machined."  Nor may it be said that such piece of metal "is . . . threaded at its forward portion" so that a barrel may be installed.

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:   **In re: EP ARMS, LLC**
July 20, 2013
Page 3

In ordinary nomenclature, the frame or receiver is a finished part which is capable of being assembled with other parts to put together a firearm." (*Receiver.* The basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled. *Glossary of the Association of Firearm and Toolmark Examiners* (2nd ed. 1985), 111.) Raw material requires further fabrication. The Gun Control Act recognizes the distinction between "Assembly and "fabrication." (Compare 18 U.S.C. §921(a)(29) (defining "handgun" in part as "any combination of parts from which a firearm described in subparagraph (A) can be *assembled*") with §921(a)(24) (referring to "any combination of parts, designed or redesigned, and intended for use in *assembling or fabricating* a firearm silencer or firearm muffler" (emphasis added.).) The term "assemble" means "to fit or join together (the parts of something, such as a machine): to assemble the parts of a kit." (Assemble. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/browse/assemble (accessed: January 23, 2013).) The term "fabricate" is broader, as it also synonymous with manufacture: "to make, build, or construct." (Fabricate. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/ browse/fabricate (accessed: January 23, 2013).) Thus, drilling, milling, and other machining would constitute fabrication, but assembly more narrowly means putting together parts already fabricated.

Moreover, "Congress did not distinguish between *receivers integrated into an operable weapon and receivers sitting in a box, awaiting installation*." (*F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 450 (D.C. Cir. 1994)(Emphasis added.) The absence of a single hole and the presence of a piece of extra metal may mean that an item is not a frame or receiver." (*Id.* at 452 ("In the case of the modified HK receiver, the critical features were the lack of the attachment block and the presence of a hole"; "welding the attachment block back onto the magazine and filling the hole it had drilled" removed the item from being a machinegun receiver.).)

## ANALOGOUS DETERMINATIONS

In an analogous situation, ATF has defined a receiver in terms of whether it was "capable of accepting all parts" necessary for firing. Like the term "firearm," the term "machinegun" is also defined to include the "frame or receiver of any such weapon." (26 U.S.C. §5845(b). The same definition is incorporated by reference in 18 U.S.C. §921(a)(3).) The Chief of the ATF Firearms Technology Branch wrote in 1978 concerning a semiautomatic receiver which was milled out to accept a full automatic sear, but the automatic sear hole was not drilled. He opined: "in such a condition, the receiver is not capable of accepting all parts normally necessary for full automatic fire. Therefore, such a receiver is not a machinegun. . . . As soon as the receiver is capable of accepting all parts necessary for full automatic fire, it would be subject to all the provisions of the NFA." (Nick Voinovich, Chief, ATF Firearms Technology Branch, Feb. 13, 1978, T:T:F:CHB, 7540. Similar opinions were rendered by the Chief, ATF Firearms Technology

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:    **In re: EP ARMS, LLC**
July 20, 2013
Page 4

Branch, Aug. 3 1977 (reference number deleted); and C. Michael Hoffman, Assistant Director (Technical and Scientific Services), May 5, 1978, T:T:F:CHB, 1549?).)

That being said, the ATF has taken differing opinions as to what extent raw material must be machined in order to be deemed a firearm.

In a 2002 determination, ATF stated the following about an unfinished lower receiver for an AR 15 that "by performing minor work with hand tools, this receiver can be assembled into a complete rifle." (Curtis H.A. Bartlett, Chief, Firearms Technology Branch, Oct. 22, 2002, 903050:RV.) The letter continues:

> The minor work includes:
> 1.  Drilling the holes for the takedown/assembly pins;
> 2.  Drilling the holes for the trigger and hammer pins;
> 3.  Drilling the holes for the magazine catch; and
> 4.  Drill and tap the holes for the pistol grip screw.
>     Our evaluation reveals that the submitted receiver can be readily converted to expel a projectile by the action of an explosive," and is, therefore, a firearm . . . .

The above assumes that the "can be readily converted" clause refers to a frame or receiver, when actually that clause refers to a *weapon* that can be so converted. A frame or receiver cannot, by itself, be converted to a weapon that expels a projectile. That would require the presence of all the other firearm parts, and even then the above machine work would be required, together with assembly.

By contrast, and more recently, ATF determined the following "unfinished AR15 lower" not to be sufficiently machined to constitute a frame or receiver:

> The FTB examination of your submission confirmed that machining operations have been performed for the following:
>
> - Magazine well;
> - Magazine catch;
> - Receiver extension / buffer tube;
> - Pistol grip;
> - Bolt catch;
> - Trigger guard;
> - Pivot pin and take down holes (drilled).

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:     **In re: EP ARMS, LLC**
July 20, 2013
Page 5


The FTB examination found that this item, in its current condition, has not reached a
point in manufacturing to be classified as a "firearm" per the GCA definition, Section
921(a)(3).

(John R. Spencer, Chief, Firearms Technology Branch, November 19, 2012, 903050:MRC
3311/2012-1034.) (See also: 903050:AG 3311/2011-703; 903050:KB 3311/300863;
903050:KB3311/300862)

It is important to note that each side of the submitted casting includes three extrusions.  As you
are aware, these extrusions do not exist on completed AR-15 type lowers.  They have been added
to the component and must be removed prior to installation of any parts or components.  While
these extrusions do contain slight depressions, these depressions are not of sufficient depth to
cross the plane of the either side of the completely machined lower receiver.

It is clear that the EPA casting does not provide housing for the "hammer, bolt or breechblock,
and firing mechanism."  In this regard, the operations performed on the exemplar casting are
more akin to the later examination than the former.  As such, it is our belief that the exemplar
casting does not constitute a "receiver" or a "firearm." But, again, we request your clarification
on this point.

Thank you for taking the time to address this issue.  We look forward to hearing from you.
Please let us know if you have any further questions or concerns.


Sincerely,

**DAVIS & ASSOCIATES**

s / *Jason Davis*

JASON DAVIS

Exhibit 'B'



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV 25405_

www.atf.gov

903050:MRC
3311/301179

February 7, 2014

Mr. Jason Davis
Davis & Associates
27201 Puerta Real
Suite 300
Mission Viejo, CA 92691

Dear Mr. Davis,

This is in reference to your correspondence, along with an AR-15 type "incomplete lower," to the Firearms Technology Branch (FTB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). You have submitted this casting on behalf of your client, EP Arms, for classification under the Gun Control Act of 1968 (GCA).

As you are aware, the GCA, 18 U.S.C. § 921(a)(3), defines the term **"firearm"** as follows: _...(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm._ Further, GCA implementing regulations, 27 CFR § 478.11 define "firearm frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

The FTB examination of this casting confirmed that it has the following features and characteristics:

1. Magazine well.
2. Magazine catch.
3. Bolt catch.
4. Pistol grip.
5. Forming and tapping for receiver-extension/buffer tube.
6. Front pivot-pin hole.

Mr. Jason Davis                                                                 Page 2

7. Rear take-down hole.
8. Holes drilled for the detent take-down and pivot pin, retainer buffer, detent
   fire-control selector, and pistol-grip screw.

Further examination by FTB revealed that excess material extends past the exterior walls
of the casting, indicating the approximate locations of the holes to be drilled for the
selector, hammer, and trigger pins. We further noted that the fire-control cavity has been
formed and then, at a later time, filled in with plastic material.

It is our determination that when the fire-control cavity was formed during the
manufacturing process, the submitted casting reached a point in its manufacture to be
classified as a "firearm" as defined in 18 U.S.C. 921(a)(3).

You argue that to be classified as a "firearm frame or receiver," the GCA and
implementing regulations require that the item be completed so that all fire control
components may presently be installed in the frame or receiver. In interpreting the GCA
and implementing regulations as applied to AR-type firearms, ATF has long held that any
machining of the fire-control cavity is the legally significant step in making a receiver.

Further, the filling of the cavity at a later point does not change our classification.
Although the fire-control cavity was filled with plastic material that must be removed
before fire control components may be installed, ATF has long held that this is not
sufficient to destroy the receiver and remove the item from classification as a "frame or
receiver." For your reference we have included the destruction diagram for AR-type
firearms.

Finally, although the definition of "machinegun" includes "frame or receiver,"
determination of what constitutes a machinegun receiver often requires a different
analysis than determining whether something is a firearm under the GCA. In some cases,
machineguns are made from semiautomatic firearms with extra components, and it is the
modification of a receiver to accept these extra components that creates the machinegun
receiver. Although FTB has determined that a semiautomatic receiver was not made into
a machinegun receiver "until the receiver is capable of accepting all parts necessary for
full automatic fire," that reasoning doesn't apply to making a determination of whether
the item is a firearm under the GCA. This is because classifying a semiautomatic receiver
as a machinegun simply because it may be machined to accept machinegun parts would
regulate all such firearms as "machineguns." Therefore ATF's classifications of
machinegun receivers is not premised on the fact that the receiver must be capable of
housing all parts necessary for automatic fire, but that a semiautomatic copy of a
machinegun becomes a machinegun only when this occurs. *See Sendra Corp. v. Magaw*,
111 F.3d 162, 163 (D.C. Cir. 1997).

In closing, we caution that the information found in this correspondence with regard to
the evaluation described above is intended only for use by the addressed recipient(s).

Please provide our Branch with a FedEx account number or a UPS shipping label
addressed to yourself so that we may return your sample. Please be advised that we do

Mr. Jason Davis                                          Page 3

not ship via the U.S. Postal Service. If you don't need to have us return your sample, you
may fax FTB at 304-616-4301 with authorization to destroy it on your behalf.

We thank you for your inquiry and sample, regret that our findings could not be more
positive, but trust the foregoing has been responsive to your request. If you require
further information concerning our findings, we can be contacted at any time.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch

Exhibit 'C'



*The Law Offices of*
# DAVIS & ASSOCIATES

27201 Puerta Real, Suite 300, Mission Viejo, CA 92691
Direct (949) 310-0817/Fax (949) 288-6894 Jason@CalGunLawyers.com
www.CalGunLawyers.com

March 4, 2014

Earl Griffith
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Firearms Technology Branch
244 Needy Road
Martinsburg, West Virginia 25405 USA
**VIA FED-EX**

Re:     **In re: EP ARMS, LLC**

Dear Mr. Griffith:

I write regarding my client, EP ARMS, LLC (EPA).  Specifically, we write to request reconsideration of your conclusion that the product sample submitted is a "firearm" in the response to your letter dated, February 7, 2014, which was based on a fundamental misunderstanding of the manufacturing process.  (Enclosed.)

Specifically, your letter was a response to our letter dated July 30, 2013 (enclosed), which requested clarification as to whether a product submitted is a firearm.  In your letter you stated that:

> It is our determination that when the *fire-control cavity was formed during the manufacturing process*, the submitting casting reached a point in its manufacturer to be classified as a "firearm" as a defined in 18 U.S.C. 921(a)(3).
>
> ***
>
> Further, the filling of the cavity at a later point does not change our classification. *Although the fire-control cavity was filled with plastic material that must be removed before fire control components may be installed*, ATF has long held that this is not sufficient to destroy the receiver and remove the item from classification as a "frame or receiver." . . .

(Emphasis added.)

As stated above, this response is based on a fundamental misunderstanding of the process by which the submitted sample is manufactured.  Specifically, the letter is based on the assumption

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:    <u>**In re: EP ARMS, LLC**</u>
March 4, 2014
Page 2

that the receiver is formed, and then it is filled with additional plastic.  This is inaccurate.  **At no time is a fire-control cavity formed during the manufacturing process, nor is the fire-control cavity "filled" with plastic material.  In fact, at no time does a fire-control cavity exist in the manufacturing process.**

The actual process of manufacturing the sample is the converse of your assumed method, and takes place in two stages:

**Stage 1:**
The manufacturing process starts with the production of a core, dubbed a "biscuit." (Enclosed with this letter are two sample core "biscuits" for your examination and evaluation.)  It is made of a material close to Nylon 66 and is the first part of the manufacturing process.  Once the biscuit is manufactured it has a 2 day curing process before proceeding to Stage 2.

**Stage 2:**
After the curing has taken place with the biscuit it is placed inside the cavity of a secondary mold. The secondary mold bonds additional material to the biscuit and creates the overall shape of the product by means of mold injection. (The previously submitted sample still in your possession represents the result of Stage 2 production).  Thus, at no time does a fire-control cavity exist.

We believe that these features molded into the raw casting do not render the casting a firearm for the reasons detailed below.  But, in an abundance of caution, we request clarification from the Bureau of Alcohol, Tobacco, Firearms, and Explosives – Firearms Technology Branch.
It is clear that the EPA casting does not provide housing for the "hammer, bolt or breechblock, and firing mechanism."  In this regard, the operations performed on the exemplar casting are more akin to the later examination than the former.  As such, it is our belief that the exemplar casting does not constitute a "receiver" or a "firearm."  But, again, we request your clarification on this point.

Thank you for taking the time to address this issue.  We look forward to hearing from you.  Please let us know if you have any further questions or concerns.  **When complete, please return the submitted parts via Fed-Ex using account number: 321690653.**

Sincerely,

**DAVIS & ASSOCIATES**

s/ *Jason Davis*

JASON DAVIS

Exhibit 'D'



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV 25405*

www.atf.gov

903050:MRC
3311/301179

Mr. Jason Davis
Davis & Associates
27201 Puerta Real
Suite 300
Mission Viejo, CA 92691

Dear Mr. Davis,

This is in reference to your letter dated March 4, 2014, requesting reconsideration of the
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) determination that the
EP80 prototype  submitted by EP Arms, LLC. (EP Arms) is classified as a "firearm
receiver" under the Gun Control Act of 1968 (GCA).  The basis for your request is your
belief that ATF's assumptions concerning the manufacturing process for the EP80 were
integral to our determination that the prototype constitutes a firearm for purposes of the
GCA.  That is not correct.  To the extent ATF made assumptions about the manufacturing
process, it was because details about that process were not provided with the July 30,
2013, request for classification. In any event, for the reasons articulated below, the details
provided in your March 4, 2014, letter do not change our ultimate conclusion that the
EP80 is a firearm receiver under the GCA.

As you are aware, the GCA, 18 U.S.C. § 921(a)(3), defines the term **"firearm"** as
follows: *...(A) any weapon (including a starter gun) which will or is designed to or may
readily be converted to expel a projectile by the action of an explosive; (B) the frame or
receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any
destructive device.  Such term does not include an antique firearm.*  Further, GCA
implementing regulations, 27 CFR § 478.11, define "firearm frame or receiver" as "that
part of a firearm which provides housing for the hammer, bolt or breechblock, and firing
mechanism, and which is usually threaded at its forward portion to receive the barrel."

Mr. Jason Davis                                                     Page 2

Our examination of this EP80 prototype submitted by EP Arms confirmed that it had the following features and characteristics:

1. Magazine well.
2. Magazine catch.
3. Bolt catch.
4. Pistol grip.
5. Forming and tapping for receiver-extension/buffer tube.
6. Front pivot-pin hole.
7. Rear take-down hole.
8. Holes drilled for the detent take-down and pivot pin, retainer buffer, detent fire-control selector and pistol-grip screw.

Further examination by the Firearms Technology Branch (FTB) revealed that excess material extended past the exterior walls of the casting, indicating the approximate locations of the holes to be drilled for the selector, hammer, and trigger pins.

In our initial classification this office included analysis of two separate and distinct issues. First, we advised that the EP Arms submission was a firearm receiver because the fire control cavity was created during the manufacturing process and was later filled with polymer—the item referred to in your appeal as the "biscuit." *In addition,* we noted that filling the fire control cavity with plastic was not sufficient to destroy the firearm.

You have not appealed this determination as being incorrect, but are appealing the determination that the EP80 receiver is a firearm because the manufacturing process differs from what is described in our determination letter. In your request for reconsideration, you describe that during the manufacturing process, the area comprising the fire control cavity is formed around a nylon core that you refer to as a "biscuit" and that at no stage in the manufacturing is the EP80 "back filled."

We previously advised that "the filling of the cavity at a later point does not change our classification....ATF has long held that this is not sufficient to destroy the receiver and remove the item from classification as a 'frame or receiver.'" We included this analysis to address any contention that inserting the biscuit would remove the item from classification as a firearm receiver.

However, based upon your newly supplied description of the EP Arms manufacturing process, we agree that this aspect of our analysis is not applicable to the EP80, as the biscuit is not meant to destroy the firearm. In fact, we understand that your contention is that this process prevents the item from reaching a stage of manufacture in which it may be classified as a "firearm receiver" claiming that "[a]t no time is a fire-control cavity formed during the manufacturing process....In fact; at no time does a fire-control cavity exist in the manufacturing process." We disagree.

The EP Arms manufacturing process represents a change from the processes by which AR-type firearms have historically been produced. ATF has long held that items such as receiver blanks–"castings" or "machined bodies" in which the fire-control cavity area is

Mr. Jason Davis                                    Page 3

completely solid and un-machined – have not yet reached a "stage of manufacture" to be classified as a "firearm receiver." These items are a *single piece of metal* that require a substantial amount of machining to the vital areas of the firearm. In your request for reconsideration, you noted several letters in which FTB determined that certain submissions were not firearm receivers. However, in each of those examples the fire-control cavity was the same material as the receiver itself and the material filling the fire-control cavity is integral to the item; therefore the fire-control "cavity" had not been created.

To illustrate, photo 1 is a receiver "blank." This is not classified as a "firearm receiver" because the fire-control cavity has not been machined in any way. It is a single piece of metal from which a firearm receiver may be produced through further machining.



Location of the Fire Control Cavity



**Photo 1**

To further illustrate this difference between the EP Arms manufacturing process and traditional metal "castings" or "machined bodies," consider the following. Photo 2 is an AR-type receiver with a fully machined fire-control cavity. The red box outlines the cavity. This is classified as a firearm receiver pursuant to the GCA.



**Photo 2**

Mr. Jason Davis                                                          Page 4

Photo 3 is an example of the EP Arms submission. The "biscuit" is the white portion—
the exact size and dimensions of the functional fire-control cavity. Notice that the biscuit
outlines the fire-control cavity as shown in photo 2.



**Photo 3**

Photo 4 is a side-view of the EP Arms design. The top sample is made of clear plastic
and shows that the biscuit creates the internal dimensions of the fire-control cavity.



**Photo 4**

The photos illustrate that the EP Arms manufacturing process creates a fire-control cavity
through the use of a "biscuit."

Accordingly, based upon your description of the EP Arms manufacturing process, the EP
Arms submission is distinguishable from other "castings" or "blanks" that are not

Mr. Jason Davis                                                    Page 5

classified as firearms. Unlike "castings" or "blanks" which are formed as a single piece so that a fire-control cavity has not been made, EP Arms uses the biscuit specifically to create that fire-control cavity during the injection molding process. As described in your letter, it appears that the sole purpose of the "biscuit" is to differentiate the fire-control area from the rest of the receiver and thus facilitate the process of making the receiver into a functional firearm. ATF has long held that "indexing" of the fire-control area is sufficient to require classification as a firearm receiver. Based upon the EP Arms manufacturing process, it is clear that the "biscuit" serves to index the entire fire-control cavity. In fact, the biscuit is meant to differentiate the fire-control cavity from the rest of the firearm so that it may be easily identified and removed to create a functional firearm. See photo 5.



**Photo 5**

Therefore, the submitted sample is properly classified as a "firearm" as defined in 18 U.S.C. 921(a)(3) because the fire-control area is created during the manufacturing process through the use of the biscuit.

In addition to the formation of the fire-control cavity in the manufacturing process, your manufacturing process results in "excess material extending past the exterior walls of the casting, indicating the approximate locations of the holes to be drilled for the selector, hammer, and trigger pins." Based upon our previous understanding of the EP Arms manufacturing process, we did not analyze whether this excess material, on its own, would be sufficient to warrant classifying the EP80 as a firearm receiver. However, to remove any doubt about the correctness of our classification decision, we are including that analysis here.

The AR-15 platform is a two-part system generally comprised of a lower and an upper assembly. The lower assembly is classified as the receiver and a "firearm" because it provides the housing for the hammer and the firing mechanism, and contains mounting points for the upper assembly which accepts the barrel and houses the bolt or

Mr. Jason Davis                                                    Page 6

breechblock.  As stated above, an AR-15 receiver blank is not classified by ATF as a firearm.  The point in the manufacturing process at which an AR-15 blank is classified as a firearm is when it has been indexed for or machined in the fire-control recess area. Such a receiver may also have had other machining performed, such as drilled pivot-pin and takedown-pin hole(s).  However, based upon your explanation of the manufacturing process, this excess material indexing the location for the holes to be drilled is, by itself, sufficient to classify the sample as a firearm receiver.  See photo 6, below.



Indexing for the selector, hammer, and trigger pins

**Photo 6**

    If you require further information concerning our findings, we can be contacted at any time.


                         Sincerely yours,


                         Earl Griffith
             Chief, Firearms Technology Branch

Exhibit 'E'

SEALED

FILED

MAR 1 7 2014

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1
2                         **UNITED STATES DISTRICT COURT**

                      **SOUTHERN DISTRICT OF CALIFORNIA**
3
4   IN THE MATTER OF A SEARCH OF       **ORDER SEALING SEARCH WARRANT,**
                                        **APPLICATION AND AFFIDAVIT FOR**
5   **Ares Armor, 206/208 N Freeman St,**     **SEARCH WARRANT, AND THIS**
    **Oceanside; Ares Armor, 416 National City**  **SEALING ORDER**
6   **Blvd; Ares Armor Warehouse, 180 Roymar**
    **St D; and 2420 Industry, Oceanside,CA**    Case No. _____
7
8        Upon motion of the UNITED STATES OF AMERICA and good cause appearing, a

9  continuing criminal investigation;

10        IT IS HEREBY ORDERED that the Affidavit of ▮▮▮▮▮▮▮ in support of the Search

11  Warrant, the Application, the Search Warrant, and this order be sealed until further order of this Court.

12

13  DATED: _3/14/14_

14

15

16                        THE HONORABLE BERNARD G. SKOMAL
                           United States Magistrate Judge
17                         United States District Court for the Southern District of
18                         California

19

20

21

22

23

24

25

26

27

28

'14MJ0962

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California



FILED

MAR 1 7 2014

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>various physical addresses associated with<br>Ares Armor | )<br>)<br>)<br>)<br>)<br>)  Case No. |

'14MJ0962

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A(1), A(2), A(3), A(4)

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 922(a)(1)(A), 922(t), and 371 | 18 U.S.C. §922(a)(1)(A) (unlawful to deal firearms without a license); 18 U.S.C. § 922 (t)(1) (failure to conduct background checks during firearms transfer); and 18 U.S.C. §371 (conspiracy to commit the foregoing offenses) |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*SA ATF*
Printed name and title

Sworn to before me and signed in my presence.

Date: 3/14/14

_____
Judge's signature

City and state: _____

Bernard Skomal
Printed name and title

I, ▮▮▮▮▮▮▮▮ , being duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND EXPERTISE

1.    I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF"), United States Department of Justice, and have been so employed since May

2009.  I am a graduate of the Federal Law Enforcement Training Center and the ATF National

Academy.  I am currently assigned to the San Diego IV, California Field Office.

2.    As a result of my training and experience as an ATF Special Agent, I am familiar with

both federal and state criminal laws.  My primary duties include the enforcement of federal firearms

and explosives laws.  I have participated in investigations involving the possession of firearms by

prohibited persons, the possession of illegal firearms, and the illegal acquisition of firearms by both

prohibited and non-prohibited persons.  I also have participated in investigations involving the

possession and distribution of illegal narcotics.  I have personally participated in the preparation and

execution of search warrants involving various violations of federal and state laws.

3.    I have received approximately 28 weeks of training at both the Federal Law Enforcement

Training Center and the ATF National Academy in Glynco, Georgia, and numerous hours of post

academy training.

## II.    PURPOSE OF AFFIDAVIT

4.    This affidavit supports an application for a warrant authorizing the search of (1) the

storefront / premises of Ares Armor Oceanside Branch, 206/208 North Freeman Street, Oceanside

California, 92054, ("TARGET LOCATION-1"), more fully described in Attachment (A)(1); (2)

storefront / premises of Ares Armor National City Branch located at 416 National City Boulevard,

National City, California ("TARGET LOCATION-2"), more fully described in Attachment (A)(2); (3)

Ares Armor warehouse location located at 180 Roymar Street, Suite D, Oceanside California, 92058

("TARGET LOCATION-3"), more fully described in Attachment (A)(3), and 2420 Industry,

Oceanside, CA ("TARGET LOCATION-4") more fully described in Attachment (A)(4) (collectively, the "TARGET LOCATIONS").

      5.    I submit that the facts contained in the paragraphs below demonstrate that there is probable cause to believe that fruits, instrumentalities, and evidence, more fully described in Attachment (B) of this affidavit, violations of 18 U.S.C. §922(a)(1)(A) (unlawful to deal firearms without a license); 18 U.S.C. § 922 (t)(1) (failure to conduct background checks during firearms transfer); and 18 U.S.C. §371 (conspiracy to commit the foregoing offenses) will be found at the TARGET LOCATIONS.

      6.    I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation and, in part, based upon information from the following sources:

          a.    Oral and written reports about this investigation and other related investigations that I have received from federal and state law enforcement officers;

          b.    Physical surveillance conducted by federal agents or local law enforcement officers, which observations have been reported to me either directly or indirectly;

          c.    Queries of law enforcement records and intelligence data bases.

      7.    Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by ATF Special Agents or other law enforcement officers. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are among many statements made by others and are stated in substance, unless otherwise indicated. Similarly, information resulting from surveillance, except where indicated, does not set forth my personal observations but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

8.     Because this affidavit is being submitted for the limited purpose of seeking authorization for warrants to search the TARGET LOCATIONS, I have not set forth each and every fact learned during the course of this investigation.  Rather, I have set forth only the facts that I believe are necessary to establish the foundation for an order authorizing the requested warrant.

## III.     <u>TECHNICAL BACKGROUND INFORMATION</u>

*Definition of a "Firearm"*

9.     A "firearm" is "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. §921(a)(3)(A).  This definition includes "the frame or receiver of any such weapon," 18 U.S.C. §921(a)(3)(B), and "any combination of parts either designed or intended" from which a firearm can be "readily assembled." 18 U.S.C. §921(a)(4)(C).  A "receiver" under 18 U.S.C. §921(a)(3)(B) includes a "lower receiver."

*The AR-15 Platform*

10.     An AR-15 is the semi-automatic, civilian-version of the .223-caliber M16 machine gun used by the United States military. Although AR-15 refers to the model produced by Colt (firearms manufacturer), the term "AR-15" is colloquially used to refer to firearms similar to, and based upon, the Colt AR-15. An example of an AR-15-style rifle is depicted below. This image is from ATF's "Police Officer's Guide to Recovered Firearms," accessible at http://www.atf.gov/files/publications/download/p/atf-p-3312- 12.pdf.



*Photo 1 - AR-15 rifle (photo unrelated to this case)*

11.    An AR-15-style rifle consists of many parts. There are five parts that will be discussed at length in this Affidavit: the (1) lower receiver; (2) upper receiver; (3) stock; (4) barrel; and (5) magazine.  These parts are labeled below.



*Photo 2 - AR-15 rifle (labeled) (photo unrelated to this case)*

4

12. Depicted below is a firearm that has been disassembled to isolate the parts



Lower Receiver

*Photo 3 - AR-15 rifle (disassembled) (photo unrelated to this case)*

13. Generally, most parts for a firearm (e.g. stocks, barrels, magazines) are not subject to domestic firearms licensing regulation by ATF. Accordingly, these parts are often made by individuals and small businesses. For the most part, these gun parts can be bought and sold without reporting the sales and without requiring a background check.

14. The lower receiver is different than common gun parts. As discussed in Paragraph 9 above, a lower receiver is considered a "firearm." That means that the lower receiver, without any other parts at all, is regulated and controlled by ATF the same way as a completed firearm (for example, the AR-15-style rifle depicted above). This also means that the manufacture, sale, transfer, and disposition of lower receivers are regulated by ATF. Depicted below is a lower receiver for an AR-15-style rifle.

5



*Photo 4 - AR-15 lower receiver (photo unrelated to this case)*



15.    The commercial firearms industry has coined several terms such as "blank", "an 80%," "an 80% blank," "an 80% lower," "casting" or "an AR-15 80%." These terms developed based on the perception that the piece of aluminum, metal or polymer was 80% of a firearm, and therefore unregulated by ATF. The term "80%" and variations of it are not used by ATF and are not officially recognized by ATF. For ease of communication, the items described above will be referred to hereafter as AR-15 variant lower receivers or simply variant lower receivers.

16.     In the case of this investigation, manufacturers are creating Kevlar reinforced polymer variant lower receivers with certain cavities filled by different colored polymer (see paragraph 18 for additional details). These variant lower receivers are made functional through the use of specialized tools, typically a drill press or a hand drill, a Dremel tool (a versatile, handheld rotary bit tool that can be used to cut, grind, drill, sand, and mill various materials), and other various types of milling equipment. These are all fairly simple and affordable hand tools that can be obtained and operated by nearly anyone. They are readily available at most hardware/home improvement stores.

17.     Using either a drill press or a hand drill, the equipment operator drills, cuts, or mills cavities in specific locations on the AR-15 variant lower receiver. Compare the AR-15 variant lower receiver depicted below left with the AR-15 lower receiver depicted below right. This process transforms the AR-15 variant lower receiver into an AR-15 lower receiver by creating the precise shape and space necessary for the lower receiver to accept the parts that will allow the firing of a projectile. These shapes or cavities must be created to the exact specifications required. If these cavities are not formed to the exact specifications required, the firearm will not function and may break. This process also creates the holes necessary to attach the upper receiver and barrel to the lower receiver. These parts (e.g. the hammer, bolt or breechlock, and firing mechanism) are the internal mechanical parts, that combine with a trigger, firing pin, and other parts to form a functioning firearm.



AR-15 variant lower receiver prior to milling

AR-15 variant lower receiver after milling, now classified as a firearm

*Photo5 - (clockwise from top left) AR-15 variant lower receiver, AR-15 lower receiver,*
*AR-15 lower receiver (top view) (photos unrelated to this case)*

18.     This investigation deals with the manufacturing of AR-15 variant lower receivers that

are designed of Kevlar reinforced polymer. The polymer products in this case are molded during the

manufacturing process. During the molding process, the manufacturer has created the material in the fire

control cavity (further referred to as the plug) a different color than that of the main body of the receiver.

This difference in color enables the customer to easily identify how much material to mill away thereby

creating the specific and exact cavities that are necessary to enable the weapon to function properly.

19.     ATF Firearms Technology Branch (FTB) provides expert technical support to ATF,

other Federal agencies, State and local law enforcement, the firearms industry, Congress, and the general

public.  They are the office within the ATF that examines and classifies firearms in accordance with the

definition provided in 18 U.S.C. § 921 (a)(3).  FTB Enforcement Officer ███████████ has reviewed

AR-15 variant lower receivers from EP Arms, LLC and determined that the material that comprises the

main body of the variant lower receiver is formed at a different time in the manufacturing process than

that which comprises the plug.  As a result of the two plastics being poured at two different times, the

8

receiver and plug being are formed in such a way that they are not adhered to each other. As such, the plug can be removed and the firearm can readily be placed into a firing condition. Additionally, the fact that two different plastics having two different colors and/ or an easily defined seam; results in the indexing of the fire-control-cavity. ATF has consistently held that the indexing of the fire-control-cavity of the AR-type receiver (or any of the mounting pin holes for the fire-control-components) is the same as if it were formed, and thus, constitutes the making of a firearm frame or receiver as defined by 18 U.S.C. §921(a)(3)(A).

20. Unlike a firearm manufactured by a licensed manufacturer, these firearms are completely untraceable. They have no serial number. They have no manufacturer identification.

21. Technical Reference: ATF Firearms Technology Branch. (November 1, 2013). Unfinished "80%" AR-15 Type Receivers. In *Technical Bulletin 14-01*.

## IV.  PROBABLE CAUSE

### A. BACKGROUND OF INVESTIGATION

22. On July 24, 2013, the ATF Firearms Technology Branch (FTB) received an AR-15 variant lower receiver exemplar from Jason Davis, the attorney representing EP Armory, LLC (EPA). The FTB is the department within the ATF that examines and classifies firearms in accordance with the definition provided in 18 U.S.C. § 921 (a)(3). The exemplar that was provided was a polymer based product that had a cavity in the fire control region which was filled with a different color polymer.

23. On February 13, 2014, a determination letter was delivered from FTB to Jason Davis, the attorney representing EP Armory, LLC, and Ares Armor. The letter indicated that the lower receivers/AR-15 variant lower receivers that are being sold by EP Armory were classified as firearms as defined by 18 U.S.C. § 921 (a)(3).

24. On March 7, 2014, ATF Special Agents served a search warrant at EP Armory, pursuant to warrant no: 5:14-sw-00013-JLT, obtained in the Federal District Court, Eastern District of California,

from United States Magistrate Judge the Honorable Jennifer L. Thurston. Business records retained from this search warrant indicated that ARES ARMOR was a dealer of AR-15 variant lower receivers for EP Armory. These records indicated that ARES ARMOR had been purchasing "variant lower receivers" that were identified by EP Armory's product name "EP80". EP Armory received payment from ARES ARMOR by means of checks that had the business name "LYCURGAN" the parent company of ARES ARMOR. The accounts billing address was listed as, 208 N. Freeman St. Oceanside, CA, 92054-2919, which is the same address as the ARES ARMOR storefront location in Oceanside ("TARGET LOCATION-1").

25.     Additional examination of the business records indicated that on December 23, 2013, EP Armory received a payment in the amount of $41,875.00 for the purchase of 1,700 "EP80" variant casting lowers. On January 29, 2014, EP Armory received a payment in the amount of $58,125.00 for the purchase of 2,325 "EP80" variant casting lowers. Finally on February 26, 2014, EP Armory received a payment in the amount of $100,010.00 for the purchase of 4,000 "EP80" variant casting lowers.

26.     Continuing on March 7, 2014, ATF Los Angeles Field Divison Paul Ware spoke with Jason Davis, the attorney for EP Armory and Ares Armor. Jason Davis stated that he had reviewed the FTB determination regarding the variant lower receivers and believed the document was created in error. Counsel Ware advised Jason Davis that despite his opinion, ATF determined that the variant lower receivers were, in fact, firearms. In response, Davis stated that he would have all of his clients remove the polymer variant lower receivers from their shelves and advise them to no longer sell them.

27.     On March 10, 2014, Division Counsel Ware contacted Jason Davis, and advised him again that ATF had determined that the "EP80" polymer variant lower receiver were, in fact, firearms. Counsel Ware further advised Jason Davis, that his other client ARES ARMOR, was currently in possession of the "EP80" polymer variant lower receivers in violation of federal law. Jason Davis indicated that he understood the violation, and stated that he would speak to his client and get back to

10

Division Counsel Ware.

      28.    Continuing on this same date, Jason Davis, the attorney for ARES ARMOR contacted Division Counsel Ware and arranged for the ATF San Diego IV Field Office to accept the forfeiture of the "EP80" variant lower receivers, in lieu of seeking a search/seizure warrant. Division Counsel Ware emphasized to Jason Davis that in addition to the "EP80" variant lower receivers, he would also require the sales records for any "EP80" variant lower receivers ARES ARMOR had previously sold. Jason Davis told Division Counsel Ware, that ARES ARMOR would surrender an estimated 4000 polymer variant lower receivers, along with the names and contact information of the customers who had previously purchased them. Jason Davis advised that the point of contact at ARES ARMOR was "Dimitri", and provided his phone number, (760) 978-9723.

      29.    On March 11, 2014, ATF Special Agent [REDACTED] called the phone number provided by Jason Davis, and spoke to Dimitri KARRAS, the owner of ARES ARMOR regarding the surrender of the polymer variant lower receivers. KARRAS told Agent [REDACTED] that he had arranged with Jason Davis that the surrender of the firearms would take place at his Oceanside store on March 12, 2014, at 11:00 a.m. KARRAS stated that he had consolidated all of his stock to one room, and he was the only person who would have access to it.

      30.    On March 12, 2014, at approximately 9:30 a.m., Agent [REDACTED] again contacted KARRAS to confirm the appointment at 11:00 a.m., and to ascertain from him, the size of the vehicle that would be required to move the firearms. KARRAS informed Agent [REDACTED] that he had his attorney file a Temporary Restraining Order (TRO) against ATF. KARRAS expressed his primary concern was having to give up the customer records that ATF was requesting.

      31.    Continuing on this date, Agent [REDACTED] sent an e-mail to Jason Davis, the Attorney for ARES ARMOR, requesting a copy of the TRO that KARRAS claimed had been issued. Jason Davis subsequently responded via e-mail that he was no longer representing ARES ARMOR on this matter. Jason Davis indicated that the Attorney handling the TRO was an individual named Alan Beck.

32.     Continuing on this date, at approximately 1:15 p.m., Agent _____ placed a phone call

to Alan Beck.  He identified himself to Beck and explained that he was handling the recovery of the

firearms from ARES ARMOR.  Agent _____ also asked Beck if he had filed a Temporary Restraining

Order against ATF.  Beck responded that he had, and that he would be willing to provide a copy of the

order to ATF.  After exchanging e-mails, Agent _____ received a copy of the restraining order from

Beck.  Specifically, Judge Sammartino ordered "that any steps to deprive Ares Armor of the Property

**SHALL NOT** be executed until after the Court holds a hearing…."  See 14-CV-548-JLS-BGS, Doc.

No. 4 (emphasis in original).

33.     Continuing on this date, at approximately 3:00 p.m., Agent _____ placed a call to

KARRAS, and asked him if he would be amenable to having a couple of ATF agents view the location

where he had indicated the lower receivers (firearms) were being stored.  Agent _____ explained to

KARRAS, that he had the right to refuse, but ATF was concerned about the safe storage of the items

until the matter regarding the TRO could be resolved.  KARRAS stated the Agents were welcome to

stop by, and he would show them the storage location.

34.     Continuing on this date, ATF Special Agent (SA) _____, and ATF Resident Agent in

Charge (RAC) _____ met with KARRAS at the Oceanside Branch of ARES ARMOR.  SA _____

contacted KARRAS via cellular telephone prior to SA _____ and SA _____ arrival at Ares Armor

to confirm the meeting.  KARRAS advised he was still at 208 N. Freeman St., Oceanside.

35.     SA _____ and SA _____ then contacted KARRAS who identified himself as the

CEO of Ares Armor at 208 N. Freeman St., Oceanside, CA. KARRAS further informed SA _____ and

RAC _____ that Ares Armor had expanded to 206 N. Freeman St., Oceanside, CA, in addition to

208 N. Freeman St. (TARGET LOCATION-1)  On March 14, 2014, SA _____ observed a sign posted

at 208 N. Freeman St. with an arrow pointing to 206 N. Freemen St., which stated that the business had

moved.  Ares Armor decals were affixed to the storefront located at 206 N. Freeman St.

36.     SA ▨ informed KARRAS that the EP Armory lower receivers were considered firearms. Since Ares Armor did not have a Federal Firearms License (FFL), Ares Armor was not authorized to possess or transfer the EP Armory lower receivers. KARRAS agreed that Ares Armor did not have an FFL. KARRAS disagreed that the EP Armory lowers should be considered firearms. This disagreement was one of the reasons he obtained a Temporary Restraining Order (TRO) against ATF, in addition to that fact that KARRAS did not want to voluntarily provide the EP Armory list of purchasers to ATF. SA ▨ explained to KARRAS that one of ATF's concerns was that since the EP Armory lower receivers were not sold as firearms, no background checks were conducted (neither state nor federal) on the individual purchasers of the EP Armory lower receivers. As a result, these firearms were potentially in the possession of convicted felons and other prohibited persons, which presented a potential threat to public safety. In response, KARRAS stated that the EP Armory lower receivers were in a secure location and offered to show SA ▨ and SA ▨ how KARRAS had secured the EP Armory lower receivers.

37.     SA ▨ and SA ▨ followed KARRAS to 180 Roymar Street, Suite D, Oceanside, CA, which was a warehouse location for Ares Armor. (TARGET LOCATION-3). KARRAS informed SA ▨ and SA ▨ that he became aware last week that the EP Armory lower receivers were considered firearms. As a result, KARRAS pulled the entire inventory from all Ares Armor branch locations and consolidated them in a room just to the right of the main entrance at 180 Roymar St. Additionally, KARRAS had placed a hard copy of the list of customers who purchased the EP lower receivers in the room. SA ▨ observed a stack of paper in the top right corner which KARRAS identified as the customer list. The room was in the process of being re-keyed.

38.     On March 13 and 14, 2014, queries were conducted in the ATF Federal Licensing System database which maintains Federal Firearms Licensee records and applications. Search results indicated that no individual or entity/ corporation had ever been licensed or requested a license in relation to the

following search terms: "Lycurgan", "Ares Armor", "Karras", "206 N Freeman", "208 N Freeman",

"180 Roymar", "2420 Industry" or "416 National City".

39.     On March 14, 2014, SA [redacted] observed an individual wearing a black shirt with the

Ares Armor logo and black pants enter into the second door from west of 2420 Industry, Oceanside, CA.

SA [redacted] is aware that Ares Armor Metal Works LLC was previously located at 2420 Industry,

Oceanside, CA. (TARGET LOCATION-4). In addition, a gray pick-up truck with CA license plate

7T34665 had a large Ares Armor decal on the back window of the camper shell. A search of California

DMV records indicate that this vehicle belongs to Jeremy Tuna. A searched of the website LinkedIn

identified Jeremy Tuna as COO for Ares Armor. Later on March 14, 2014, SA [redacted] observed an

older model Subaru with AZ license plate ADC9713 parked directly in front of 2424 Industry. SA

[redacted] recognized the vehicle as one similar to one driven by Jonathan Zummallen on March 12, 2014.

A search of Arizona DMV records showed that the vehicle was registered to Jonathan Zummallen who

was involved in the meeting with SA [redacted], RAC [redacted] and Karras on March 12, 2014.

40.     On March 13, 2014, SA [redacted] conducted a search of the internet for Ares Armor,

National City, CA. SA [redacted] viewed the Ares Armor website at www.aresarmor.com which listed a

store in National City at 416 National City Blvd, National City, CA. (TARGET LOCATION-2) On

March 14, 2014, ATF SA [redacted] observed the building located at 416 National City Blvd. The

building is a duplex in which the southern storefront has Ares Armor logo decal affixed to the store

front. In addition, there is a billboard above the building which has a picture of an AR-15 variant rifle

"Ares Armor" and "Unserialized. No Registration. Legal" written on the billboard.

41.     On March 14, 2014, at approximately 2:00 p.m., Judge Sammartino issued an order that

states, in relevant part:

(1) Plaintiff Lycurgan Inc. DBA Ares Armor ("Plaintiff") and its owners, officers, managers,

employees, and agents **ARE HEREBY PROHIBITED** from taking any steps to destroy, transfer, sell,

or otherwise divest themselves of the items that are the subject matter of the Court's March 11, 2014

Temporary Restraining Order ("TRO") (see ECF No. 4);

(2) the Court's March 11, 2014 TRO **DOES NOT ENJOIN** lawful criminal proceedings, including the application for or lawfully executed seizure of evidence and contraband pursuant to a search warrant issued by a sworn United States Magistrate Judge pursuant to Federal Rule of Criminal Procedure 41;

14-CV-548-JLS-BGS, Doc. No. 6 (emphasis in original).

## B. TRAINING AND EXPERIENCE IN FIREARM TRAFFICKING AND THE PROLIFERATION OF 80% RECEIVER/ VARIANT LOWER RECEIVERS

42. A lower receiver holds the firing mechanism of a gun. The Gun Control Act of 1968 defines a completed lower receiver as a firearm, triggering a federal background check and a federal firearms license before purchase. Individuals purchasing completed lower receivers are bound by the same laws that regulate the purchase of "firearms."

43. California citizens must undergo an extensive background check prior to a firearm purchase. They must complete a Personal Firearms Eligibility Check (PFEC) conducted by the California Department of Justice. The Department reviews state and federal data bases, to include the National Instant Criminal Background Check System, often referred to as "NICS", to determine whether applicants can legally possess and purchase firearms. The Department denies purchase to applicants that have been convicted of a felony, have a history of mental illness, are addicted to narcotics, or are the subject of a domestic violence restraining order.

44. Only a PFEC-eligible individual may legally purchase firearms. When a PFEC-eligible purchaser wants to obtain a specific firearm he/she must obtain a Safety Certificate and undergo a ten-day waiting period.

45. Because "80%" completed lower receivers are partially completed, they are not regulated as firearms, but are considered inert hunks of metal. There is no prohibition for anyone to possess an

15

80% lower receiver or a firearm parts kit containing an 80% lower receiver. Federal law also requires that both intact guns and all completed lower receivers must be "Conspicuously engraved, cast or stamped" with a serial number to a depth of no less than .003" and a font size not less than 1/16 of an inch. Because 80% lower receivers do not constitute "complete" lower receivers, they are void of serial number and markings that would normally be required for their sale and distribution.

46.    As mentioned above, converting an 80% receiver into a "firearm" requires only basic machine work before it is ready to be used in the build of a gun. Additionally, internet videos and discussion boards provide detailed, step-by-step instructions on how to complete a firearm build. Computer Numerical Control (CNC) machine shops have also contributed to the influx of un-serialized and un-traceable firearms, by capitalizing on this market opportunity offering customers the ability to "rent" time on their equipment to complete a lower receiver. Parts required to complete the build of the firearm are not controlled items, do not require any type of background investigation, and are commercially available at gun stores and via on-line distributers. The anonymity of an 80% receiver that is converted into a firearm thereby allows individuals to obtain, use and sell weapons they would otherwise be prohibited from possessing.

47.    I know from my training, experience, and discussions with other experience law enforcement officials that firearm traffickers and/or manufacturers frequently possess the following evidence of their unlawful activity in their residences, businesses, storage units, vehicles and on their persons:

a.    Firearms, lower receivers, upper receivers, grips, stocks, magazines, magazine repair kits, trigger assemblies, variant lower receivers, and barrels,

b.    Information concerning where and from whom the trafficker/manufacturer purchased firearms or firearm parts,

c.    Information concerning where and to whom the trafficker/manufacturer sold firearms

or firearm parts,

d. Firearm records (purchase/sale, method of payment), documents related to milling of the firearms, notes or other documentation concerning profits made (i.e., comparing cost of purchase vs. cost of sale),

e. Customer files and lists related to the services provided or firearm sales,

f. Records and/or documents provided to customers in connection with the services provided or firearms,

g. Correspondence to and/or from actual or prospective customers or suppliers,

h. Records and/or documents reflecting or related to the purchase of equipment, materials, or supplies for the operation of the business,

i. Records and/or documents of mailings, shipping or delivery, whether by the United States Postal Service or other private delivery services,

j. Information concerning methods used to advertise the availability of their firearms or firearm parts for purchase,

k. Photos of their firearms or firearm parts for purposes of advertising for sale, to keep track of their inventory, for insurance in case of theft, etc.

l. Written, recorded oral, or digital communications with associates involved in the purchase/sale of firearms or firearm parts,

m. Written statements showing profits made from the sale of firearms or firearm parts for internal purposes,

n. Bank deposit records, checking account records, and other financial documentation showing the purchase of firearms or firearm parts, the securing of cash to purchase firearms, and the depositing of cash proceeds from the sale of firearms,

o. Other records and/or documents which appear to be related to the business including, but not limited to notes, internal correspondence, external correspondence,

memoranda, directives, organizational charts,

p.  Cell phone records which show the phone number and subscriber information, and numbers called/received,

q.  Indicia of persons in control over a premises where the above items are found, including addressed mail, material in the premises with personal identification information, photographs of persons in or about the location, etc.

r.  Tools and equipment associated with the manufacture of firearms, including CNC machines, drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws,

s.  Templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

## V.    PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

48.  With the approval of the Court in signing this warrant, Agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, listed in Attachment A, which may contain data subject to seizure pursuant to this warrant:

a.  Based upon the foregoing, there is probable cause to believe that the computers and other electronic storage devices, listed in Attachment A, are instrumentalities of the enumerated offenses because there is probable cause to believe that they may contain contraband and fruits of crime as provided at Rule 41(c)(2), Fed R. Crim. P., or were used in committing crime as provided at Rule 41(c)(3).  Consequently, the computers and any other electronic devices are subject to seizure, retention, and possible forfeiture and destruction.  They will be taken offsite for imaging and preliminary analysis in accordance with subparagraph (b) below.

b.  The offsite imaging and preliminary analysis of computers, other electronic storage devices, and media to confirm their status as instrumentalities will be conducted within forty-five (45) days from the issuance of this warrant.  Seized items confirmed to be instrumentalities will not

be returned and will be further analyzed as provided below. If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the Court. An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

      c.   Computers and other electronic storage devices and media that are retained as instrumentalities will not be returned to its owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific need. The identified official or other representative of the seizing agency will reply in writing. In the event that the owner's request is granted, arrangements will be made for a copy of the requested data to be obtained by the owner. If the request is denied, the owner will be directed to Rule 41(g), Federal Rules of Criminal Procedure.

## IDENTIFICATION AND EXTRACTION OF RELEVANT DATA

      d.   A forensic image is an exact physical copy of the hard drive or other media. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are literally thousands of different hardware items and software programs, and different versions of the same program, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

      e.   Analyzing the contents of a computer or other electronic storage device, even without

19

significant technical issues, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue: who created it, when and how it was created, downloaded, or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Sometimes it is possible to recover and entire document that was never saved to the hard drive if the document was printed. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications do not store data searchable text. The data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computer or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting as the keyboard.

       f.   It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users which generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing

20

history, cookies, and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars, and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

g. Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has been mind-boggling. For example, as single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced paged of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

h. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred and twenty (120) days from the data of seizure pursuant to this

warrant, absent further application to this Court.

     i.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## GENUINE RISK OF DESTRUCTION OF DATA

     j.    Based upon my experience and training, and the experience and training of other Agents with whom I have communicated, it is not uncommon for technically sophisticated criminals to use encryption, programs to destroy data that can be triggered remotely or by a pre-programmed event or keystroke and sophisticated techniques to hide data.

## PRIOR ATTEMPTS TO OBTAIN DATA

     k.    The United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

Based on the foregoing, there is probable cause to believe that Title 18 United States Code, Sections 922 (a) (1)(A), 922 (t), and 371 have been violated, and that the property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the TARGET LOCATIONS, described in Attachments A(1), A(2), A(3), and A(4). I respectfully request that this Court issue a search warrant for the TARGET LOCATIONS, authorizing the seizure and search of the items described in Attachments B.

//

//

//

//

//

//

## REQUEST FOR SEALING

It is further respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into criminal activity, and not all of the targets of this investigation are aware that they are being investigated for federal crimes. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed to and sworn before
me this _14_ day of March 14, 2014.

THE HONORABLE BERNARD G. SKOMAL
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A(1)

### PREMISES TO BE SEARCHED



The TARGET LOCATION-1 is located at **206/208 N. Freeman Street, Oceanside, Califonria 92054, in the County of San Diego, California.** The business is described as a commercial building located within a strip of commercial buildings. The facing is red brick with white framed windows. There is a shingled overhang. There is a black sign with "Ares Armor" printed it hanging over the door with number the number "208" affixed to it. Space "206" is located directly next door. The door contains a "206" and Ares Armor decals.

The search shall include all rooms, attics, crawl spaces, computers, electronic storage devices, safes, briefcases, storage areas, containers, garages, sheds, and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, cans, bags, trash cans and other vehicles located on or near the premises, that are owned or under the control of ARES ARMOR or LYCUGRAN Inc.,

**ATTACHMENT A(2)**

**PREMISES TO BE SEARCHED**

TARGET LOCATION-2 is located at **416 National City Blvd, Unit B, National City, CA,** located on the west side of National City Blvd. Unit B is located on the north side of a single story duplex. The building is described as a tan building with a glass front and a flat roof. The storefront has a welcome mat with "Ares Armor" printed on the mat and the Ares Armor logo decal is placed on the glass front. The number "416" is affixed to the entry door on the north unit of the duplex.

The search shall include all rooms, attics, crawl spaces, computers, electronic storage devices, safes, briefcases, storage areas, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and other vehicles located on or near the premises, that are owned or under the control of ARES ARMOR or LYCUGURAN Inc.

## ATTACHMENT A(3)

## PREMISES TO BE SEARCHED



TARGET LOCATION-3 is Ares Armor warehouse location located at 180 Roymar Street, Suite D, Oceanide Califonria, 92058. The location is described as a commercial building located within a commercial area. It is a multi-business building and can be described as single story and white in color. Suite D is the fourth glass entry door from the west on the south side of the building. The letter "D" is affixed above the entry door on the south side of the building.

The search shall include all rooms, attics, crawl spaces, computers, electronic storage devices, safes, briefcases, storage areas, containers, garages, sheds, and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, cans, bags, trash cans and other vehicles located on or near the premises, that are owned or under the control of ARES ARMOR or LYCUGRAN Inc.,

## ATTACHMENT A(4)

### PREMISES TO BE SEARCHED



   TARGET LOCATION-4 is the previous location of Ares Armor Metal Works, LLC, located at 2420 Industry, Suite A, Oceanside, CA. The location is described as a large commercial building, located on the north side of Industry Avenue. It is a multi-business building and can be described as tan in color with lighter colored trim. The numbers "2420" appears on the façade above the door. The space associated with Ares Armor is accessed through the regular sized door (that is closed) on the left in the picture listed above, closest to the stairs.

   The search shall include all rooms, attics, crawl spaces, computers, electronic storage devices, safes, briefcases, storage areas, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and other vehicles located on or near the premises, that are owned or under the control of ARES ARMOR or LYCUGURAN Inc.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization is sought to search for and seize items that constitute evidence, fruits, proceeds, and instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (dealing of firearms without a license); 18 U.S.C. § 922 (t)(1) (failure to conduct background checks during firearms transfer); and 18 U.S.C. § 371 (conspiracy to commit the foregoing offenses), including:

1.    Any firearm that does not have a lawful manufacturer stamp and serial number, any unregistered firearm (where registration is required by Title 26 of the United States Code), and variant lower receivers of any kind (including AR-15 variant lower receivers).

2.    Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and barrels for AR-15-style firearms.

3.    Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms and/or variant lower receivers, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B.

4.    Records, including electronically stored data, relating to the acquisition and distribution and repair of firearems and/or variant lower receivers, including but not limited to ATF Forms 4473, California Dealer Of Record Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets. The records should also include, but not be limited to, bank records, vendor lists, customer lists, mailings, and purchase invoices/receipts.

5.    Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tends to establish communication between co-conspirators.

6.    Correspondence to and from/or from actual or prospective customers or suppliers.

7.    Evidence and records relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing including, but not limited to, money order receipts, money transfer documents, bank records, and sales invoices/receipts.

8.    Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them.

9.    Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents.

10.    Any safes, locked cabinets, and/or other secured containers and/or devices at the locations identified in Attachments A-1, A-2, A-3, and A-4. Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.

Exhibit 'F'

U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

| | 903050:ELG |
|---|---|
| Martinsburg, West Virginia  25405 | 3311/2010-469 |
| www.atf.gov | |

MAR 1 6 2010

Mr. Jason Renschler
Quentin Laser, LLC
751 N. Monterey Street
Gilbert, Arizona  85233

Dear Mr. Renschler:

This is in reference to your recently received correspondence and accompanying, partially machined, AR-15 pattern receiver forging that was submitted to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), for classification with respect to the provisions of the amended Gun Control Act of 1968 (GCA).

As you are aware, the GCA, 18 U.S.C. § 921(a)(3), states that the term "firearm" includes—

> ... *(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon...*

Based on this definition, a firearm receiver casting or firearm receiver blank can itself be a "firearm" if completed to the point at which it can be recognized as a firearm frame or receiver.

Previously, FTB has determined that an AR-15 type receiver which has no machining of any kind performed in the area of the trigger/hammer recess might not be classified as a firearm. Such a receiver could have **all** other machining operations performed, including pivot-pin, takedown-pin hole(s), and clearance for the takedown-pin lug, but must be completely solid and un-machined in the trigger/hammer recess area.

Our examination revealed that the forging incorporates machining for the selector opening, which exceeds the allowable machining described above. Due to this operation, FTB finds that the submitted item is a "firearm" as defined in the GCA. In order to obtain a non-firearm classification, you must omit this machining operation (also see enclosed photo diagram).

-2-

Mr. Jason Renschler

We thank you for your inquiry and trust that the foregoing has been responsive.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

Enclosure

-3-

Mr. Jason Renschler

### Obtaining a "Non-Firearm"



Exhibit 'G'



U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

Martinsburg, WV 25405

www.atf.gov

903050: WJS
3311/300627

May 17, 2013

Mr. Doug Hughes
Operations Manager
Kenney Enterprises, Inc
4343 East Magnolia Street
Phoenix, AZ 85034

Dear Mr. Hughes,

This is in reference to your correspondence, with enclosed sample, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB).
In your letter, you asked for a classification of the submitted, partially completed
AR-type receiver your company is planning to manufacture. Specifically, you wish to
know if this item would be classified as a "firearm" under the Gun Control Act of 1968
(GCA).

During the examination of your sample, FTB found that the following machining/drilling
operations performed on the submitted sample:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot detent pin holes drilled.
3. Selector-retainer hole drilled.
4. Magazine release and catch slots cut.
5. Trigger-guard holes drilled.
6. Rear of receiver drilled and threaded to accept buffer tube.
7. Buffer-retainer hole drilled.
8. Pistol-grip mounting area faced off, drilled, and threaded.
9. Magazine well completed.

The machining operations not yet performed are as follows:

1. Milling out of fire-control cavity.
2. Drilling of selector-lever hole.

Mr. Doug Hughes

    3. Cutting of trigger slot.
    4. Drilling of trigger pin hole.
    5. Drilling of hammer pin hole.

The FTB examination of your submitted casting and diagrams found that your submitted item will not be sufficiently complete to be classified as the frame or receiver of a firearm and thus would not be a "firearm" as defined in the GCA.

In closing, we should point out that the information found in correspondence from our Branch is intended only for use by the addressed individual or company with regard to a specific scenario described within that correspondence.

To facilitate return of your sample, please provide FTB with the appropriate FedEx account information within 60 days of receipt of this letter.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.  Please do not hesitate to contact us if additional information is needed.

               Sincerely yours,

               Earl Griffith
      Chief, Firearms Technology Branch

Exhibit 'H'



U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV 25405*

www.atf.gov

903050:WJS
3311/300833

July 15, 2013

Mr. Tilden Smith
80 Percent Arms
202 East Alton Avenue
Suite A
Santa Ana, CA 92707

Dear Mr. Smith,

This is in reference to your correspondence, with enclosed samples, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB).
In your letter, you asked for a classification of the partially completed AR-type receivers
your company is planning to manufacture (see enclosed photos). Specifically, you want
to know if the three submitted items, identified as samples 1, 2, and 3 (and reviewed
below) would be classified as "firearms" under the Gun Control Act of 1968 (GCA).

SAMPLE #1

During the examination of this sample, FTB found that the following machining/drilling
operations had been performed:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot-detent pin holes drilled.
3. Magazine-release and catch slots cut.
4. Rear of receiver drilled and threaded to accept buffer tube.
5. Buffer-retainer hole drilled.
6. Pistol-grip mounting area faced off and threaded.
7. Magazine well completed.
8. Trigger guard machined.
9. Receiver end-plate area machined.
10. Pistol-grip mounting area threaded.
11. Selector-lever detent hole drilled.

Mr. Tilden Smith                                                              Page 2

The machining operations <u>not</u> yet performed are as follows:

1. Milling out of fire-control cavity.
2. Selector-lever hole drilled.
3. Cutting of trigger slot.
4. Drilling of trigger pin hole.
5. Drilling of hammer pin hole.

The FTB examination of your submitted casting found that <u>**SAMPLE #1**</u> is not
sufficiently complete to be classified as the frame or receiver of a firearm and thus would
<u>not</u> be a "firearm" as defined in the GCA.

Exhibit 'I'

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV 25405*

www.atf.gov

903050:MCP
3311/302035

MAY 0 5 2014

Mr. Bradley Reece
Palmetto State Defense, LLC
555 East Suber Road
Greer, SC 29650

Dear Mr. Reece,

This is in reference to your correspondence to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), which accompanied your prototype sample of an AR-10 type receiver blank your company intends to manufacture and market. Specifically, you requested an examination and classification of the submitted sample pursuant to the amended Gun Control Act of 1968 (GCA) and asked if it would be regulated as a "firearm" under the GCA.

As background, the GCA, 18 U.S.C. § 921(a)(3), defines the term "firearm" to include *any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive...[and] ...the frame or receiver of any such weapon....*

*Note: FTB uses the following terms to describe certain items (also see citation, p.3)—*

*The term "**receiver blank**" is used to describe forgings, castings, or machined bodies (defense articles¹) such as AR-15 receiver castings, AK receiver flats, etc., in various stages of folding/machining which are not classified as firearms.*

*The term "**incomplete receiver**" is used to describe forgings, castings, or machined bodies (defense articles) which have been classified as firearms but are not completely machined for use as a functional firearm receiver.*

*The term "**receiver**" is used to describe functional firearms frames or receivers.*

As you are aware, FTB has previously determined that an AR-10 type receiver blank which has no machining of any kind performed in the area of the trigger/hammer (fire-control) recess might not be classified as a firearm. Such a receiver blank could have **all** other machining operations performed, including pivot-pin and takedown-pin hole(s) and clearance for the takedown-pin lug, but must be completely solid and un-machined in the fire-control recess area. We have determined that in order to be considered "completely solid and un-machined in the fire-control recess area," the takedown-pin lug clearance area must be no longer than 1.6 inches, measured from immediately forward of the front of the buffer-retainer hole.

Our examination of the submitted item confirmed that the receiver blank has been partially machined, including a takedown pin hole and clearance for the takedown-pin lug. Our examination confirmed that the takedown-pin lug clearance area is less than 1.6 inches, measured from immediately forward of the front of the buffer-retainer hole (see photos below). The sample is completely solid and un-machined in the fire-control recess area and, accordingly, is not a "firearm" as defined in the GCA.



**Submitted prototype sample**

To facilitate return of the submitted sample, please provide FTB with an appropriate FedEx or similar account number within 60 days of receipt of this letter.

We thank you for your inquiry and trust the foregoing has been responsive to your request.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch

‚Äã TITLE 27 CFR CHAPTER II
PART 447‚ÄîIMPORTATION OF ARMS, AMMUNITION AND IMPLEMENTS OF WAR

**Subpart B‚ÄîDefinitions**
**¬ß 447.11 Meaning of terms.**

**Defense articles.** Any item designated in ¬ß 447.21 or ¬ß 447.22. This term includes models, mockups, and other such items which reveal technical data directly relating to ¬ß 447.21 or ¬ß 447.22. For purposes of this Category XXII, any item enumerated on the U.S. Munitions List (22 CFR Part 121).

**Subpart C‚ÄîThe U.S. Munitions Import List**
**¬ß 447.21 The U.S. Munitions Import List.**

The U.S. Munitions List compiled by the Department of State, Office of Defense Trade Controls, and published at 22 CFR 121.1, with the deletions indicated, has been adopted as an enumeration of the defense articles subject to controls under this part. The expurgated list, set out below, shall, for the purposes of this part, be known as the U.S. Munitions Import List:

**THE U.S. MUNITIONS IMPORT LIST**
**CATEGORY I‚ÄîFIREARMS**
(a) Nonautomatic and semiautomatic firearms, to caliber .50 inclusive, combat shotguns, and shotguns with barrels less than 18 inches in length, and all components and parts for such firearms.
(b) Automatic firearms and all components and parts for such firearms to caliber .50 inclusive.
(c) Insurgency-counterinsurgency type firearms of other weapons having a special military application (e.g. close assault weapons systems) regardless of caliber and all components and parts for such firearms.
(d) Firearms silencers and suppressors, including flash suppressors.
(e) Riflescopes manufactured to military specifications and specifically designed or modified components therefor..

NOTE: Rifles, carbines, revolvers, and pistols, to caliber .50 inclusive, combat shotguns, and shotguns with barrels less than 18 inches in length are included under Category 1(a). Machineguns, submachineguns, machine pistols and fully automatic rifles to caliber .50 inclusive are included under Category 1(b).

**¬ß 447.22 Forgings, castings, and machined bodies.**
Articles on the U.S. Munitions Import List include articles in a partially completed state (such as forgings, castings, extrusions, and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions Import List, (including components, accessories, attachments and parts) then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this part, except for such items as are in normal commercial use.

Exhibit 'J'







